# EXHIBIT 1

0.0/
- /0-0-00/ /cdl

## STANDARD FORM OFFICE LEASE
(BASE YEAR)

This Standard Form Office Lease ("Lease"), dated for reference purposes only as of March 21, 2012, is entered into by and between PTF FOR OPERATING ENGINEERS, LLC, a Delaware limited liability company ("Landlord"), and ASSOCIATED THIRD PARTY ADMINISTRATORS, a California corporation ("Tenant").

### ARTICLE I

### BASIC LEASE PROVISIONS

Each reference in this Lease to the "Basic Lease Provisions" shall mean and refer to the following terms, the application of which shall be governed by the provisions in the remaining Articles of this Lease.

1.       Address of Landlord:       c/o McMorgan & Company LLC
   One Front Street, Suite 500
   San Francisco, California 94111
   Attn: Asset Manager

2.       Premises Address:       1640 South Loop Road
   Alameda, California 94501

3.       Address of Tenant:       1640 South Loop Road
   Alameda, California 94501

4.       Tenant's Trade Name:  Associated Third Party Administrators

5.       Tenant's Contact:  Diane Gist, Sandi Snyder  Telephone:  (510) 337-3050

6.       Building Square Footage:  The parties have agreed that the Premises will be deemed to consist of 49,067 rentable square feet, regardless of whether or not the actual number of rentable square feet is greater or less than such agreed number of rentable square feet.

7.       Commencement Date:  July 1, 2012

8.       Term:  Sixty-Five (65) Months

9.       Monthly Rent:  The Monthly Rent payable by Tenant under the Lease during the Term shall be as follows:

| Period of the Term | Monthly Rent for Each Month During the Period |
|---|---|
| July 1, 2012 - Nov. 30, 2013 | $89,771.84 |
| Dec. 1, 2013 - Nov. 30, 2014 | $99,058.46 |
| Dec. 1, 2014 - Nov. 30, 2015 | $102,028.15 |
| Dec. 1, 2015 - Nov. 30, 2016 | $105,089.00 |
| Dec. 1, 2016 - Nov. 30, 2017 | $108,241.67 |

Alternate Monthly Rent Table If no Qualified Guarantor Recapitalization

Notwithstanding the above table, from and after October 1, 2013, the Monthly Rent shall be the following if there is no Qualified Guarantor Recapitalization by September 30, 2013:

| Period of the Term | Monthly Rent for Each Month During the Period |
|---|---|
| Oct. 1, 2013 - Nov. 30, 2013 | $58,977.10 |
| Dec. 1, 2013 - Nov. 30, 2014 | $88,261.72 |
| Dec. 1, 2014 - Nov. 30, 2015 | $91,233.41 |
| Dec. 1, 2015 - Nov. 30, 2016 | $94,294.26 |
| Dec. 1, 2016 - Nov. 30, 2017 | $97,446.93 |

10. Letter of Credit: $50,000.

11. Permitted Uses: General office purposes consistent with a first-class office building, all in accordance with Applicable Laws and the CC&Rs (as hereafter defined) and pursuant to approvals which have been obtained by Tenant or which are to be obtained by Tenant from all relevant City, County and other governmental agencies and authorities having jurisdiction.

12. Brokers: Cushman & Wakefield of California, Inc. is representing Landlord.

   CM Commercial Real Estate, Inc. ("Broker") is representing Tenant

13. Landlord's Architect: as designated by Landlord from time to time

14. Guarantor: United Benefits and Pension Services, Inc.

15. Vehicle Parking Spaces: Approximately 174 unreserved, unassigned vehicle parking spaces (or such number as exist on the Premises, from time to time).

16. Additional Insureds: Landlord; McMorgan and Company LLC

17. Tenant's Minimum Liability Insurance Limits: $5,000,000

18. Operating Expense Base Year: July 1, 2012 to June 30, 2013

Exhibits:  Exhibit A (Legal Description of Property)
Exhibit B (Rules and Regulations)
Exhibit C (Letter of Credit)
Exhibit D (Tenant Improvement Costs Approved as of March 30, 2012)

## ARTICLE II

### DEFINITIONS

   2.1    Certain Definitions.  The capitalized terms set forth below, unless the context clearly requires otherwise, shall have the following meanings in this Lease.

   "Additional Rent" means any and all sums (whether or not specifically called "Additional Rent" in this Lease), other than Monthly Rent, which Tenant is or becomes obligated to pay to Landlord under this Lease, but not including Tenant's obligations for damages due to improper use of the Premises, waste, or for indemnification, defense or attorneys' fees and costs.  See also Rent.

   "Alterations" means any alterations, decorations, modifications, additions or improvements made in, on, about, under or contiguous to the Premises (or relating to Tenant's use thereof) by or for the benefit of Tenant (other than the Tenant Improvements), including, but not limited to, telecommunications and data cabling and wiring, lighting, HVAC and electrical fixtures, pipes and conduits, transfer, storage and disposal facilities, partitions, drapery, wall coverings, shelves, cabinetwork and carpeting.

"Applicable Laws" is defined in Section 5.2.

"Applicable Rate" means the greater of seven percent (7%) per annum or three percent (3%) in excess of the discount rate of the Federal Reserve Bank of San Francisco in effect on the twenty-fifth (25th) day of the calendar month immediately prior to the event giving rise to the Applicable Rate imposition; provided, however, the Applicable Rate shall in no event exceed the maximum interest rate permitted to be charged by Applicable Laws.

"Broker" means, collectively, the person(s) or entity(ies) identified in Item 12 of the Basic Lease Provisions.

"Building" means that certain building commonly known as 1640 South Loop Road, Alameda, California, which is on and a part of the Premises.

"Casualty" is defined in Section 12.1.

"CC&Rs" means any covenants, conditions, restrictions or other contents of any document recorded, or which may in the future be recorded against all or any part of the Premises.

"City" means the city in which the Premises are located.

"Commencement Date" means the commencement date of the Term, described in Section 3.2.

"County" means the county in which the Premises are located.

"Event of Default" means the Tenant defaults described in Section 15.1.

"Guarantor" means the person(s) or entity identified in Item 14 of the Basic Lease Provisions, if any.

"HVAC" means the heating, ventilating and air conditioning system serving the Building.

"Hazardous Materials" is defined in Article VI.

"Landlord's Agents" means Landlord's agents, trustees, representatives, property managers (whether as agents or independent contractors), investment managers, attorneys, consultants, contractors, partners, managers, members, subsidiaries, affiliates, directors, officers and employees, including, without limitation, the Additional Insureds named in Item 16 of the Basic Lease Provisions.

"Landlord's Architect" means the architect or architectural firm from time to time designated by Landlord to perform the function of Landlord's Architect set forth in this Lease.

"Lease" means this instrument together with all exhibits, amendments, addenda and riders attached hereto and made a part hereof.

"Monthly Rent" means the monthly rental which Tenant is to pay to Landlord pursuant to Section 4.1, as the same may be adjusted from time to time as set forth in this Lease. See also Rent.

"Mortgage" means any mortgage, deed of trust, or similar lien now or hereafter affecting the Premises or any portion thereof, and any renewal, modification, consolidation, replacement and/or extension thereof.

"Mortgagee" means any mortgagee, beneficiary or lender under any Mortgage now or hereafter affecting the Premises or any portion thereof.

"Notice" means each and every notice, communication, request, demand, reply or advice, or duplicate thereof, in this Lease provided or permitted to be given, made or accepted by either party to the other party, which shall be in writing and given in accordance with the provisions of Section 21.6.

"Operating Expenses" means, collectively, Premises Costs and Real Property Taxes.

"Operating Expense Base Year" means the period defined in Item 18 of the Basic Lease Provisions.

"Premises" means the premises described in Exhibit A including the land so described and the Building and other improvements thereon.

"Premises Costs" is defined in Section 7.2.

"Premises Square Footage" means the entire area included within the Building which is a part of the Premises determined in accordance with the measurement standards set forth in the BOMA ANSI Z65.1 – 1996 Standard Method for Measuring Floor Area in Office Buildings as appropriate for single tenant office buildings. The Premises Square Footage as of the execution of this Lease is set forth in Item 6 of the Basic Lease Provisions and is subject to re-measurement in accordance with the provisions of Item 9 of the Basic Lease Provisions.

"Property" means the real property described in Exhibit A.

"Real Property Taxes" is defined in Section 7.3.

"Rent" means Monthly Rent and Additional Rent, collectively.

"Rules and Regulations" means, collectively, the rules and regulations attached hereto as Exhibit C and any modifications thereto promulgated by Landlord or Landlord's Agents from time to time.

"Security Deposit" means the amount set forth in Item 10 of the Basic Lease Provisions.

"Substantial Completion" and "substantially completed" means the Tenant Improvements, or repair of the Premises following a Casualty, have been fully completed except for minor details of construction, mechanical adjustments or decoration which do not materially interfere with Tenant's use and enjoyment of the Premises (items normally referred to as "punch list" items), all as reasonably determined by Landlord.

"Tenant Improvements" means those certain improvements, if any, to be constructed on the Premises as provided in Article XX.

"Tenant's Agents" means Tenant's agents, representatives, consultants, contractors, affiliates, subsidiaries, officers, directors, employees, subtenants, guests, customers and invitees.

"Tenant's Personal Property" means Tenant's removable trade fixtures, furniture, equipment and other personal property located in or on the Premises.

"Term" means the term of this Lease, as provided in Section 3.2.

"Unavoidable Delay" means any delays which are beyond a party's reasonable control, including, but not limited to, delays due to inclement weather, strikes, acts of God, inability to obtain labor or materials, inability to secure governmental approvals or permits, governmental restrictions, civil commotion, fire, earthquake, explosion, flood, hurricane, the elements, or the public enemy, action or interference of governmental authorities or agents, war, invasion, insurrection, rebellion, riots, lockouts or any other cause whether similar or dissimilar to the foregoing which is beyond a party's reasonable control; provided however, that in no event shall any of the foregoing ever apply with respect to the payment of any monetary obligation.

2.2    Other Definitions. Terms defined elsewhere in this Lease, unless the context clearly requires otherwise, shall have the meaning as there given.

## ARTICLE III

## PREMISES AND TERM

3.1    Lease of Premises. Subject to and upon the terms and conditions set forth herein, Landlord hereby leases the Premises to Tenant, and Tenant hereby leases the Premises from Landlord.

3.2    Term and Commencement. Unless sooner terminated as provided herein, the Term of this Lease shall be for that period of years and/or months set forth in Item 8 of the Basic Lease Provisions, and shall commence on the date set forth in Item 7 of the Basic Lease Provisions (the "Commencement Date").

3.3    Prior Lease.  Tenant is in possession of the Premises under an Office Building Lease dated December 29, 1994, (as amended, the "1994 Lease").  The Tenant shall continue to occupy the Premises under the 1994 Lease until the Commencement Date under this Lease at which time the term of the 1994 Lease shall be deemed to have expired and the Term of this new Lease shall commence.  All of Tenant's obligations under the 1994 Lease shall continue to apply through such expiration of the 1994 Lease and shall be computed and determined under and in accordance with the terms of the 1994 Lease.  Claims and obligations which are intended to survive the expiration of the 1994 Lease, including without limitation, claims and liabilities under the 1994 Lease for indemnity, defense, maintenance and replacement, and for the payment of rent thereunder, shall continue to apply to any claims, liabilities or obligations which arose during or which are allocable to the period prior to the expiration of the 1994 Lease.  Without limiting the generality of the foregoing, Tenant shall continue to perform all of its obligations under the 1994 Lease relating to the maintenance of the premises and improvements leased thereunder and shall, within ten (10) days after demand and documentation (receipts, work orders, etc.) by the Landlord under this Lease, pay all costs paid or incurred by Landlord for the correction, maintenance or replacement of any item or matter which were not in the condition required for surrender of the Premises under the 1994 Lease.  Such payment shall be additional Rent hereunder and the cost paid or incurred by Landlord on account of such correction, maintenance or replacement shall not be considered to be a Premises Cost hereunder.

3.4    Option to Extend.

(a)    Tenant shall have the option to extend the Term on all the provisions contained in this Lease for one (1) five-year period following expiration of the Initial Term, by giving written notice of exercise of the option (the "Option Notice") to Landlord at least two hundred seventy (270) days but not more than three hundred sixty-five (365) days before the expiration of the Initial Term.  Provided that, if Tenant is in default on the date of giving the Option Notice beyond any applicable cured periods, the Option Notice shall, at Landlord's election, be totally ineffective, or if Tenant is in default on the date the extended Term is to commence, subject to any applicable cured periods, the extended Term in question shall, at Landlord's election, not commence and this Lease shall expire at the end of the Term without the extended Term in question.  Tenant, shall have no other right to extend the Term of this Lease.

(b)    The Monthly Rent for each of the first twelve (12) months of the extended Term shall be the then current Fair Market Value for the Premises but not less than the Monthly Rent for the last full calendar month preceding the extended Term after deducting from such Monthly Rent the portion attributable to the amortization of the Tenant Improvement Allowance, if any.  As used herein, the "Fair Market Value" shall equal the monthly rent being paid for comparable space, with appropriate adjustments for the size of the Building and the Premises and the base year, but giving effect only to the following concessions ("Concessions"): (a) rental abatement concessions, if any, being granted such tenants in connection with such comparable space, and (b) tenant improvements or allowances provided or to be provided for such comparable space, including design/engineering fees and permits, and taking into account the existing improvements in the Premises, such value to be based upon the age, quality and layout of the improvements and the extent to which the same could be utilized by Tenant based upon the fact that the precise tenant improvements existing in the Premises are specifically suitable to Tenant, and, (c) real estate brokerage commission in connection with comparable transactions.  The Monthly Rent payable during the second and subsequent twelve month periods of the extended Term shall be subject to increases each December 1st so that the Monthly Rent is three percent (3%) higher than the Monthly Rent which was payable under this Lease during the preceding month.

(c)    The parties shall have thirty (30) days after Landlord receives the Option Notice in which to agree on  Fair Market Value applicable during the extended Term.  If the parties agree on the Fair Market Value for the extended Term during that period, they shall immediately execute an amendment to this Lease stating the terms.

(d)    If the parties are unable to agree on the Fair Market Value for the extended Term within that period, then within ten (10) days after the expiration of that period, each party, at its cost and by giving notice to the other party, shall appoint a real estate appraiser with at least five (5) years' full-time commercial appraisal experience in the area in which the Premises are located to appraise and set the Fair Market Value for the extended Term.  If a party does not appoint an appraiser within ten (10) days after the other party has given notice of the name of its appraiser, the single appraiser appointed shall be the sole appraiser and shall set the Fair Market Value for the extended Term.  If the two appraisers are appointed by the parties as stated in this paragraph, they shall meet promptly and attempt to set the Fair Market Value for the extended Term.  If they are unable to agree within thirty (30) days after the second appraiser has been appointed, they shall attempt to elect a third appraiser meeting the qualifications stated in this paragraph within

ten (10) days after the last day the two appraisers are given to set the Fair Market Value. If they are unable to agree on the third appraiser, either of the parties to this Lease by giving ten (10) days' notice to the other party can apply to the then president of the county real estate board of the county in which the Premises are located for the selection of a third appraiser who meets the qualifications stated in this Section, or either party may have the third appraiser appointed in the manner provided in Section 1281.6 of the California Code of Civil Procedure for appointment of an arbitrator. Each of the parties shall bear one-half (½) of the cost of appointing the third appraiser and of paying the third appraiser's fee. The third appraiser, however selected, shall be a person who has not previously acted in any capacity for either party.

(e)    Within thirty (30) days after the selection of the third appraiser, a majority of the appraisers shall set the Fair Market Value for the extended Term. If a majority of the appraisers are unable to set the Fair Market Value within the stipulated period of time, the three appraisals shall be added together and their total divided by three; the resulting quotient shall be the Fair Market Value for the Premises during the extended Term. If, however, the high appraisal is more than one hundred ten percent (110%) times the middle appraisal, or if the low appraisal is less than 90% times the middle appraisal, or both, then such appraisal which exceeds such percentage (in the case of the high appraisal) or which is lower than such percentage (in the case of the low appraisal) shall be disregarded. If only one appraisal is disregarded, the remaining two appraisals shall be added together and their total divided by two, and the resulting quotient shall be the Fair Market Value for the Premises during the extended Term. If both the low appraisal and the high appraisal are disregarded in the manner prescribed in this paragraph, then the middle appraisal shall be the Fair Market Value for the Premises during the extended Term.

3.5    <u>Tenant Termination Right</u>.    Tenant shall have the one-time right to cause the Term of this Lease to expire on the last day of the forty-first (41st) full calendar month of the Term of this Lease by giving notice exercising such right of early termination to Landlord at least twelve (12) full calendar months prior to the date on which the termination will become effective.  To be effective, such notice must be accompanied by the payment of the "Early Termination Fee."  As used herein the "Early Termination Fee" is the sum of the following:  (i) the amount of the unamortized leasing commissions and Tenant Improvements paid for by Landlord hereunder as of the last day of the sixth (6th) month following the effective date of the termination; (ii) the amount of the unamortized Imputed Free Rent provided hereunder as of the last day of the sixth (6th) month following the effective date of termination; and (iii) the Monthly Rent plus Operating Expenses which would be payable in months 42 through 47, inclusive, under this Lease if such termination were not exercised.  The amounts in clauses 3.5(i) and (ii) above shall be calculated using an interest rate factor of 8.5% per annum commencing as of the Commencement Date and assuming that such amounts are amortized evenly over the initial Term of the Lease, without extension or early termination.  The amounts in clause 3.5(iii) above shall equal the actual Monthly Rent for the months in question and six times the Additional Rent estimated, by Landlord, to be payable for the last full calendar month of the Term prior to the effective date of the termination.  As used herein, the term "Imputed Free Rent" is Four Hundred Eighty Thousand, Eight Hundred Fifty-Six and 60/100 Dollars ($480,856.60), which is the amount derived when the agreed rentable square feet of the Premises, 49,067, is multiplied by five (5) months and then multiplied by $1.96.

3.6    <u>"AS-IS" Condition of Premises</u>.    Tenant shall accept the Premises from Landlord in its "AS-IS" condition and Tenant acknowledges and agrees that Landlord has no obligation to improve, alter or remodel the Premises in any manner whatsoever.

3.7    <u>No Representations</u>.    Tenant acknowledges that neither Landlord nor any of Landlord's Agents has made any representations or warranties as to the suitability or fitness of the Premises for the conduct of Tenant's business, including, but not limited to, any representations or warranties regarding zoning or other land use matters, or for any other purpose, and that neither Landlord nor any of Landlord's Agents has agreed to undertake any alterations or additions or construct any tenant improvements to the Premises except as expressly provided in this Lease.

3.8    <u>Landlord Termination Right</u>.    If at any time during the Term the Landlord determines that termination of the Lease is required for continuing compliance with the Employee Retirement Income Security Act of 1974, as amended ("ERISA") by Landlord, this Lease shall terminate upon one hundred eighty (180) days' written notice to Tenant by Landlord.  Landlord shall notify Tenant as soon as it is reasonably determined that termination of the Lease is necessary in order to comply with ERISA.  If Landlord receives a notice of action or intended action by the I.R.S. or the Department of Labor or other agencies which leads Landlord to believe that it must terminate the Lease, Landlord will advise Tenant of the notice.  Landlord will allow Tenant to participate at all levels of appeal with said agency and exhaust any administrative remedies with the agency before terminating said Lease under this paragraph.

## ARTICLE IV

### RENT AND ADJUSTMENTS

4.1    Monthly Rent.  From and after the Commencement Date, Tenant shall pay to Landlord, for each calendar month of the Term, the Monthly Rent set forth in Item 9 of the Basic Lease Provisions. Monthly Rent shall be due and payable to Landlord in lawful money of the United States, in advance, on the first (1st) day of each calendar month of the Term, without abatement, deduction, claim or offset, and without prior notice, invoice or demand, at Landlord's address set forth in Item 1 of the Basic Lease Provisions or at such place as Landlord may from time to time designate.

4.2    Additional Rent.  All Additional Rent shall be due and payable to Landlord in lawful money of the United States, at Landlord's address set forth in Item 1 of the Basic Lease Provisions or at such other place as Landlord may from time to time designate, without abatement, deduction, claim or offset, within ten (10) days of receipt of Landlord's invoice or statement for same, or, if this Lease provides another time for the payment of certain items of Additional Rent, then at such other time.

4.3    Prorations.  If the Commencement Date is not the first (1st) day of a month, or if the expiration of the Term of this Lease is not the last day of a month, a prorated installment of Monthly Rent based on a thirty (30) day month shall be paid for the fractional month during which the Term commences or expires, as applicable.

4.4    Application of Payments.  Landlord shall have the right to apply payments received from Tenant under this Lease to any sums past or currently due under this Lease, whether Monthly Rent, Additional Rent or otherwise, in such order and in such amounts as Landlord, in its sole discretion, may elect, regardless of any designation of such payments by Tenant to the contrary.

4.5    Late Payment Charges.  Tenant acknowledges that late payment by Tenant to Landlord of Rent under this Lease will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which is extremely difficult or impracticable to determine.  Such costs include, but are not limited to, processing and accounting charges, late charges that may be imposed on Landlord by the terms of any Mortgage, and late charges and penalties that may be imposed due to late payment of Real Property Taxes.  Therefore, if any installment of Monthly Rent or any payment of Additional Rent due from Tenant is not received by Landlord in good funds by the fifth (5th) calendar day from the applicable due date, Tenant shall pay to Landlord an additional sum equal to five percent (5%) of the amount overdue as a late charge for every month or portion thereof that such amount remains unpaid. The parties acknowledge that this late charge represents a fair and reasonable estimate of the costs that Landlord will incur by reason of the late payment by Tenant.  Acceptance of any late Rent and late charge therefor shall not prevent Landlord from exercising any of the other rights and remedies available to Landlord for any other Event of Default under this Lease.  In no event shall this provision for a late charge be deemed to grant Tenant a grace period or extension of time within which to pay Rent or prevent Landlord from exercising any of the other rights and remedies available to Landlord for any Event of Default under this Lease.  Notwithstanding the foregoing (i) should any payment of Rent by personal check be rejected for insufficient funds, Landlord shall have the right, upon notice to Tenant, to require that all future payments by Tenant under this Lease be made in cashier's check acceptable to Landlord, and (ii) upon the third (3rd) occurrence during the Term of Tenant's failure to timely pay Rent when due, Landlord may, upon notice to Tenant, require that Monthly Rent for the balance of the Term be made in quarterly installments, in advance, in an amount equal to the sum of the Monthly Rent amounts payable during such three (3) month period.  Notice is hereby given to Tenant that the acceptance of partial Rent by Landlord shall not constitute a waiver by Landlord of any rights, including, without limitation, the right of Landlord to recover possession of the Premises and/or sue for the remaining balance owed.  The foregoing notice shall be deemed to constitute notice to Tenant as required under California Code of Civil Procedure Section 1161.1(c).

4.6    Grace Period.  Tenant shall have a one-time grace provision for late payments wherein no late payment penalty will be applicable so long as Tenant submits the full payment due within three (3) business days of delinquency notice from Landlord.

## ARTICLE V

### USE

5.1    Tenant's Use.  Tenant shall use the Premises solely for the purposes set forth in Item 11 of the Basic Lease Provisions and shall use the Premises for no other purpose.  Tenant's use of the Premises shall be subject to all of the terms and conditions of this Lease, including, but not limited to, all the provisions of this Article V.

Tenant, at Tenant's sole cost and expense, shall procure, maintain and make available for Landlord's inspection throughout the Term, all governmental approvals, licenses and permits required for the proper and lawful conduct of Tenant's permitted use of the Premises. At Landlord's request, Tenant shall deliver copies of all such approvals, licenses and permits to Landlord.

5.2     Compliance with Applicable Laws. As of the Commencement Date forward, and throughout the Term, Tenant, at Tenant's sole cost and expense, shall comply with, and shall not use the Premises, or suffer or permit anything to be done in or about the same which will in any way conflict with, (i) any and all present and future laws, statutes, zoning restrictions, ordinances, orders, regulations, directions, rules and requirements of all governmental or private authorities having jurisdiction over all or any part of the Premises (including, but not limited to, state, municipal, county and federal governments and their departments, bureaus, boards and officials) pertaining to the use or occupancy of, or applicable to, the Premises or privileges appurtenant to or in connection with the enjoyment of the Premises, (ii) any and all applicable federal, state and local laws, regulations or ordinances pertaining to air and water quality, Hazardous Materials (as defined in Article VI), waste disposal, air emissions and other environmental or health and safety matters, zoning, land use and utility availability, which impose any duty upon Landlord or Tenant directly or with respect to the use or occupation of the Premises or any portion thereof, (iii) the requirements of the Board of Fire Underwriters or other similar body now or hereafter constituted relating to or affecting the condition, use or occupancy of the Premises or any portion thereof, (iv) any covenants, conditions, easements or restrictions, including, but not limited to, the CC&Rs, now or hereafter affecting or encumbering the Premises or any portion thereof, regardless of when they become effective, and (v) the Rules and Regulations, (collectively, (i) through (v) above are hereinafter referred to as "Applicable Laws"). Tenant shall not be required to comply with any law that requires structural alterations unless the structural alterations are required as a result of Tenant's Alterations to the Building or Premises or any structural alteration triggered by any use specific to Tenant or triggered by any change in use by Tenant. Tenant shall immediately furnish Landlord with a copy of any notices received from any governmental agency, insurance company, or inspection bureau in connection with the Premises. Tenant shall not commit any waste of the Premises, or any public or private nuisance or any other act or thing which might or would disturb the quiet enjoyment of any other person or entity. Tenant shall not place or permit to be placed any loads upon the floors, walls or ceilings in excess of the maximum designed load specified by Landlord or which might damage the Premises or the Building, or place or permit to be placed any harmful liquids in the drainage systems, and Tenant shall not dump or store, or permit to be placed or stored, any inventory, waste materials, refuse or other materials or allow any such materials to remain outside the Building proper, except in designated enclosed trash areas. Tenant shall not conduct or permit any auctions, sheriff's sales or other like activities at the Premises. As of the Commencement Date, Landlord shall be responsible for the installation of all changes or upgrades to the Building structure or major Building systems, if any, required by any Applicable Laws, unless caused by or required in connection with: (i) Tenant's initial work; (ii) any Alteration during the Term; (iii) any change in use by Tenant; or, (iv) any use specific to Tenant other than general office uses.

5.3     CC&Rs. Tenant agrees that this Lease is subject and subordinate to the CC&Rs, as the same may now or hereafter exist, and that it will execute and deliver to Landlord within ten (10) days of Landlord's request therefor, any further documentation or instruments which Landlord deems necessary or desirable to evidence or effect such subordination. Without limiting the provisions of Section 5.2, Tenant shall, throughout the Term, timely comply with all of the terms, provisions, conditions and restrictions of the CC&Rs which pertain to, restrict or affect the Premises or Tenant's use thereof, or Tenant's use of any other area of the Premises permitted hereunder, including the payment by Tenant of any periodic or special dues or assessments charged against the Premises or Tenant which may be allocated to the Premises or Tenant in accordance with the provisions of the CC&Rs. Periodic or special dues and assessments which would constitute Premises Costs under this Lease if paid by the Landlord shall be paid by Landlord and such payments shall be treated as Premises Costs hereunder. Tenant shall hold Landlord, Landlord's Agents and the Premises harmless and shall indemnify, protect and defend Landlord and Landlord's Agents from and against any loss, expense, damage, attorneys' fees and costs or liability arising out of or in connection with the failure of Tenant to so perform or comply with the CC&Rs. Tenant agrees that it will subordinate this Lease to any other covenants, conditions and restrictions and any reciprocal easement agreements or any similar agreements which Landlord may hereafter record against the Premises and to any amendment or modification to any of the existing CC&Rs, provided that such subordination does not unreasonably interfere with Tenant's access to or use and enjoyment of the Premises.

5.4     Landlord's Right of Entry. Landlord and Landlord's Agents shall have the right to enter the Premises at all reasonable times upon twenty four (24) hour notice to Tenant (except for emergencies or to provide janitorial services, in which case no notice shall be required) to inspect the Premises, to take samples and conduct environmental investigations, to post notices of nonresponsibility and similar notices and signs indicating the availability of the Premises for sale, to show the Premises to interested parties such as prospective lenders and purchasers, to perform Landlord's obligations (or to exercise its rights) under this Lease, to perform Tenant's obligations as permitted herein when Tenant has failed to do so and, at any reasonable time after one hundred eighty

(180) days prior to the expiration of the Term, to place upon the Premises reasonable signs indicating the availability of the Premises for lease and to show the Premises to prospective tenants, all without being deemed to have caused an eviction of Tenant and without any liability to Tenant or abatement of Rent. The above rights are subject to reasonable security regulations of Tenant, and in exercising its rights set forth herein, Landlord shall use commercially reasonable efforts to minimize interference with Tenant's business. Landlord shall at all times have the right to retain a key which unlocks all of the doors in the Premises, excluding Tenant's vaults, safes and other areas as reasonably designated by Tenant and necessary to preserve Tenant's confidential or property information, and Landlord and Landlord's Agents shall have the right to use any and all means which Landlord may deem proper to open the doors in an emergency to obtain entry to the Premises, and any entry to the Premises so obtained by Landlord or Landlord's Agents shall not under any circumstances be deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an eviction of Tenant from the Premises.

## ARTICLE VI

### HAZARDOUS MATERIALS

With respect to the Premises, Tenant, at its sole cost and expense, shall comply with all laws, ordinances, regulations, and standards regulating or controlling hazardous wastes or hazardous substances, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. 9601, et seq., the Hazardous Material Transportation Act, 49 U.S.C. 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. 6901, et seq.; the Carpenter-Presley-Tanner Hazardous Substance Account Act, Health and Safety Code Section 25300, et seq.; the Underground Storage of Hazardous Substance Act, Health and Safety Section 25280, et seq.; the Safe Drinking Water and Toxic Enforcement Act of 1986 (Health and Safety Code Sections 25249.5, et seq.); and the Hazardous Waste Control Law, Health and Safety Code Sections 25100, et seq. (the "Environmental Laws"). Tenant shall indemnify, defend, protect and hold harmless the Landlord, the Landlord's Agents and any successors to the Landlord's interest in the chain of title to the Premises, their respective Landlord's Agents, and agents from and against any and all claims, suits, demands, response costs, contribution costs, liabilities, losses, or damages, directly or indirectly arising out of the existence, use, generation, manufacture, storage, transportation, release, threatened release, or disposal of Hazardous Materials (defined below) in, on, or under the Premises or in the groundwater under the Premises and the migration or transportation of Hazardous Materials to or from the Premises or the groundwater underlying the Premises; provided, however, that Tenant's obligation to so indemnify the Landlord shall not apply to any migration of Hazardous Materials onto the Premises from other properties to the extent that Tenant can establish, by clear and convincing evidence, that Tenant did not cause, contribute to or exacerbate any of the foregoing by Tenant's acts or omissions or by the acts or omissions of Tenant's Agents. This indemnity extends to the costs incurred by Landlord or its successors to reasonably repair, clean up, dispose of, or remove such Hazardous Materials in order to comply with the Environmental Laws, provided Landlord gives Tenant not less than thirty (30) days advance written notice of its intention to incur such costs, Tenant's obligations pursuant to the foregoing shall survive the expiration or sooner termination of this Lease. Tenant's Agents shall not use, generate, manufacture, store, transport, release, threaten release, or dispose of Hazardous Materials in, on, or about the Premises unless Tenant shall have received Landlord's prior written consent therefor, which Landlord may withhold or revoke at any time in its reasonable discretion, and shall not cause or permit the release or disposal of Hazardous Materials from the Premises except in compliance with applicable Environmental Laws. Tenant shall not permit any person, including, without limitation, Tenant's Agents to use, generate, manufacture, store, transport, release, threaten release, or dispose of Hazardous Materials in, on, or about the Premises or transport Hazardous Materials from the Premises unless Tenant shall have received Landlord's prior written consent therefor, which Landlord may withhold or revoke at any time in its reasonable discretion and shall not cause or permit the release or disposal of Hazardous Materials. Tenant shall promptly deliver written notice to Landlord if it obtains knowledge sufficient to infer that Hazardous Materials are located on the Premises that are not in compliance with applicable Environmental Laws or if any third party, including, without limitation, any governmental agency, claims a significant disposal of Hazardous Materials occurred on the Premises or is being or has been released from the Premises, or any such party gives notice of its intention to declare the Premises to be Border Zone Property (as defined in Section 25117.4 of the California Health and Safety Code). Upon reasonable written request of Landlord, Tenant, through its professional engineers and at its cost, shall thoroughly investigate suspected Hazardous Materials contamination of the Premises but not including any of the foregoing which Tenant proves, by clear and convincing evidence, were not caused by Tenant or Tenant's Agents. Tenant, using duly licensed and insured contractors, shall promptly commence and diligently complete the removal, repair, clean-up, and detoxification of any Hazardous Materials from the Premises but not including any of the foregoing which Tenant proves, by clear and convincing evidence, were not introduced by Tenant or Tenant's Agents as may be required by applicable Environmental Laws.

Notwithstanding anything to the contrary in this Lease, nothing herein shall prevent Tenant from using materials other than Hazardous Materials on the Premises as would be used in the ordinary course of the Tenant's

business as contemplated by this Lease. Tenant warrants and represents to Landlord that Tenant does not in the course of the Tenant's current business use Hazardous Materials other than office and cleaning supplies typically used in first class office buildings and Tenant agrees that it will not have such supplies, on the Premises, in amounts in excess of the smallest amounts reasonably necessary for the conduct of Tenant's business. If, during the Term, Tenant contemplates utilizing Hazardous Materials (or subleases/assigns this Lease to a subtenant or assignee who utilizes Hazardous Materials), Tenant shall obtain prior written approval from Landlord. Landlord, at its option, and at the Tenant's expense, may cause an engineer selected by Landlord, to review (a) the Tenant's operations including materials used, generated, stored, disposed, and manufactured in the Tenant's business, and (b) the Tenant's compliance with terms of this Article VI. Tenant shall provide the engineer with such information reasonably requested by the engineer to complete the review. The first such review may occur prior to or shortly following the Commencement Date. Thereafter, such review shall not occur more frequently than once each year unless cause exists for some other review schedule. The fees and costs of the engineer shall be paid promptly by Tenant to Landlord upon receipt of written notice of such fees and costs.

"Hazardous Materials" means any hazardous waste or hazardous substance as defined in any federal, state, county, municipal, or local statute, ordinance, rule, or regulation applicable to the Premises, including, without limitation, the Environmental Laws. "Hazardous Materials" shall also include asbestos or asbestos-containing materials, radon gas, petroleum or petroleum fractions, urea formaldehyde foam insulation, transformers containing levels of polychlorinated biphenyls greater than 50 parts per million, and chemicals known to cause cancer or reproductive toxicity, whether or not defined as a hazardous waste or hazardous substance in any such statute, ordinance, rule, or regulation.

## ARTICLE VII

### OPERATING EXPENSES; TAXES; UTILITIES

7.1    Tenant to Pay Increases in Operating Expenses.   Tenant shall pay to Landlord, as an item of Additional Rent, Operating Expenses in excess of the Operating Expenses paid or incurred by Landlord during the Operating Expense Base Year as follows: Prior to July 1, 2013, and prior to each July 1 thereafter during the Term, Landlord shall give Tenant Landlord's written estimate of the amount by which Operating Expenses for the next fiscal year (from July 1 through June 30, inclusive) or partial fiscal year, as the case may be, are estimated to exceed the Operating Expenses for the Operating Expense Base Year. Commencing on July 1, 2013 and continuing thereafter throughout the Term, Tenant shall pay, as an item of Additional Rent, such estimated amount, notice of which shall be provided to Tenant by Landlord, in equal monthly installments, in advance, on or before the first (1st) day of each calendar month. If Landlord has not furnished its written estimate by the time set forth above, Tenant shall pay monthly installments of Operating Expenses for the fiscal year in question at the rate established for the prior fiscal year, if any; provided that when the new estimate is delivered to Tenant, Tenant shall at the next monthly payment date pay Landlord any accrued deficiency based on the new estimate, or Landlord shall credit any accrued overpayment based on such estimate toward Tenant's next installment payment hereunder. Within a reasonable period of time after the end of each fiscal year starting with the fiscal year which ends June 30, 2014, Landlord shall furnish Tenant a statement ("Annual Statement") showing, in commercially reasonable detail, the actual Operating Expenses for such fiscal year in excess of the Operating Expenses paid or incurred by Landlord during the Operating Expense Base Year; provided, however, with respect to the fiscal year during which this Lease expires or sooner terminates, rather than wait until after the determination of actual Operating Expenses for such fiscal year to furnish Tenant with an Annual Statement for said fiscal year, Landlord may, at its election, provide Tenant with an Annual Statement for such fiscal year prior to the end of such fiscal year based on estimated (not actual) Operating Expenses for such fiscal year, as determined by Landlord, which Annual Statement shall not be subject to further adjustment or reconciliation once actual Operating Expenses are determined for such fiscal year. If Tenant's estimated payments are less than the actual amount by which Operating Expenses for the fiscal year in question exceed the Operating Expenses paid or incurred by Landlord during the Operating Expense Base Year as shown by the applicable Annual Statement, Tenant shall pay the difference to Landlord within thirty (30) days thereafter. If Tenant shall have overpaid Landlord, Landlord shall credit such overpayment toward Tenant's next installment payment due hereunder. When the Annual Statement is furnished to Tenant for the fiscal year in which this Lease expires or sooner terminates, Tenant shall, even if this Lease has expired or sooner terminated, pay to Landlord within fifteen (15) days after notice the excess of the actual Operating Expenses set forth in such Annual Statement in excess of the Operating Expenses paid or incurred by Landlord during the Operating Expense Base Year over the amounts paid by Tenant on account of such Operating Expenses. Conversely, any overpayment shall be rebated by Landlord to Tenant within fifteen (15) days. If this Lease expires or sooner terminates on a day other than the last day of a fiscal year, Tenant's share of Operating Expenses for such partial fiscal year shall be calculated over the entire twelve-month fiscal year, but shall be prorated on the basis by which the number of days from the commencement of such fiscal year to and including the expiration or sooner termination of this Lease bears to 365. If Landlord shall reasonably determine, at any time, that Landlord's estimate of the amount by which Operating

Expenses for a fiscal year will exceed the Operating Expenses paid or incurred by Landlord during the Operating Expense Base Year is or will become significantly different than the actual increase in such Operating Expenses for any reason, Landlord may, at its election, determine the approximate amount of such inadequacy and issue a supplemental estimate as to Tenant's share of such Operating Expenses, and Tenant shall pay any increase as reflected by such supplemental estimate. Landlord shall keep or cause to be kept separate and complete books of accounting covering all Operating Expenses and showing the method of calculating the amount of Operating Expenses payable by Tenant hereunder, and shall preserve, for at least twelve (12) months after the close of each fiscal year, all material documents evidencing said Operating Expenses for that fiscal year. Provided Tenant objects to the Annual Statement within forty-five (45) days after Landlord's delivery of such statement, for a period of one hundred twenty (120) days following Tenant's receipt of an Annual Statement, Tenant, at its sole cost and expense, through members of its accounting staff who are CPAs or a certified public accountant retained by it on a non-contingency fee basis, shall have the right, upon written notice to Landlord indicating the portion of the Annual Statement that is at issue, during reasonable business hours at Landlord's offices, to examine and/or audit the books and documents mentioned above evidencing such costs and expenses for the period covered by the applicable Annual Statement, so long as, at the time of any such examination or audit desired by Tenant no uncured Event of Default then exists under this Lease. As a condition precedent to Tenant's exercise of its right of objection, dispute, inspection and/or audit as set forth in this Section 7.1, Tenant shall not be permitted to withhold payment of, and Tenant shall timely pay to Landlord, the full amounts as required by the provisions of this Article VII in accordance with the Annual Statement.  Tenant shall keep confidential any information obtained by Tenant or Tenant's accountant or agent, as well as the results of the audit and any change in Tenant's share of Operating Expenses arising therefrom.  If Tenant does not notify Landlord of any objection to the Annual Statement within forty-five (45) days of Landlord's delivery thereof, Tenant shall be deemed to have accepted such Annual Statement as true and correct and shall be deemed to have waived any right to dispute Tenant's share of Operating Expenses due pursuant to such statement.  Any delay or failure by Landlord in delivering any estimate or statement pursuant to this Section 7.1 shall not constitute a waiver of its right to require Tenant to pay Operating Expenses for a particular fiscal year to the extent in excess of the Operating Expenses paid or incurred by Landlord during the Operating Expense Base Year pursuant hereto.

7.2    Definition of Premises Costs.  The term "Premises Costs" means all costs and expenses paid or incurred by Landlord or Landlord's Agents in connection with the operation of the Premises, including, but not limited to, the following: janitorial services, repair and maintenance of the roof, structural frame, foundation and exterior walls of the Building and other improvements on the Premises, periodic painting of the Building and other improvements on the Premises, periodic cleaning of the exterior windows of the Building, landscaping services, outside pest control, normal maintenance and repair of the HVAC through maintenance contracts or otherwise, sweeping, maintenance services, repairs to and replacement of asphalt paving, bumpers, striping, light bulbs, light standards, monument and directional signs and lighting systems, perimeter walls, retaining walls, sidewalks, planters, landscaping and sprinkler system in planting area, any and all assessments levied against the Premises pursuant to the CC&Rs, water, electrical and other utility services not supplied directly to a tenant, removal of trash, rubbish and other refuse from the Premises, cleaning of and replacement of signs of the Premises, including relamping and repairs made as required; repair, operation and maintenance of the Premises and payment of all electrical, water and other utility charges or fees for services furnished to the Premises; obtaining and maintaining public liability, property damage and other forms of insurance which Landlord may or is required to maintain in connection with the Premises (including the payment of any deductibles or self insured retention thereunder); costs incurred in connection with compliance with any laws or changes in laws applicable to the Premises, including, without limitation, any laws or changes in laws regarding Hazardous Materials; establishment of reasonable reserves for replacements and/or repair of the Premises, equipment and supplies; employment of such personnel as Landlord may deem reasonably necessary, if any, to police the Premises and facilities; the cost of any capital improvements made by or on behalf of Landlord to the Premises but only if such capital expenditures are expended to (i) reduce Premises Costs, (ii) to repair or to replace existing improvements or equipment with like-kind or upgraded replacements or, (iii) required by Applicable Law and then only to the extent of the amortized amount thereof over the useful life of such capital improvements (or, in the case of capital improvements made to reduce Premises Costs, over the "payback" period, which is the shorter of the useful life of the capital improvement and period over which Landlord estimates the initial cost will be saved in cost savings), calculated at a market cost of funds, as determined by Landlord, which determination is currently eight (8%) percent, for each year of the applicable amortization period during the Term; depreciation of machinery and equipment used in connection with the maintenance and operation of the Premises for which a reasonable reserve has not been established as herein provided; employment of personnel used in connection with any of the foregoing, including, but not limited to, payment or provision for unemployment insurance, worker's compensation insurance and other employee costs; the cost of bookkeeping, accounting and auditing and legal services provided in connection with any of the foregoing; the cost of any environmental consultant or other services used in connection with Landlord's monitoring of the Premises with respect to Hazardous Materials; the cost of any tax, insurance or other consultant utilized in connection with the Premises; and any other items reasonably necessary from time to time to properly repair, replace, maintain and operate the Premises.  Premises Costs shall

also include a management fee to cover management, overhead and administrative expenses; provided however, if Landlord elects to delegate its duties hereunder to a professional property manager, then Premises Costs shall not include any management fee to Landlord (except for any costs and/or administrative and overhead expenses reasonably incurred by Landlord in monitoring and auditing the performance delegated to the professional property manager), but under such circumstances any reasonable amounts paid to the professional property manager shall be added to and deemed a part of Premises Costs. Premises management fees payable to Landlord or to another property manager shall not exceed three percent (3%) of the Monthly Rent payable hereunder. If Landlord elects to perform any maintenance or repair herein described in conjunction with properties other than the Premises, and if a common maintenance contractor is contracted with for such purpose, the contract amount allocable to the Premises, as reasonably determined by Landlord, shall be added to and deemed a part of Premises Costs hereunder. Premises Costs shall also include any costs, expenses and other charges levied or charged against Landlord and/or the Premises under the CC&Rs. Increases in Premises Costs by reason of a disproportionate impact by Tenant thereon (for example, and not by way of limitation, increases in costs of trash collection because of Tenant's excessive generation of trash or increases in costs of Premises maintenance because of Tenant's unpermitted storage of inventory or materials in the Premises), in Landlord's reasonable judgment, may be billed by Landlord, as an item of Additional Rent, directly to Tenant. Expenditures for capital improvements or other capital items which are otherwise included in the definition of "Premises Costs" shall not be included when computing Premises Costs which have been paid or incurred during the Operating Expense Base Year but shall be included in computing Premises Costs paid or incurred in all periods subsequent to the Operating Expense Base Year.

7.3      Premises Costs Exclusions. Premises Costs shall not include the following:

(a)      Any ground lease rental;

(b)      Costs incurred by Landlord for the repair of damage to the Building to the extent that Landlord is reimbursed by insurance or condemnation proceeds or by Tenant, warrantors or other third persons;

(c)      Depreciation, amortization and interest payments, except as specifically permitted elsewhere in the Lease, and except upon materials, tools, supplies and vendor-type equipment purchased by Landlord, and when depreciation or amortization is permitted or required, the item shall be amortized over the reasonably anticipated useful life of the item in question;

(d)      Marketing costs including leasing commissions, attorney's fees in connection with the negotiation and preparation of letters, deal memos, letter of intent, leases, subleases and/or assignments, space planning costs, and other costs and expenses incurred in connection with lease, sublease and/or assignment negotiations and transactions with any entity other than Tenant;

(e)      Except as permitted elsewhere in the Lease, costs of a capital nature, including without limitation, capital improvements, capital replacements, capital repairs, capital equipment and capital tools ("Capital Items");

(f)      Interest, principal, points and fees on debt or amortization on any mortgage, deed of trust or other debt encumbering the Premises;

(g)      Attorney's fees and other costs and expenses incurred in connection with negotiations or disputes with present or prospective Tenants or other occupants of the Building;

(h)      Expenses in connection with services or other benefits which are not offered to Tenant, or for which Tenant is charged for directly;

(i)      Costs incurred by Landlord due to the violation by Landlord of the terms and conditions of any lease of space in the Building;

(j)      Overhead and profit increment paid to Landlord or to subsidiaries or affiliates of Landlord for goods and/or services provided to the Building to the extent the same exceeds the overhead and profit that would generally be charged for such goods and/or services if rendered on a competitive basis, based upon a standard of comparable buildings by unaffiliated third parties capable of providing such services; provided, however, that nothing in this subparagraph (j) shall restrict Landlord's right to employ an affiliate of

Landlord to manage the Property, to pay such affiliate administrative, management fee and other compensation and to include such aggregate amount in Premises Costs;

(k)     Costs of Landlord's general corporate overhead;

(l)     Electric power costs for which Tenant directly contracts with the local public service company;

(m)     Landlord's charitable or political contributions;

(n)     Rentals for items (except when needed in connection with replacement, repairs or maintenance of permanent systems) which if purchased, rather than rented, would constitute a cost of a capital nature which is specifically excluded above;

(o)     Rentals and other related expenses incurred in leasing HVAC systems, elevators or other equipment ordinarily considered to be costs of a capital nature, except for (1) expenses in connection with making repairs on or keeping systems in operation while repairs are being made and (2) costs of equipment not affixed to the Building which is used in providing janitorial or similar services;

(p)     Advertising and promotional expenditures;

(q)     Costs incurred in connection with upgrading the Property to comply with handicap (including ADA), life, fire and safety codes as such codes are interpreted to apply to the project by the responsible public officials as of a time which is prior to the Commencement Date as indicated in a notice received by Landlord prior to the Commencement Date;

(r)     Tax penalties incurred as a result of Landlord's negligence, inability or unwillingness to make payments and/or to file any income tax or informational returns when due;

(s)     Costs associated with the operation of the business of the partnership or entity which constitutes Landlord as the same are distinguished from the costs of operation of the Premises, including partnership accounting and legal matters, costs of defending any lawsuits with any mortgagee (except as the actions of Tenant may be in issue), costs of selling, syndicating, financing, mortgaging or hypothecating any of Landlord's interest in the Building, or costs of any disputes between Landlord and its employees (if any) not engaged in Building or Project operation, disputes of Landlord with Building management;

(t)     Costs of signs in or on the Building identifying the owner of the Building;

(u)     Costs to remove Hazardous Materials from the Premises (other than those: (i) incurred to remove trash, garbage, materials or refuse generated from the Premises, (ii) which are paid or incurred to address Hazardous Materials which have appeared suddenly and accidentally or whose removal was not required at the Commencement Date; (iii) to remove Hazardous Materials from the Premises as a result of any use or change in use by Tenant or to accommodate any alteration made by or for the benefit of Tenant.

(v)     Real Property Taxes.

7.4     Definition of Real Property Taxes.  The term "Real Property Taxes" means any form of tax, assessment, charge, license, fee, rent tax, levy, penalty (if a result of Tenant's delinquency), real property or other tax (other than Landlord's net income, estate, succession, inheritance, or franchise taxes), now or hereafter imposed with respect to the Premises or any part thereof (including any Alterations), this Lease or any Rent payable under this Lease by any authority having the direct or indirect power to tax, or by any city, county, state or federal government or any improvement district or other district or division thereof, whether such tax or any portion thereof (i) is determined by the area of the Premises or any part thereof or the Rent payable under this Lease by Tenant, including, but not limited to, any gross income or excise tax levied by any of the foregoing authorities with respect to receipt of the Rent due under this Lease, (ii) is levied or assessed in lieu of, in substitution for, or in addition to, existing or additional taxes with respect to the Premises or any part thereof whether or not now customary or within the contemplation of Landlord or Tenant, or (iii) is based upon any legal or equitable interest of Landlord in the Premises or any part thereof.

7.5    Apportionment of Taxes. If the Premises are assessed as part of a larger parcel, then Landlord shall equitably apportion the Real Property Taxes assessed against the real property, which includes the Premises, and reasonably determine the amount of Real Property Taxes attributable to the Premises. If other buildings exist on the assessed parcel, the Real Property Taxes apportioned to the Premises shall be based upon the ratio of the square footage of all buildings within the Premises to the square footage of all buildings on the assessed parcel, and the amount of Real Property Taxes so apportioned to the Premises shall be included as part of Operating Expenses. Landlord's reasonable determination of such apportionment shall be conclusive.

7.6    Tax on Improvements. Tenant shall, at Landlord's election, be directly responsible for and shall pay the full amount of any increase in Real Property Taxes attributable to the Tenant Improvements and any other any improvements of any kind whatsoever placed in, on or about the Premises during the Term for the benefit of, at the request of, or by Tenant, which payment shall be made by Tenant to Landlord within ten (10) days following Landlord's written demand therefor from time to time.

7.7    Utilities and Services. Landlord agrees to furnish to the Premises (a) during reasonable hours of generally recognized business days, as established by Landlord from time to time ("Building standard hours"; currently Monday through Friday (excluding Holidays (as defined below)), 8 a.m. to 6 p.m.), subject to the conditions and in accordance with the standards set forth in the Rules and Regulations, as may be amended in writing by Landlord from time to time during the Term of this Lease and delivered to Tenant, reasonable quantities of electric current for normal lighting and fractional horsepower office machines, water for lavatory and drinking purposes, heat and air conditioning required in Landlord's judgment for the comfortable use and occupation of the Premises, and to the extent provided in the Building only, elevator service by non-attended automatic elevators, and (b) janitorial service, five (5) days per week (excluding Holidays), at such times as determined by Landlord from time to time and consistent with the standards set forth in the attached Schedule 7.7, Janitorial Specifications, as the same may be modified by Landlord from time to time, based on Landlord's property management practices. Except as otherwise provided herein, the cost of all such utilities and services shall be included within the definition of Premises Costs, and shall be paid by Tenant in the manner set forth in Section 7.1. Landlord shall not be liable for, and Tenant shall not be entitled to terminate this Lease or to any abatement or reduction of Rent by reason of Landlord's failure to furnish any of the foregoing when such failure is caused by accident, breakage, repairs, Unavoidable Delay or by any other causes. Tenant may request that specific vendors be used by Landlord for the provision of building operating and management services to be furnished by Landlord through independent contractors hereunder and, so long as Landlord has no reasonable objection to such contractors, Landlord shall utilize such independent contractors for such purposes; provided, however, if the cost of using any such independent contractor exceeds the bid Landlord obtains for such period, then the amount of the cost of the service included in the Operating Expenses for purposes of computing Operating Expenses paid or incurred in the Operating Expense Base Year, shall not include the excess cost of Tenant's vendor which provides the service, and Tenant shall pay such excess cost for the Operating Expense Base Year on a monthly basis, in a manner similar to that provided in Section 7.1 hereof. At Landlord's election all such contracts shall be with independent contractors who are signatory to a union, collective bargaining agreement. At Tenant's election, all such contracts shall be with such signatories, provided such signatories are ready, willing and able to perform under such contracts. If Tenant requires or utilizes more water or electrical power than is considered reasonable or normal by Landlord, Landlord may at its option require Tenant to pay, as Additional Rent, the cost, as reasonably determined by Landlord, incurred by such extraordinary usage. In addition, Landlord may install separate meter(s) for the Premises, at Tenant's sole expense, and Tenant thereafter shall pay all charges of the metered service. If such utilities and services (including, without limitation, HVAC service) are requested by Tenant during hours other than the Building standard hours, Landlord shall use reasonable efforts to furnish such utilities and services upon reasonable notice from Tenant, and Tenant shall pay Landlord's charges for such utilities and services therefor on demand as Additional Rent (after-hours HVAC services are charged by Landlord on a per hour basis; Landlord's current charge for after-hours HVAC services is $50 per hour, or any portion thereof, which charge is subject to adjustment by Landlord from time to time). Tenant shall cooperate with any present or future government conservation requirements and with any conservation practices established by Landlord. If there is any failure, stoppage or interruption of any services provided hereunder, Landlord shall use reasonable diligence to resume services promptly. Landlord shall at all times have free access to all mechanical installations of the Building and Premises, including, but not limited to, air conditioning equipment and vents, fans, ventilating and machine rooms and electrical closets. Tenant shall be solely responsible for securing telecommunications services to the Premises, all at its sole cost and expense, and Landlord shall have no responsibility therefor. For purposes of this Lease, "Holidays" means those days recognized by any federal, state or local governmental agency as a holiday which Landlord, in its sole discretion, designates from time to time as "Holidays" for purposes of this Lease, such designation being subject to change from time to time. Notwithstanding the foregoing: (i) in the event that, due solely to Landlord's negligence or willful misconduct, Landlord is unable to supply any of the Building's sanitary, electrical, heating, air conditioning, water, elevator, life safety or other essential system serving the Premises (collectively, the "Essential Services"), and such inability of Landlord prevents Tenant from using the Premises for a period of five (5) consecutive business days after Landlord receives notice from the Tenant that such Essential Services are not being

furnished, the Monthly Rent shall be abated on a day-for-day basis for each day commencing with the sixth (6th) business day of such prevention and continuing until such prevention ceases. The commencement of such rental abatement shall be postponed (or if rental abatement has commenced it shall be suspended) during any period when Landlord is unable to correct the Landlord's inability to furnish Essential Services due to events or circumstances which are not within the reasonable control of the Landlord. Such abatement shall be Tenant's sole remedy in the event of Landlord's inability to furnish Essential Services. If there is any disagreement over the Tenant's right to such abatement, then the Tenant shall continue to pay Rent hereunder, without such abatement, and the question of the right to such abatement shall be resolved by agreement or, if agreement is not reached within thirty (30) days after either party notifies the other party that the disagreement is subject to a thirty (30) day resolution period, then the disagreement shall be resolved by a final judgment of a court of competent jurisdiction.

## ARTICLE VIII

## ALTERATIONS

8.1    <u>Permitted Alterations</u>. Tenant shall not make or permit any Alterations without the prior written consent of Landlord (which consent shall not be unreasonably withheld, conditioned or delayed). Notwithstanding the foregoing, Tenant shall be permitted to make Alterations following not less than twenty (20) business days notice to Landlord, but without Landlord's prior approval, to the extent any such Alteration is merely non-structural and cosmetic in nature (i.e. re-painting and re-carpeting for which no permit or governmental approval is required) and costs less than $50,000 cumulatively over the Term, and provided that such alteration does not affect the exterior of the Building, the structure of the Building or the systems and equipment of the Building. Notwithstanding the foregoing, in no event shall any Alterations (i) affect the exterior of the Building or the outside areas of the Premises (or be visible from adjoining sites), (ii) affect or penetrate any of the structural portions of the Building, including, but not limited to, the roof, or (iii) require any change to the structural or mechanical components of the Premises, (iv) interfere in any manner with the proper functioning of or Landlord's access to any mechanical, electrical, plumbing or HVAC systems, facilities or equipment located in or serving the Building, or (v) diminish the value of the Premises. All Alterations shall be constructed pursuant to plans and specifications previously provided to and, when applicable, approved in writing by Landlord, shall be installed by a licensed contractor at Tenant's sole expense in compliance with all Applicable Laws, and shall be accomplished in a good and workmanlike manner conforming in quality and design with the Premises existing as of the Commencement Date and in accordance with the provisions of Section 22.1 below. No Hazardous Materials, including, but not limited to, asbestos or asbestos-containing materials, shall be used by Tenant or Tenant's Agents in the construction or installation of any Alterations permitted hereunder. Tenant shall, if required by Landlord, obtain and pay for, at Tenant's own expense, a completion and indemnity bond covering such Alterations, the form and amount of which shall be subject to approval of Landlord. All Alterations made by Tenant shall be and become the property of Landlord upon the construction or installation thereof and shall not be deemed Tenant's Personal Property. Landlord may, at its option, require that Tenant, upon the expiration or sooner termination of this Lease, at Tenant's expense, remove any or all Alterations and return the Premises to its condition as of the Commencement Date, normal wear and tear excepted; provided Landlord reserved the right to require such restoration at the time Landlord consented to such Alterations. Notwithstanding any other provisions of this Lease, Tenant shall be solely responsible for the maintenance, repair and replacement of any and all Alterations made by or for the benefit of Tenant (including, without limitation, by Landlord for the benefit of Tenant). In addition, Tenant shall be responsible for the payment of any increases in Real Property Taxes that are attributable to any Alterations (but not to any Tenant Improvements), which payment shall be made by Tenant to Landlord within ten , (10) days following Landlord's written demand therefor from time to time. Tenant shall reimburse Landlord for all costs, fees and expenses incurred by Landlord with respect to the proposed Alterations. Landlord's approval of any plans and specifications for any such work shall not constitute a warranty or representation with respect thereto.

8.2    <u>Trade Fixtures; Taxes</u>. Tenant shall, at its own expense, provide, install and maintain in good condition all of Tenant's Personal Property required in the conduct of its business in the Premises. Tenant shall pay before delinquency any and all taxes, assessments, license fees and public charges levied, assessed or imposed against Tenant or Tenant's estate in this Lease or the property of Tenant situated within the Premises which become due during the Term, including, without limitation any Alterations and Tenant's Personal Property. Upon request by Landlord, Tenant shall promptly furnish Landlord with satisfactory evidence of these payments.

8.3    <u>Mechanics' Liens</u>. Tenant shall give Landlord Notice of Tenant's intention to perform any work on the Premises which might result in any claim of lien at least ten (10) days prior to the commencement of such work to enable Landlord to post and record a notice of nonresponsibility or other notice Landlord deems proper prior to the commencement of any such work. Tenant shall not permit any mechanic's, materialmen's or other liens to be filed against the Premises or any portion thereof or against Tenant's leasehold interest in the Premises. If Tenant fails to cause the release of record of any lien(s) filed against the Premises or any portion thereof or its leasehold estate in

the Premises by payment or posting of a proper bond within ten (10) days from the date of the lien filing(s), then Landlord may, at Tenant's expense, cause such lien(s) to be released by any means Landlord deems proper, including, but not limited to, payment of or defense against the claim giving rise to the lien(s). All sums reasonably disbursed, deposited or incurred by Landlord in connection with the release of the lien(s), including, but not limited to, all costs, expenses and actual attorneys' fees, shall be due and payable by Tenant to Landlord, as an item of Additional Rent, on demand by Landlord, together with interest thereon at the Applicable Rate from the date of such demand until paid by Tenant.

8.4   <u>Alterations by Landlord</u>.  Landlord reserves the right at any time and from time to time without the same constituting an actual or constructive eviction and without incurring any liability to Tenant therefor or otherwise affecting Tenant's obligations under this Lease, to make such changes, alterations, additions, improvements, repairs or replacements in or to the Building (including the Premises if required to do so by any Applicable Laws) and the fixtures and equipment thereof, as well as in or to the street entrances, walls, passages, and stairways thereof, or to change the name by which the Building is commonly known, as Landlord may deem necessary or desirable so long as such changes do not materially interfere with or materially impair Tenant's access to or use or occupancy of the Building, Premises or the parking areas.  Nothing contained herein shall be deemed to relieve Tenant of any duty, obligation or liability of Tenant with respect to making any repair, replacement or improvement or complying with any Applicable Laws in connection with the Premises, and nothing contained herein shall he deemed or construed to impose upon Landlord any obligation, responsibility or liability whatsoever for the care of the Building or any part thereof other than as otherwise especially provided in this Lease.

## ARTICLE IX

## MAINTENANCE AND REPAIR

9.1   <u>Landlord's Maintenance and Repair Obligations</u>.  Landlord shall, subject to Section 9.2, Article XII and Article XIII, maintain in good condition and repair the roof, exterior walls, structural elements and foundation of the Building, provide normal maintenance services for the HVAC serving the Building through maintenance contracts or otherwise, and paint the exterior of the Building and clean the exterior windows of the Building as and when such painting or window cleaning, as the case may be, becomes necessary in Landlord's sole discretion.  Landlord shall also provide maintenance and repair services to the electrical, plumbing, fire/life safety and mechanical systems serving the Premises.  Landlord shall not be required to make any repairs unless and until Tenant has notified Landlord in writing of the need for such repair and Landlord shall have a reasonable period of time thereafter to commence and complete said repair, if warranted.  The cost of any maintenance and repairs on the part of Landlord provided for in this Section 9.1 shall be considered part of Premises Costs, except that repairs which Landlord deems arise out of any negligent act or omission of Tenant or Tenant's Agents shall be made at the expense of Tenant. Landlord's obligation to so repair and maintain the Premises shall be limited to the cost of effecting such repair and maintenance and in no event shall Landlord be liable for any costs or expenses in excess of said amounts, including, but not limited to, any consequential damages, opportunity costs or lost profits incurred or suffered by Tenant.

9.2   <u>Tenant's Maintenance and Repair Obligations</u>.  Tenant shall at all times during the Term of this Lease, at Tenant's sole cost and expense, clean, keep, maintain, repair and make necessary improvements to the interior portions of the Building· and ·every·portion·thereof· and all· improvements therein·or thereto, in good· and sanitary order and condition to the reasonable satisfaction of Landlord and in compliance with all Applicable Laws, usual wear and tear excepted. The performance of such obligations shall be subject to the requirements of Section 22.1 below.  Tenant shall pay all costs of operating, maintaining and replacing the HVAC equipment serving Tenant's data center on the Premises, all costs for the electricity to run such HVAC equipment and Tenant's data center and all other equipment therein, and such costs shall not be considered Operating Expenses hereunder.  If the HVAC equipment is not separately metered, Tenant shall arrange to have such HVAC equipment separately metered and the cost of the meter and its installation shall be split equally between Landlord and Tenant.  Any damage or deterioration of the Premises shall not be deemed usual wear and tear if the same could have been prevented by good maintenance practices by Tenant.  Tenant's repair and maintenance obligations herein shall include, but are not limited to, all necessary maintenance and repairs to all portions of the Premises, and all exterior entrances, all glass, windows, window casements, show window moldings, partitions, doors, doorjambs, door closures, hardware, fixtures, electrical lighting and outlets, plumbing fixtures, sewerage facilities, interior walls, floors, ceilings, skylights, fans and exhaust equipment, and fire extinguisher equipment and systems.  As part of its maintenance obligations hereunder, Tenant shall, at Landlord's request, provide Landlord with copies of all maintenance schedules, reports and notices prepared by, for, or on behalf of Tenant. Landlord may impose reasonable restrictions and requirements with respect to repairs by Tenant, which repairs shall be at least equal in quality to the original work, and the provisions of Section 8.3 above shall apply to all such repairs. Tenant's obligation to repair includes the obligation to replace, as necessary, regardless of whether the benefit of such replacement extends beyond the Term.  Notwithstanding the

foregoing, Landlord shall have the right (but not the obligation), upon notice to Tenant, to undertake the responsibility for maintenance and repair of automatic fire extinguisher equipment, such as sprinkler systems and alarms, and other obligations of Tenant hereunder which Landlord deems appropriate to undertake that affect the Building as a whole, in which event the cost thereof shall be included as part of Premises Costs and paid by Tenant in the manner set forth in Section 7.1. Tenant shall not permit or authorize any person to go onto the roof of the Building without the prior written consent of Landlord.

9.3     Waiver.  Tenant hereby waives all rights provided for by the provisions of Sections 1932(1), 1941 and 1942 of the California Civil Code and any present or future laws regarding Tenant's right to make repairs at the expense of Landlord or to terminate this Lease because of the condition of the Premises.

9.4     Self-Help.  If Tenant refuses or fails to repair and maintain the Premises as required hereunder within ten (10) days from the date on which Landlord makes a written demand on Tenant to effect such repair and maintenance (or such shorter time as may be required in the event of an emergency), Landlord may enter upon the Premises and make such repairs or perform such maintenance without liability to Tenant for any loss or damage that may accrue to Tenant or its merchandise, fixtures or other property or to Tenant's business by reason thereof. All sums reasonably disbursed, deposited or incurred by Landlord in connection with such repairs or maintenance, plus ten percent (10%) for overhead, shall be due and payable by Tenant to Landlord, as an item of Additional Rent, on demand by Landlord, together with interest at the Applicable Rate on such aggregate amount from the date of such demand until paid by Tenant.

## ARTICLE X

## PREMISES AND PARKING

10.1     Grant of Nonexclusive License and Right.  Subject to the provisions of Section 10.6 and Exhibit C, Landlord hereby reserves a non-exclusive license and right to have its employees, agents, contractors and vendors use the exterior and parking areas of the Property for vehicular parking, for pedestrian and vehicular ingress, egress and travel, and for such other purposes and for doing such other things as may be provided for, authorized and/or permitted by this Lease and the CC&Rs. Such reserved parking rights may be exercised to the extent reasonably necessary for or in connection with any inspection, work or maintenance of the Premises.

10.2     Use of Premises.  Notwithstanding anything to the contrary herein, Tenant and its successors, assigns, employees, agents and invitees shall use the Premises only for the purposes permitted hereby and by the CC&Rs and the Rules and Regulations. All uses permitted within the Premises shall be undertaken in such reasonable manner so as not to interfere with the rights of any other person or entity. In no event shall Tenant erect, install, or place, or cause to be erected, installed, or placed any structure, building, trailer, fence, wall, signs or other obstructions on the parking areas or in the areas outside of the Building which is part of the Premises, and Tenant shall not store or sell any merchandise, equipment or materials on such parking or outside areas.

10.3     Control of Parking Areas.  Landlord shall have the right to construct, maintain and operate lighting facilities and other improvements on or within the Premises; to police the parking areas from time to time; to change the area, level, location and arrangement of the parking areas and other improvements therein; to close all or any portion of the parking areas or improvements thereto to such extent as may, in the opinion of counsel for Landlord, be legally sufficient to prevent a dedication thereof or the accrual of any rights to any person or to the public therein; to close temporarily all or any portion of the parking areas and/or the improvements thereon (including, without limitation, in connection with any repairs, maintenance and renovations thereof); to discourage non-tenant parking; and to do and perform such other acts in and to said parking areas and improvements thereon as, in the use of good business judgment, Landlord shall determine to be advisable. Landlord reserves the right to promulgate such reasonable rules and regulations relating to the use of the Premises as Landlord may deem appropriate, and Tenant agrees to comply with (and cause its agents, employees, guests, customers, invitees and subtenants to comply with) any such rules and regulations as promulgated by Landlord. If Landlord is required by any law to limit or control parking within the Premises, by validation of parking tickets or any other method, Tenant agrees to participate in such validation or other program under such reasonable rules and regulations as are from time to time established by Landlord.

10.4     Maintenance of Premises.  Subject to the provisions of the CC&Rs, Landlord shall operate and maintain (or cause to be operated and maintained) the exterior areas of the Premises and Building in a similar condition to comparable office building exterior areas located in the general vicinity of the Premises, in such manner as Landlord in its reasonable discretion shall determine from time to time. Landlord shall have the full right and authority to employ or cause to be employed all personnel necessary for the proper operation and maintenance of the

Premises and Building and the improvements located thereon. The cost of such maintenance of the Premises and Building, including without limitation any repairs, replacements, changes or upgrades required, shall be included as part of Premises Costs subject to the exclusions and limitations set forth in Article VII, except that any capital expenditures for the same shall not be considered Premises Costs during the Operating Expense Base Year. Tenant shall not use any part of the exterior of the Premises for the storage of any items, including, without limitation, vehicles, materials, inventory and equipment. Tenant shall place all trash and other refuse in designated receptacles.

10.5    Landlord's Reserved Rights.  Landlord reserves the right to install, use, maintain, repair, relocate and replace pipes, ducts, conduits, wires and appurtenant meters and equipment included in the Premises or outside the Premises, change the boundary lines of the Property and install, use, maintain, repair, alter or relocate, expand and replace any portion of the Premises; provided, however, Landlord shall not unreasonably interfere with Tenant's use of or access to the Premises.

10.6    Parking.  Subject to Landlord's right to use parking for its employees, agents, contractors and vendors while providing services on the Premises, Tenant shall be entitled to use  vehicle parking spaces at the Property.  All parking spaces shall be used only for parking by vehicles no larger than full size passenger automobiles or pick-up trucks.  Parking within the Premises shall be limited to striped parking stalls, and no parking shall be permitted in any driveways, access ways or in any area which would prohibit or impede the free flow of traffic.  If Tenant commits, permits or allows a violation of any of the terms and conditions of this Lease relating to the use of the Premises, the rules then in effect with respect thereto, or the CC&Rs (including, without limitation, any damage or injury thereto), or if a vehicle is being operated by Tenant or its agents, employees, guests, customers, invitees or subtenants in a manner that Landlord or its designated agent reasonably determines is a danger to the health and safety of persons on or about the Premises or the Building, then Landlord, through its designated agent, shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and to charge the cost to Tenant, which cost shall be immediately payable upon demand by Landlord.

## ARTICLE XI

## INDEMNITY AND INSURANCE

11.1    Indemnification.  To the fullest extent permitted by law, Tenant hereby agrees to defend (with attorneys reasonably acceptable to Landlord), indemnify, protect and hold harmless Landlord and Landlord's Agents and any successors to all or any portion of Landlord's interest in the Premises and their directors, officers, shareholders, partners, managers, members, investment advisors, employees, authorized agents, representatives, affiliates and Mortgagees, from and against any and all damage, loss, claim, liability and expense, including, but not limited to, actual attorneys' fees and legal costs (collectively "Claims"), incurred directly or indirectly by reason of any claim, suit or judgment brought by or on behalf of (i) any person or persons for damage, loss or expense due to, but not limited to, personal or bodily injury or property damage sustained by such person or persons which arise out of, are occasioned by, or are in any way attributable to the use or occupancy of the Premises or the acts or omissions of the Tenant or Tenant's Agents in or about the Premises (including, but not limited to, any Event of Default hereunder), or (ii) Tenant or Tenant's Agents for damage, loss or expense due to, but not limited to, personal or bodily injury or property damage which arise out of, are occasioned by, or are in any way attributable to the use of any of the Premises, except to the extent caused by the gross negligence or willful misconduct of Landlord or the Landlord Agents seeking the benefits of this Section 11.1.  The foregoing provisions shall apply to Claims which are absolute or contingent, liquidated or unliquidated, and whether or not caused, in whole or in part, by the active or passive negligence of the Landlord or Landlord's Agents.  Landlord shall hold Tenant harmless from and indemnify Tenant against any Claim for personal injury, illness, or death to any person or damage to any tangible property to the extent (i) such injury, illness, death or damage is caused by the gross negligence or willful misconduct of Landlord or any agents, employees of Landlord, and (ii) such Claim is not included within the risks insured against under the insurance that Tenant is required to carry pursuant to this Article 11. The provisions of this Section 11.1 shall survive the termination of this Lease with respect to any injury, illness, death or damage occurring prior to such termination. Notwithstanding anything to the contrary set forth in this Section 11.1 or elsewhere in this Lease, in no event shall Landlord be liable for any consequential or remote damages, or for loss of or damage to artwork, currency, jewelry, bullion, securities or other property in the Premises, not in the nature of ordinary fixtures, furnishings, equipment and other property used in general business office activities.

11.2    Property Insurance.  Landlord shall obtain and keep in force during the Term of this Lease a policy or policies of insurance, with deductibles at the sole discretion of Landlord, covering loss or damage to the Premises, the Building, the Tenant Improvements and objects owned by Landlord and normally covered under a "Boiler and Machinery" policy (as such term is used in the insurance industry), at least in the amount of eighty percent (80%) of

the full replacement cost thereof, and in no event less than the total amount required by any current or future Mortgagees, against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, special extended perils ("all risk" or "special causes of loss," as such terms are used in the insurance industry, including, at Landlord's option, collapse, earthquake and flood) and other perils as required by the Mortgagees or deemed necessary by Landlord. A stipulated value or agreed amount endorsement deleting any co-insurance provision of said policy or policies shall be procured with said insurance. The cost of such insurance policies shall be included in the definition of Premises Costs, and shall be paid by Tenant in the manner set forth in Section 7.1. Such insurance policies shall provide for payment of loss thereunder to Landlord or, at Landlord's election, to the Mortgagees, if any. If the Premises are part of a larger building, or if the Premises are part of a group of buildings owned by Landlord which are adjacent to the Premises, then Tenant shall pay for any increase in the property insurance of the Building or such other building or buildings within the Premises if such increase is caused by Tenant's acts, omissions, use or occupancy of the Premises. Tenant shall obtain and keep in force during the Term, at its sole cost and expense, (i) an "all risk" or "special causes of loss" property policy in the amount of the full replacement cost covering Tenant's Personal Property and any Alterations made by or at the request of Tenant, with Landlord insured as its interest may appear, and (ii) an "all risk" or "special causes of loss" policy of business interruption and/or loss of income insurance covering a period of one (1) year, with loss payable to Landlord to the extent of the Monthly Rent and Additional Rent only which would have been payable hereunder but for the incident or occurrence giving rise to the payment under the policy.

11.3    Liability/Miscellaneous Insurance.  Tenant shall maintain in full force and effect at all times during the Term (plus such earlier and later periods as Tenant may be in occupancy of the Premises), at its sole cost and expense, for the protection of Tenant, Landlord and Landlord's Agents and Mortgagees, policies of insurance issued by a carrier or carriers acceptable to Landlord and the Mortgagees which afford the following coverage: (i) statutory workers' compensation, (ii) employer's liability with minimum limits of One Million Dollars ($1,000,000), (iii) commercial general liability insurance, including, but not limited to, blanket contractual liability (including the indemnity set forth in Section 11.1), fire and water legal liability, broad form property damage, personal injury, completed operations, products liability, independent contractors, warehouser's legal liability and, if alcoholic beverages are served, manufactured, distributed or sold in the Premises, comprehensive liquor liability, and owned, non-owned and hired vehicles, of not less than the limits set forth in Item 17 of the Basic Lease Provisions, naming Landlord, the Mortgagees, and the Additional Insureds named in Item 16 of the Basic Lease Provisions as additional insureds, and including a cross-liability or severability of interests endorsement, and (iv) such other insurance in such form and amounts as may be required by Landlord or the Mortgagees from time to time.  Landlord or Landlord's Agents on behalf of Landlord may, at Landlord's election, obtain liability insurance in such amounts and on such terms as Landlord shall determine, and the cost thereof shall be included in Premises Costs and paid by Tenant in the manner described in Section 7.1.

11.4    Deductibles.  Any policy of insurance required pursuant to this Lease containing a deductible exceeding Five Thousand Dollars ($5,000.00) per occurrence must be approved in writing by Landlord prior to the issuance of such policy. Tenant shall be solely responsible for the payment of any deductible.

11.5    Blanket Coverage.  Any insurance required of Tenant pursuant to this Lease may be provided by means of a so-called "blanket policy", so long as (i) the Premises are specifically covered (by rider, endorsement or otherwise), (ii) the limits of the policy are applicable on a "per location" basis to the Premises and provide for restoration of the aggregate limits, and (iii) the policy otherwise complies with the provisions of this Lease.

11.6    Increased Coverage.  Upon demand, Tenant shall provide Landlord, at Tenant's expense, with such increased amount of existing insurance, and such other insurance as Landlord or the Mortgagees may reasonably require.

11.7    Sufficiency of Coverage.  Neither Landlord nor any of Landlord's Agents makes any representation that the types of insurance and limits specified to be carried by Tenant under this Lease are adequate to protect Tenant. If Tenant believes that any such insurance coverage is insufficient, Tenant shall provide, at its own expense, such additional insurance as Tenant deems adequate. Nothing contained herein shall limit Tenant's liability under this Lease, and Tenant's liability under any provision of this Lease, including, without limitation, under any indemnity provisions, shall not be limited to the amount of any insurance obtained.

11.8    Insurance Requirements.  Tenant's insurance (i) shall be in a form satisfactory to Landlord and the Mortgagees and shall be carried with companies licensed to do business in the State of California that have a "Best Key Rating Guide" rating of A-/VII or better and that are determined by Landlord, in its sole discretion, as financially sound on a current basis, (ii) shall provide that such policies shall not be subject to material alteration or cancellation except after at least ten (10) days prior written notice to Landlord, and (iii) shall be primary, and any insurance carried

by Landlord or Landlord's Agents shall be excess and noncontributing. Tenant's policy or policies, or duly executed certificates for them in the form and content acceptable to Landlord, shall be deposited with Landlord concurrently with Tenant's execution of this Lease, and prior to renewal of such policies. If Tenant fails to procure and maintain the insurance required to be procured by Tenant under this Lease, Landlord may, but shall not be required to, order such insurance at Tenant's expense. All sums reasonably disbursed, deposited or incurred by Landlord in connection therewith, including, but not limited to, all costs, expenses and actual attorneys' fees, shall be due and payable by Tenant to Landlord, as an item of Additional Rent, on demand by Landlord, together with interest thereon at the Applicable Rate from the date of such demand until paid by Tenant.

11.9    Impound Funds.  If requested by any Mortgagees to whom Landlord has granted a security interest in the Premises, or if any Event of Default occurs under this Lease, Tenant shall, at Landlord's election, pay Landlord, concurrently with each payment of Monthly Rent, a sum equal to one-twelfth (1/12) of the annual insurance premiums payable by Tenant for all insurance which Tenant is required to obtain pursuant to this Article XI. Such sums (the "Impound Funds") shall be held by Landlord and applied to the payment of such insurance premiums when due; provided, however, Landlord shall not be required to keep the Impound Funds separate from other funds, Tenant shall not be entitled to interest on the Impound Funds and no trust relationship shall be created with respect to the Impound Funds. The amount of the Impound Funds when unknown shall be reasonably estimated by Landlord. If the Impound Funds paid to Landlord by Tenant under this Section 11.9 are insufficient to discharge the obligations of Tenant to pay such insurance premiums as the same become due, Tenant shall pay to Landlord, within ten (10) days after Landlord's written request therefor, such additional sums necessary to pay such obligations. If an Event of Default has occurred, any balance remaining from the Impound Funds may, at the option of Landlord, be applied to any obligation then due under this Lease in lieu of being applied to the payment of insurance premiums. The unused portion of the Impound Funds, if any, shall be returned to Tenant within thirty (30) days of the expiration of this Lease or any termination of this Lease not resulting from an Event of Default, provided that Tenant has vacated the Premises in the manner required by this Lease.

11.10    Landlord's Disclaimer.  Notwithstanding any other provisions of this Lease, and to the fullest extent permitted by law, Landlord and Landlord's Agents shall not be liable to Tenant for any loss or damage to persons or property resulting from theft, vandalism, fire, explosion, falling materials, glass, tile or sheetrock, steam, gas, electricity, water or rain which may leak from any part of the Premises, or from the pipes, appliances or plumbing works therein or from the roof, street or subsurface, or from acts of God or from any other cause whatsoever, unless caused by or due to the gross negligence or willful misconduct of Landlord or Landlord's Agents or Landlord's breach of this Lease (provided, however, in no event shall Landlord be liable for any consequential damages, opportunity costs or lost profits incurred or suffered by Tenant). Landlord and Landlord's Agents shall not be liable for interference with light or air, or for any latent defect in the Premises except as otherwise expressly provided in this Lease. Tenant shall give prompt Notice to Landlord in case of a casualty, accident or repair needed to the Premises.

11.11    Waiver of Subrogation.  Landlord, except to the extent Tenant's insurance covers loss to Landlord plus Tenant's obligations with respect to maintenance and repair and payment of insurance deductibles hereunder, and Tenant each hereby waives all rights of recovery against the other and the other's agents on account of loss and damage occasioned to such waiving party to the extent only that such loss or damage is insured against under any insurance policies required by this Article XI (and to the extent such insurance is inadequate to cover such loss, this waiver shall not apply to amounts of loss above such coverage) and to the extent permitted by Applicable Law. Tenant and Landlord shall, upon obtaining policies of insurance required hereunder, give notice to the insurance carriers that the foregoing waiver of subrogation is contained in this Lease. Notwithstanding the foregoing, it is agreed that in the event that any loss is due to the act, omission or negligence or willful misconduct of Tenant or Tenant's Agents, Tenant's liability insurance shall be primary and shall cover all losses and damages prior to any other insurance hereunder.

## ARTICLE XII

### DAMAGE OR DESTRUCTION

12.1    Landlord's Obligation to Rebuild.  If the Premises are damaged or destroyed by fire or other casualty (a "Casualty"), Tenant shall promptly give notice thereof to Landlord, and Landlord shall thereafter repair the Premises as set forth in Sections 12.3 and 12.4 unless Landlord or Tenant has the right to terminate this Lease as provided below and Landlord or Tenant elects to so terminate this Lease.

12.2    Landlord's Right to Terminate.  Landlord shall have the right to terminate this Lease following a Casualty if any of the following occurs: (i) Insurance proceeds (together with any additional amounts Tenant elects, at its option, to contribute) are not available to Landlord to pay one hundred percent (100%) of the cost to fully repair

the Premises, excluding the deductible (for which Tenant shall pay), regardless of whether such unavailability is due to coverage or other policy limits or the requirements of any Mortgagee; (ii) Landlord's Architect determines that the Premises cannot, with reasonable diligence, be fully repaired by Landlord (or cannot be safely repaired because of the presence of hazardous factors, including, but not limited to, Hazardous Materials, earthquake faults, radiation, chemical waste and other similar dangers) within one hundred eighty (180) days after the date of such Casualty; (iii) the Premises are destroyed or damaged during the last twelve (12) months of the Term provided, however, that if Landlord exercises such termination right and Tenant has any unexercised and unexpired option to extend the Term in full force and effect, then Tenant may exercise such option within the ten (10) days after receipt of such cancellation, and this Lease shall continue in effect for the remainder of the extended Lease Term, subject to all the other provisions hereof; or (iv) an Event of Default has occurred and is continuing at the time of such Casualty. If Landlord elects to terminate this Lease following a Casualty pursuant to this Section 12.2, Landlord shall give Tenant Notice of its election to terminate within ninety (90) days after Landlord has knowledge of such Casualty, and this Lease shall terminate fifteen (15) days after the date of such notice.

      12.3    <u>Tenant's Right to Terminate</u>. Notwithstanding the foregoing, in the event of a Major Casualty, Tenant may terminate this Lease upon thirty (30) days' prior written notice if Landlord is required to or elects to perform such repair or restoration and the damage or destruction occurs within the last twelve (12) months of the Term and cannot, with reasonable diligence, be repaired by Landlord within ninety (90) days following the issuance of any necessary permits to complete such repairs, as reasonably determined by Landlord's Architect. Notwithstanding the foregoing, Tenant shall not have the right to terminate this Lease under this Section 12.3 if (a) the Tenant is in default under this Lease at the time of such damage or destruction or at the time Tenant exercises the right to terminate, or (b) the damage or destruction was caused , in whole or in part, by the act or omission of Tenant or Tenant's Agents. If Tenant elects to terminate this Lease pursuant to this Section 12.3, Tenant shall give Landlord Notice of its election to terminate within ten (10) days after the date of Tenant's receipt of the applicable determination of Landlord's Architect pursuant to this Section 12.3 upon which such termination right is based, and this Lease shall terminate thirty (30) days after the delivery of such Notice from Tenant to Landlord.   For purposes of this Section 12.3, a "Major Casualty" shall mean casualty damage to the Premises that materially and adversely impairs Tenant's reasonable and substantial use and enjoyment of the Premises.

      12.4    <u>Effect of Termination</u>. If this Lease is terminated following a Casualty pursuant to Section 12.2 or 12.3, Landlord shall, subject to the rights of the Mortgagees, be entitled to receive and retain all the property insurance proceeds resulting from or attributable to such Casualty, except for those proceeds payable under policies obtained by Tenant which specifically insure Tenant's Personal Property.   If neither Landlord nor Tenant exercises any such right to terminate this Lease, this Lease will continue in full force and effect, and Landlord shall, within sixty (60) days after the date of such Casualty and receipt of the amounts set forth in clause (i) of Section 12.2, commence the process of obtaining necessary permits and approvals for the repair of the Premises, and shall commence such repair and prosecute the same diligently to completion as soon as is practicable following its receipt of such permits and approvals.  Tenant shall fully cooperate with Landlord in removing Tenant's Personal Property and any debris from the Premises to facilitate the making of such repairs.

      12.5    <u>Limited Obligation to Repair</u>. Landlord's obligation, should it elect or be obligated to repair the Premises following a Casualty, shall be limited to the basic Building and Tenant Improvements and Tenant shall, at its expense, replace or fully repair all Tenant's Personal Property and any Alterations existing at the time of such Casualty.  If the Premises are to be repaired in accordance with the foregoing, Tenant shall make available to Landlord any portion of insurance proceeds that Tenant receives which are allocable to the Tenant Improvements.

      12.6    <u>Abatement of Monthly Rent</u>. During any period when Landlord or Landlord's Architect reasonably determines that there is substantial interference with Tenant's use of the Premises by reason of a Casualty, Monthly Rent and Additional Rent shall be temporarily abated in proportion to the degree of such substantial interference, but only to the extent of any business interruption or loss of income insurance proceeds received by Landlord from Tenant's insurance described in Section 11.2. Subject to the immediately preceding sentence, such abatement shall commence upon the date Tenant notifies Landlord of such Casualty and shall end upon the Substantial Completion of the repair of the Premises which Landlord undertakes or is obligated to undertake hereunder. Tenant shall not be entitled to any compensation or damages from Landlord for loss of the use of the Premises, Tenant's Personal Property or other damage or any inconvenience occasioned by a Casualty or by the repair or restoration of the Premises thereafter, including, but not limited to, any consequential damages, opportunity costs or lost profits incurred or suffered by Tenant.  Tenant hereby waives the provisions of Section 1932(2) and Section 1933(4) of the California Civil Code, and the provisions of any similar or successor statutes.

      12.7    <u>Landlord's Determination</u>. The determination in good faith by Landlord's Architect of or relating to the estimated cost of repair of any damage, replacement cost, the time period required for repair or the interference

with or suitability of the Premises for Tenant's use or occupancy shall be conclusive for purposes of this Article XII and Article XIII.

## ARTICLE XIII

### CONDEMNATION

13.1    <u>Total Taking--Termination</u>.  If title to the Premises or so much thereof is taken for any public or quasi-public use under any statute or by right of eminent domain so that reconstruction of the Premises will not result in the Premises being reasonably suitable for Tenant's continued occupancy for the uses and purposes permitted by this Lease, this Lease shall terminate as of the date possession of the Premises or part thereof is so taken.

13.2    <u>Partial Taking</u>.  If any part of the Premises are taken for any public or quasi-public use under any statute or by right of eminent domain and the remaining part is reasonably suitable for Tenant's continued occupancy for the uses permitted by this Lease as reasonably determined by Landlord, this Lease shall, as to the part so taken, terminate as of the date that possession of such part of the Premises are taken and the Monthly Rent shall be reduced in the same proportion that the rentable square footage of the floor area of the portion of the Premises so taken (less any addition thereto by reason of any reconstruction) bears to the original rentable square footage of the floor area of the Premises, as reasonably determined by Landlord or Landlord's Architect. Landlord shall, at its own cost and expense, make all necessary repairs or alterations to the Premises so as to make the portion of the Premises not taken a complete architectural unit.  Such work shall not, however, exceed the scope of the work done by Landlord in originally constructing the Premises.  If severance damages from the condemning authority are not available to Landlord in sufficient amounts to permit such restoration, Landlord may terminate this Lease upon Notice to Tenant.  Monthly Rent due and payable hereunder shall be temporarily abated during such restoration period in proportion to the degree to which there is substantial interference with Tenant's use of the Premises, as reasonably determined by Landlord or Landlord's Architect.  Each party hereby waives the provisions of Section 1265.130 of the California Code of Civil Procedure and any present or future law allowing either party to petition the Superior Court to terminate this Lease in the event of a partial taking of the Building or Premises.

13.3    <u>No Apportionment of Award</u>.  No award for any partial or total taking shall be apportioned, it being agreed and understood that Landlord shall be entitled to the entire award for any partial or entire taking.  Tenant assigns to Landlord its interest in any award which may be made in such taking or condemnation, together with any and all rights of Tenant arising in or to the same or any part thereof.  Nothing contained herein shall be deemed to give Landlord any interest in or require Tenant to assign to Landlord any separate award made to Tenant for the taking of Tenant's Personal Property, for the interruption of Tenant's business or its moving costs, or for the loss of its goodwill.

13.4    <u>Temporary Taking</u>.  No temporary taking of the Premises (which for purposes hereof shall mean a taking of all or any part of the Premises for one hundred eighty (180) days or less) shall terminate this Lease or give Tenant any right to any abatement of Rent.  Any award made to Tenant by reason of such temporary taking shall belong entirely to Tenant and Landlord shall not be entitled to share therein.  Each party agrees to execute and deliver to the other all instruments that may be required to effectuate the provisions of this Section 13.4.

13.5    <u>Sale Under Threat of Condemnation</u>.  A sale made in good faith to any authority having the power of eminent domain, either under threat of condemnation or while condemnation proceedings are pending, shall be deemed a taking under the power of eminent domain for all purposes of this Article XIII.

## ARTICLE XIV

### ASSIGNMENT AND SUBLETTING

14.1    <u>Prohibition</u>.  Tenant shall not directly or indirectly, voluntarily or by operation of law, assign this Lease, or any right or interest hereunder, or sublet the Premises or any part thereof, or allow any other person or entity to occupy or use all or any part of the Premises without first obtaining the written consent of Landlord in each instance, which consent shall not be unreasonably withheld, conditioned or delayed.  In no event shall Tenant directly or indirectly, voluntarily or by operation of law, pledge, mortgage or hypothecate this Lease, or any right or interest hereunder or in or to the Premises.  In addition, in the event that Landlord consents to a subletting, in no event shall the applicable sublessee be permitted to assign the sublease or sub-sublet all or any portion of the applicable sublease premises (and any subleases of the Premises or any part thereof shall specifically include the foregoing prohibition).  Any attempted assignment, subletting, pledge, mortgaging, hypothecation or other transfer in violation of the terms of this Article XIV, whether voluntary or involuntary, by operation of law, under legal process or

proceedings, by receivership, in bankruptcy, or otherwise shall constitute an Event of Default under this Lease and shall be voidable at Landlord's option. To the extent not prohibited by provisions of the Bankruptcy Code of 1978, 11 U.S.C. Sections 101 et seq. (as amended, the "Bankruptcy Code"), Tenant on behalf of itself, creditors, administrators and assigns waives the applicability of Sections 541(c) and 365(e) of the Bankruptcy Code unless the proposed assignee of the trustee for the estate of the bankrupt meets Landlord's standards for consent as set forth below. If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies or other considerations payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or the estate of Tenant within the meaning of the Bankruptcy Code. Any and all monies or other considerations constituting Landlord's property under the preceding sentence not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and be promptly paid or delivered to Landlord. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption.

14.2    Landlord's Consent.  In the event Landlord consents to any assignment or subletting, such consent shall not constitute a waiver of any of the restrictions of this Article XIV and the same shall apply to each successive assignment or subletting hereunder, if any. In no event shall an assignment or subletting affect the continuing primary liability of Tenant (which, following an assignment, shall be joint and several with the assignee), or relieve Tenant of any of its obligations hereunder without an express written release being given by Landlord.  In the event that Landlord shall consent to an assignment or subletting under this Article XIV, such assignment or subletting shall not be effective until the assignee or sublessee shall assume in a writing delivered to Landlord all of the obligations of this Lease on the part of Tenant to be performed or observed and whereby the assignee or sublessee shall agree that the provisions contained in this Lease shall, notwithstanding such assignment or subletting, continue to be binding upon it with respect to all future assignments and sublettings, and Tenant and the applicable assignee or sublessee have entered into Landlord's standard consent to sublease agreement or consent to assignment agreement, as the case may be.  Such assignment or sublease agreement  and consent agreement shall be duly executed and a fully executed copy thereof shall be delivered to Landlord, and Landlord may collect Monthly Rent and Additional Rent due hereunder directly from the assignee or sublessee.  Collection of Monthly Rent and Additional Rent directly from an assignee or sublessee shall not constitute a consent or a waiver of the necessity of consent to such assignment or subletting, nor shall such collection constitute a recognition of such assignee or sublessee as the Tenant hereunder or a release of Tenant from the performance of all of its obligations hereunder.

14.3    Information.  Regardless of whether Landlord's consent is required under this Article XIV, Tenant shall notify Landlord in writing of Tenant's intent to assign this Lease or any right or interest hereunder, or to sublease the Premises or any part thereof, and of the name of the proposed assignee or sublessee, the nature of the proposed assignee's or sublessee's business to be conducted on the Premises, the terms and provisions of the proposed assignment or sublease, a copy of the proposed assignment or sublease form, and such other information as Landlord may reasonably request concerning the proposed assignee or sublessee, including, but not limited to, net worth, income statements and other financial statements for a two-year period preceding Tenant's request for consent, evidence of insurance complying with the requirements of Article XI, and the fee described in Section 14.7.

14.4    Landlord's Election.  Landlord shall, within twenty-one (21) days of receipt of such Notice and all information requested by Landlord concerning the proposed assignee or sublessee, elect to take one of the following actions by Notice to Tenant:

(a)    consent to such proposed assignment or sublease;

(b)    refuse to consent to such proposed assignment or sublease, which refusal shall be on reasonable grounds, set forth in the notice;

(c)    If Tenant proposes to sublease all or part of the Premises, elect to recapture such portion of the Premises as Tenant proposes to sublease and, as of the thirtieth (30th) day after Landlord so notifies Tenant of its election to recapture, this Lease shall terminate as to the portion of the Premises recaptured and the Monthly Rent payable under this Lease shall be reduced in the same proportion that the floor area of that portion of the Premises so recaptured bears to the floor area of the Premises prior to such recapture; or

(d)    If Tenant proposes to assign this Lease, elect to recapture the Premises and, as of the thirtieth (30th) day after Landlord so notifies Tenant of its election to recapture, this Lease shall terminate.

Tenant agrees, by way of example and without limitation, that it shall not be unreasonable for Landlord to withhold its consent to a proposed assignment or subletting if any of the following situations exist or may exist:

(i)    Landlord determines that the proposed assignee's or sublessee's use of the Premises conflicts with Article V or Article VI, presents an unacceptable risk, as determined by Landlord, under Article VI, or conflicts with any other provision under this Lease;

(ii)    Landlord determines that the proposed assignee or sublessee is not financially responsible in light of the obligations being assumed as of the date of Tenant's request for consent or as of the effective date of such assignment or subletting;

(iii)    Landlord determines that the proposed assignee or sublessee lacks sufficient business reputation or experience to conduct on the Premises a business of a type and quality equal to that conducted by Tenant;

(iv)    Landlord determines that the proposed assignment or subletting would breach a covenant, condition or restriction in some other lease, financing agreement or other agreement relating to the Premises, the Building, or this Lease;

(v)    Landlord determines that the proposed assignee or sublessee (A) has been required by any prior landlord, lender or governmental authority to take remedial action in connection with Hazardous Materials contaminating a property if such contamination resulted from the proposed assignee's or sublessee's actions or use of the property in question, or (B) is subject to any enforcement order issued by any governmental authority in connection with the use, disposal or storage of Hazardous Materials;

(vi)    An Event of Default has occurred and is continuing at the time of Tenant's request for Landlord's consent, or as of the effective date of such assignment or subletting; or

(vii)    The proposed assignee or sublessee is either a governmental agency or instrumentality thereof.

14.5    <u>Bonus Value</u>.  Tenant agrees that fifty percent (50%) of any amounts paid by the assignee or sublessee, however described, in excess of (i) Rent payable by Tenant hereunder (or, in the case of sublease of a portion of the Premises, in excess of the Monthly Rent reasonably allocable to such portion), plus (ii) Tenant's reasonable, direct, out-of-pocket costs which Tenant certifies to Landlord have been paid for leasing commissions, tenant improvements and legal fees directly related to the sublease or assignment in question (which direct out-of-pocket costs shall, for purposes of calculating the amounts payable to Landlord under this Section 14.5, be amortized on a straight-line basis over the applicable sublease term (in the case of a sublease) or the then-remaining balance of the Term of this Lease (in the case of an assignment)), shall be the property of Landlord and such amounts shall be payable directly to Landlord by the assignee or sublessee.  At Landlord's request, a written agreement shall be entered into by and among Tenant, Landlord and the proposed assignee or sublessee confirming the requirements of this Section 14.5.

14.6    <u>Certain Transfers</u>.  The sale of all or substantially all of Tenant's assets (other than bulk sales in the ordinary course of business), or, if Tenant is a corporation, an unincorporated association, a limited liability company or a partnership, (i) any merger, reorganization or consolidation involving Tenant, and/or (ii) the transfer, assignment or hypothecation of any stock or interest in such corporation, association, limited liability company or partnership in the aggregate in excess of twenty-five percent (25%) (except for publicly traded shares of stock), shall be deemed an assignment within the meaning and provisions of this Article XIV.  In the event that the acquiring or surviving entity is wholly-owned or majority controlled by another entity or person ("Parent"), then, without in any way limiting the basis upon which Landlord may grant or withhold its consent to such assignment, it shall not be unreasonable for Landlord to condition its consent upon the execution and delivery by the Parent of a written guaranty of Tenant's obligations and liabilities under this Lease on a form of lease guaranty provided by Landlord.  Notwithstanding the foregoing, assignment or subletting or all or part of the Premises to an affiliate or a successor through merger, sale of assets or sale of equity, shall be permitted without Landlord's prior written consent and shall not be subject to recapture pursuant to Section 14.4(c) or (d), above, or rent sharing pursuant to Section 14.5, above, if: (i) the affiliate or successor has a net worth which is greater, as of the effective date of the assignment or sublease, than the net worth of the original tenant under this Lease as of the Commencement Date of the Term or the effective date of the transfer, whichever is greater (in each case computed in accordance with GAAP); (ii) Tenant is not in breach or default hereunder taking into account applicable cure periods and provisions; (iii) Tenant provides Landlord with at least twenty-one (21) days advance notice of the transfer which notice shall describe the proposed transaction in

631227.10/SF
370251-00009/4-5-12/lgm/lgm

-24-

reasonably detail and shall provide financial Information reasonably satisfactory to Landlord evidencing compliance with the foregoing net worth requirements; (iv) Tenant provides copies of the documents effectuating the transfer to the Landlord within five (5) days following the effective date of the assignment or sublease; (v) the transferee executes a document, acceptable to the Landlord, assuming all of the Tenant's obligations hereunder with respect to the portion or all of the Premises assigned or sublet, (vi) the transferee is not a person or entity which would, with the giving of notice or the passage of time or both, be in breach of any provision of this Lease or cause Landlord, by virtue of being a landlord for such entity, to be in violation of any law, regulation or the CC&Rs or to breach any provision of any other lease between Landlord, or any of its predecessors, and any other party; and (vii) the Tenant complies with the other provisions of this Article XIV other than the requirement to obtain Landlord's prior written consent to the assignment or sublease.. For the purposes of this Lease, an "affiliate" is any person or entity which is controlled by, in control of or under common control with the Tenant (with "control," for such purposes, meaning the ownership of at least fifty-one percent (51%) of the equity and voting control and the power to direct the management decisions of the entity).

      14.7    Landlord's Fee and Expenses.  If Tenant requests Landlord's consent to an assignment or subletting  by Tenant under this Lease, Tenant shall pay to Landlord a fee of One Thousand Dollars ($1,000) and all of Landlord's out-of-pocket expenses, including, but not limited to, attorneys' fees reasonably incurred related to such assignment or subletting by Tenant, whether or not the assignment or subletting is approved.

      14.8    Prohibited Transfers and Users.  Notwithstanding anything contained in this Article XIV to the contrary, in no event shall Tenant enter into any assignments or subleases with, or permit the Premises or any portion thereof to be used by, any person or entity with whom United States persons or entities are restricted from doing business under existing or future regulations of the Office of Foreign Assets Control ("OFAC") of the Department of the Treasury (including, without limitation, those named on OFAC's Specially Designated and Blocked Persons List) or under any existing or future statute, executive order (including, without limitation, Executive Order 13224 entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action. Any assignment, subletting or other agreement or arrangement made in violation of this Section 14.8 shall, at Landlord's option, be null and void and of no force or effect and constitute an Event of Default by Tenant under this Lease.

      14.9    Remedy.  In the event that Landlord does not consent to any proposed sublease or assignment, neither Landlord nor any of Landlord's Agents shall be subject to liability for damages in connection therewith, nor shall Tenant have any right to terminate this Lease as a result of Landlord's refusal to consent.  In such case, Tenant's sole remedy shall be to petition a court to direct Landlord to consent to such proposed sublease or assignment on the basis that it would be unreasonable not to do so.

## ARTICLE XV

## DEFAULTS AND REMEDIES

      15.1    Tenant's Default.  At the option of Landlord, a default under this Lease by Tenant shall exist if any of the  following events shall occur (each is called an "Event of Default"):

          (a)      Tenant fails to pay the Rent payable hereunder, as and when due, for a period of three (3) days after Notice by Landlord; provided, however, the Notice given hereunder shall be in lieu of, and not in addition to, any notice required under Sections 1161, et seq., of the California Code of Civil Procedure;

          (b)      Tenant attempts to make or suffers to be made any transfer, assignment or subletting, except as permitted in Article XIV hereof;

          (c)      Any of Tenant's rights under this Lease are sold or otherwise transferred by or under court order or legal process or otherwise or if any of the actions described in Section 15.2 are taken by or against Tenant or any Guarantor;

          (d)      The Premises are used for any purpose other than as permitted pursuant to Article V;

          (e)      Tenant vacates or abandons the Premises and fails to pay Monthly Rent and/or Additional Rent;

(f)      Any representation or warranty given by Tenant under or in connection with this Lease proves to be materially false or misleading;

(g)      Tenant fails to timely comply with the provisions of [Section 3.2 ("Term and Commencement"),] Article VI ("Hazardous Materials"), Article XIV ("Assignment and Subletting"), Article XVI ("Subordination; Estoppel Certificate; Financials"), Section 21.5 ("Modifications for Mortgagees") or Section 21.19 ("Authority"); or

(h)      Tenant fails to observe, keep, perform or cure within fifteen (15) days after Notice by Landlord any of the other terms, covenants, agreements or conditions contained in this Lease or those set forth in any other agreements or rules or regulations which Tenant is obligated to observe or perform. The Notice required by this subparagraph 15.1(h) shall be in lieu of, and not in addition to, any notice required under Sections 1161, et seq., of the California Code of Civil Procedure.

No Notice given under this Section 15.1 shall be deemed a forfeiture or a termination of this Lease unless Landlord so elects in the Notice.

15.2     Bankruptcy or Insolvency.  In no event shall this Lease be assigned or assignable by operation of law and in no event shall this Lease be an asset of Tenant in any receivership, bankruptcy, insolvency or reorganization proceeding.  In the event:

(a)      A court makes or enters any decree or order adjudging Tenant to be insolvent, or approving as properly filed by or against Tenant a petition seeking reorganization or other arrangement of Tenant under any provisions of the Bankruptcy Code or any applicable state law, or directing the winding up or liquidation of Tenant and such decree or order shall have continued for a period of thirty (30) days;

(b)      Tenant makes or suffers any transfer which constitutes a fraudulent or otherwise avoidable transfer under any provisions of the Bankruptcy Code or any applicable state law;

(c)      Tenant assigns its assets for the benefit of its creditors; or

(d)      The material part of the property of Tenant or any property essential to Tenant's business or of Tenant's interest in this Lease is sequestered, attached or executed upon, and Tenant fails to secure a return or release of such property within ten (10) days thereafter, or prior to sale pursuant to such sequestration, attachment or levy, whichever is earlier;

then this Lease shall, at Landlord's election, immediately terminate and be of no further force or effect whatsoever, without the necessity for any further action by Landlord, except that Tenant shall not be relieved of obligations which have accrued prior to the date of such termination.  Upon such termination, the provisions herein relating to the expiration or earlier termination of this Lease shall control and Tenant shall immediately surrender the Premises in the condition required by the provisions of this Lease. Additionally, Landlord shall be entitled to all relief, including recovery of damages from Tenant, which may from time to time be permitted, or recoverable, under the Bankruptcy Code or any other applicable state laws.

15.3     Landlord's Remedies.  Upon the occurrence of an Event of Default, then, in addition to and without waiving any other rights and remedies available to Landlord at law or in equity or otherwise provided in this Lease, Landlord may, at its option, cumulatively or in the alternative, exercise the following remedies:

(a)      Landlord may terminate Tenant's right to possession of the Premises, in which case this Lease shall terminate and Tenant shall immediately surrender possession of the Premises to Landlord.  No act by Landlord other than giving Notice to Tenant of Landlord's election to terminate Tenant's right to possession shall terminate this Lease.  Acts of maintenance, efforts to relet the Premises, or the appointment of a receiver on Landlord's initiative to protect Landlord's interest under this Lease shall not constitute a termination of Tenant's right to possession.  Termination shall terminate Tenant's right to possession of the Premises but shall not relieve Tenant of any obligation under this Lease which has accrued prior to the date of such termination.  Upon such termination, Landlord shall have the right to re-enter the Premises, and remove all persons and property, and Landlord shall also be entitled to recover from Tenant:

(i)      The worth at the time of award of the unpaid Monthly Rent and Additional Rent which had been earned at the time of termination;

        (ii)     The worth at the time of award of the amount by which the unpaid Monthly Rent and Additional Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided;

        (iii)    The worth at the time of award of the amount by which the unpaid Monthly Rent and Additional Rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided;

        (iv)    Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result from Tenant's default, including, but not limited to, the cost of recovering possession of the Premises, commissions and other expenses of reletting, including necessary repair, demolition and renovation of the Premises to the condition existing immediately prior to Tenant's occupancy, the unamortized portion of any brokerage commissions funded by Landlord in connection with this Lease, the cost of rectifying any damage to the Premises occasioned by the act or omission of Tenant, reasonable attorneys' fees, and any other reasonable costs; and

        (v)     At Landlord's election, all other amounts in addition to or in lieu of the foregoing as may be permitted by law.

        As used in subsections (i) and (ii) above, the "worth at the time of award" shall be computed by allowing interest at the maximum legal rate permitted by law. As used in subsection (iii) above, the "worth at the time of award" shall be computed by discounting the amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

        (b)    Landlord may elect not to terminate Tenant's right to possession of the Premises, in which event this Lease will continue in full force and effect as long as Landlord does not terminate Tenant's right to possession, and Landlord shall have the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has the right to sublet or assign, subject only to reasonable limitations) and Landlord may continue to enforce all of its rights and remedies under this Lease, including the right to collect all Rent as it becomes due.  In the event that Landlord elects to avail itself of the remedy provided by this subparagraph 15.3(b), Landlord shall not unreasonably withhold its consent to an assignment or subletting of the Premises subject to the standards and conditions for Landlord's consent as are contained in this Lease (which standards and conditions Tenant acknowledges and agrees are reasonable at the time this Lease is executed by Tenant).  In addition, in the event Tenant has entered into a sublease which is valid under the terms of this Lease, Landlord may also, at its option, cause Tenant to assign to Landlord the interest of Tenant under said sublease, including, but not limited to, Tenant's right to payment of Rent as it becomes due. Notwithstanding the above, no act by Landlord allowed by this subparagraph 15.3(b) shall terminate this Lease unless Landlord notifies Tenant in writing that Landlord elects to terminate this Lease.

15.4    No Surrender.  Tenant waives any rights of redemption, reinstatement or relief from forfeiture under California Code of Civil Procedure Sections 1174 and 1179 and California Civil Code Section 3275, and under any other present or future laws which would operate to permit redemption, reinstatement or relief from forfeiture if Tenant is evicted or Landlord takes possession of the Premises or this Lease is terminated by reason of an Event of Default. No act or thing done by Landlord or Landlord's Agents during the Term shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept a surrender shall be valid unless in writing and signed by Landlord.  No employee of Landlord or of Landlord's Agents shall have any power to accept the keys to the Premises prior to the termination of this Lease, and the delivery of the keys to any employee shall not operate as a termination of this Lease or a surrender of the Premises.

15.5    Interest on Late Payments.  Any Rent or other payment due under this Lease that is not paid to Landlord within three (3) days of the date when due shall commence to bear interest at the Applicable Rate from the due date until fully paid. Neither the accrual nor the payment of interest shall cure any default by Tenant under this Lease.

15.6    Attorneys' and Other Fees.  All sums reasonably incurred by Landlord in connection with an Event of Default or holding over of possession by Tenant after the expiration or termination of this Lease, including, but not limited to, all costs, expenses and actual accountants', appraisers', attorneys' and other professional fees, and any collection agency or other collection charges, shall be due and payable by Tenant to Landlord on demand, and shall bear interest at the Applicable Rate from the date of such demand until paid by Tenant. In addition, in the event that

any action shall be instituted by either of the parties hereto for the enforcement of any of its rights in and under this Lease, the party in whose favor judgment shall be rendered shall be entitled to recover from the other party all expenses reasonably incurred by the prevailing party in such action, including actual costs and reasonable attorneys' fees.

15.7    Landlord's Default.    Landlord shall not be deemed to be in default in the performance of any obligation required to be performed by it hereunder unless and until it has failed to perform such obligation within thirty (30) days after receipt of Notice by Tenant to Landlord (and the Mortgagees who have provided Tenant with notice) specifying the nature of such default; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days are required for its performance, then Landlord shall not be deemed to be in default if it shall commence such performance within such thirty (30) day period and thereafter diligently prosecutes the same to completion.

15.8    Limitation of Landlord's Liability.    The obligations of Landlord do not constitute the personal obligations of the individual partners, managers, members, trustees, directors, officers or shareholders of Landlord or its constituent partners or any of their asset managers or investment advisors.  If Landlord shall fail to perform any covenant, term, or condition of this Lease upon Landlord's part to be performed, Tenant shall be required to deliver to Landlord Notice of the same.  If, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment (i) shall not exceed twenty percent (20%) of the fair market value of the Building and (ii) shall be satisfied only out of the proceeds of the sale received upon execution of such judgment and levied thereon against the right, title and interest of Landlord in the Building and out of rent or other income from such property receivable by Landlord or out of consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title or interest in the Building, and no action for any deficiency may be sought or obtained by Tenant.  Nothing herein shall limit Tenant's right to recover against any available insurance coverage; provided, however, that if Tenant pursues recovery against any such insurance, Tenant shall be responsible for any deductible, self-insured retention, co-insurance obligation, payments of attorneys' fees and costs incurred by Landlord in responding to any requests for discovery or to prepare for or to participate in any deposition, meeting, hearing, arbitration, mediation, trial or appeal or to make or respond to any motion or application to any court or arbitrator for any decision or order as for any form of relief and for all payments which Landlord is required to make in connection with Tenant's pursuant of such recovery, including, without limitation any payments to the insurance carrier as a result of or relating to the Claim.  In addition, in no event shall Landlord be liable for any punitive, consequential damages, opportunity costs or lost profits incurred or suffered by Tenant as a result of a default by Landlord under this Lease.

15.9    Mortgagee Protection.    Upon any default on the part of Landlord, Tenant will give notice by registered or certified mail to any Mortgagee who has provided Tenant with notice of its interest together with an address for receiving notice, and shall offer such Mortgagee a reasonable opportunity to cure the default (which in no event shall be less than thirty (30)) days), including time to obtain possession of the Premises by power of sale or a judicial foreclosure, if such should prove necessary, to effect a cure.  Tenant agrees that each of the Mortgagees to whom this Lease has been assigned by Landlord is an express third party beneficiary hereof. Tenant shall not make any prepayment of Monthly Rent more than one (1) month in advance without the prior written consent of such Mortgagee.  Tenant waives any right under any present or future law to the collection of any security deposit from such Mortgagee or any purchaser at a foreclosure sale of such Mortgagee's interest unless such Mortgagee or such purchaser shall have actually received and not refunded the security deposit in accordance with the terms of this Lease.  Tenant agrees to make all payments under this Lease to the Mortgagee with the most senior encumbrance upon receiving a direction, in writing, to pay said amounts to such Mortgagee.  Tenant shall comply with such written direction to pay without determining whether an event of default exists under such Mortgagee's loan to Landlord.

15.10    Landlord's Right to Perform.  If Tenant shall at any time fail to make any payment or perform any other act on its part to be made or performed under this Lease, Landlord may (but shall not be obligated to), at Tenant's expense, and without waiving or releasing Tenant from any obligation of Tenant under this Lease, make such payment or perform such other act to the extent Landlord may deem desirable, and in connection therewith, pay expenses and employ counsel.  All sums paid by Landlord and all penalties, interest and costs, including, but not limited to, collection costs and attorneys' fees reasonably incurred in connection therewith, shall be due and payable by Tenant to Landlord, as an item of Additional Rent, on demand by Landlord, together with interest thereon at the Applicable Rate from the date of such demand until paid by Tenant.

15.11    Limitation of Actions Against Landlord.  Any claim, demand or right of any kind by Tenant which is based upon or arises in connection with this Lease shall be barred unless Tenant commences an action thereon within twelve (12) months after the date that the act, omission, event or default upon which the claim, demand or right arises, has occurred.  In the event that Landlord commences any summary proceeding or action against Tenant for the nonpayment of Rent, Tenant shall not interpose any counterclaims of any nature or description in any such

proceeding or action (unless such counterclaims shall be mandatory); rather, Tenant shall be relegated to bringing an independent action at law therefor.

15.12    Waiver of Jury Trial.  TO THE FULLEST EXTENT PERMITTED BY LAW, TENANT HEREBY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY TENANT ON ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES AND/OR ANY CLAIM OF INJURY OR DAMAGE.

## ARTICLE XVI

### SUBORDINATION; ESTOPPEL CERTIFICATE; FINANCIALS

16.1    Subordination, Attornment and Non-Disturbance.  Without the necessity of any additional document being executed by Tenant for the purpose of effecting a subordination, and at the election of Landlord or any Mortgagee or any ground lessor with respect to the land of which the Premises are a part, this Lease shall be subject and subordinate at all times to (i) all ground leases or underlying leases which may now exist or hereafter be executed affecting the Premises, and (ii) the lien of any Mortgage which may now exist or hereafter be executed in any amount for which the Premises, the Building, ground leases and/or underlying leases, and/or Landlord's interest or estate in any of said items, is specified as security.  Landlord or any such Mortgagee or ground lessor shall have the right, at its election, to subordinate or cause to be subordinated any such ground leases or underlying leases or any such liens to this Lease.  No subordination shall permit material interference with Tenant's rights hereunder, and any ground lessor or Mortgagee shall recognize Tenant and its permitted successors and assigns as the tenant of the Premises and shall not disturb Tenant's right to quiet possession of the Premises during the Term so long as no Event of Default has occurred and is continuing under this Lease.  If Landlord's interest in the Premises are acquired by any ground lessor or Mortgagee, or in the event proceedings are brought for the foreclosure of, or in the event of exercise of power of sale under, any Mortgage made by Landlord covering the Premises or any part thereof, or in the event a conveyance in lieu of foreclosure is made for any reason, Tenant shall, notwithstanding any subordination and upon the request of such successor in interest to Landlord, attorn to and become the Tenant of the successor in interest to Landlord and recognize such successor in interest as the Landlord under this Lease and the ground lessor, Mortgagee or other successor in interest to Landlord shall recognize Tenant and its permitted successors and assigns as the tenant of the Premises and shall not disturb Tenant's right to quiet possession of the Premises during the Term so long as no Event of Default has occurred and is continuing under this Lease.  Although this Section 16.1 is self-executing, Tenant covenants and agrees to execute and deliver, upon demand by Landlord and in the form requested by Landlord, or any Mortgagee, or ground lessor, any additional documents evidencing the priority or subordination of this Lease with respect to any such ground leases or underlying leases or the lien of any such Mortgage, and/or evidencing the attornment of Tenant to any successor in interest to Landlord as herein provided. Tenant's failure to timely execute and deliver such additional documents within ten (10) days following written request therefor shall, at Landlord's option, constitute an Event of Default hereunder.

16.2    Estoppel Certificate.  Tenant shall, within ten (10) days following written request by Landlord from time to time, execute and deliver to Landlord any documents, including estoppel certificates, in a form required by Landlord (i) certifying, to extent of Tenant's knowledge at the time, that this Lease is unmodified and in full force and effect or, if modified, attaching a copy of such modification and certifying that this Lease, as so modified, is in full force and effect and the date to which the Rent and other charges are paid in advance, if any, (ii) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of the Landlord or stating the nature of any uncured defaults, (iii) evidencing the status of this Lease as may be required by a Mortgagee or a purchaser of the Premises, (iv) certifying the current Monthly Rent amount and the amount and form of Security Deposit on deposit with Landlord, and (v) certifying to such other information as Landlord, Landlord's Agents, Mortgagees and/or prospective purchasers or their Mortgagees may reasonably request, including, but not limited to, any requested information regarding Hazardous Materials.  Tenant's failure to deliver an estoppel certificate within ten (10) days after delivery of Landlord's written request therefor shall if not cured within two (2) business days following a second notice from Landlord, at Landlord's option, constitute an Event of Default hereunder, and shall be conclusive against Tenant (1) that this Lease is in full force and effect and has not been modified except as represented by Landlord; (2) that there are no uncured defaults in Landlord's performance and that Tenant has no right of offset, counterclaim, or deduction against Rent; (3) not more than one (1) month's Rent has been paid in advance; and (4) as to the truth and accuracy of any other matters set forth in the form of estoppel certificate submitted to Tenant.

16.3    Financial Information.  Tenant shall deliver to Landlord, prior to the execution of this Lease, and within ten (10) days following written request therefor by Landlord from time to time during the Term (but not more than twice per calendar year), Tenant's current financial statements, and Tenant's financial statements for the two (2)

years prior to the current fiscal financial statement's year, certified to be true, accurate and complete by the chief financial officer of Tenant, including a balance sheet and profit and loss statement for the most recent prior year (collectively, the "Statements"), which Statements shall accurately and completely reflect the financial condition of Tenant and shall be provided on a non-consolidated basis. Landlord agrees that it will keep any non-publicly available Statements confidential, except that Landlord shall have the right to deliver the same to any proposed purchaser of the Premises, the Premises or any portion thereof, and to the Mortgagees of Landlord or such purchaser. Tenant acknowledges that Landlord is relying on the Statements in its determination to enter into this Lease, and Tenant represents to Landlord, which representation shall be deemed made on the date of this Lease and again on the Commencement Date, that no material change in the financial condition of Tenant, as reflected in the Statements, has occurred since the date Tenant delivered the Statements to Landlord.

## ARTICLE XVII

## SIGNS AND GRAPHICS

Subject to compliance with applicable laws, the CC&Rs and the rules and regulations of the Harbor Bay Business Park Association and subject to Landlord's reasonable approval, all of which shall be complied with and obtained by Tenant at Tenant's sole cost and expense, Tenant shall be entitled to erect a monument sign on the Premises and signage on the exterior the Building ("Permitted Signage"). Tenant shall have no right to maintain any other signs or graphics in any other location in, on or about the Premises and shall not display or erect any other signs, displays or other advertising materials that are visible from the exterior of the Building or outside of the Premises. Permitted Signage shall be installed and maintained by Tenant (and removed by Tenant upon the expiration or sooner termination of this Lease), at Tenant's sole cost and expense, and shall conform to the sign criteria established by Landlord from time to time for such signage. Tenant shall be responsible for paying to restore the Building and Premises, as the case may be, to good condition and repair upon the removal or modification of any sign. Tenant may use the Tenant Improvement Allowance to pay for a portion of the costs of such signage.

Landlord shall not be liable to Tenant for any use of any photograph or video of the exterior of the Building or the Property or for use of Tenant's name and logo and, during the last nine (9) months of the Lease Term, any photograph of the interior of the Premises (unless Landlord and Tenant are actively engaged in bona fide Lease renewal discussions), in reports, marketing materials or other promotional materials relating to the Premises. .

## ARTICLE XVIII

## QUIET ENJOYMENT

Landlord covenants that Tenant, upon performing the terms, conditions and covenants of this Lease, shall have quiet and peaceful possession of the Premises as against any person claiming the same by, through or under Landlord.

## ARTICLE XIX

## SURRENDER; HOLDING OVER

19.1    Surrender of the Premises.  Upon the expiration or sooner termination of this Lease, Tenant shall surrender the Premises to Landlord in its condition existing as of the Commencement Date of this Lease (as modified by the Tenant Improvements paid for, in whole or in part with the Tenant Improvement Allowance), normal wear and tear and acts of God excepted, with all interior walls in good repair, all carpets cleaned, the HVAC equipment, plumbing, electrical and other mechanical fixtures within the Premises in good operating order, reasonable wear and tear excepted, and all floors cleaned, all to the reasonable satisfaction of Landlord. Tenant shall remove those Alterations (including, without limitation, telecommunications and data cabling and wiring, but excluding any Tenant Improvements) which Tenant is required to remove pursuant to Section 8.1 above and Section 22.3 below and all Tenant's Personal Property, and shall repair any damage and perform any restoration work caused by such removal. If Tenant fails to remove such Alterations and Tenant's Personal Property which Tenant is authorized and obligated to remove pursuant to the above, and such failure continues after the expiration or sooner termination of this Lease, Landlord may retain such property and all rights of Tenant with respect to it shall cease, or Landlord may place all or any portion of such property in public storage for Tenant's account, or Landlord may dispose of such property in any other manner permitted by law. Tenant shall pay to Landlord, upon demand, the costs of removal of any such Alterations and Tenant's Personal Property and storage and transportation costs of same, and the cost of repairing and restoring the Premises, together with attorneys' fees and interest on said amounts at the Applicable Rate from the date of expenditure by Landlord. If the Premises are not so surrendered at the expiration or sooner termination of

this Lease, Tenant hereby agrees to Indemnify Landlord and Landlord's Agents against all Claims resulting from any delay by Tenant In so surrendering the Premises, including, but not limited to, any Claims made by any succeeding tenant, and actual attorneys' fees and costs.

      19.2   Holding Over.  If Tenant remains in possession of all or any part of the Premises after the expiration or sooner termination of this Lease with the prior written consent of Landlord, such possession shall constitute a month-to-month tenancy only and shall not constitute a renewal or extension for any further term.  If Tenant remains in possession of all or any part of the Premises after the expiration or sooner termination of this Lease without the prior written consent of Landlord, such possession shall constitute a tenancy at sufferance.  In either of such events, Monthly Rent shall be increased, for the first thirty (30) days of such holdover, to an amount equal to one hundred twenty-five percent (125%) of the Monthly Rent payable during the last full calendar month of the Term and, thereafter, to one hundred fifty percent (150%) of the Monthly Rent payable during the last full calendar month of the Term, and any other sums due hereunder shall be payable in the amounts and at the times specified in this Lease.  Any such tenancy shall be subject to every other term, condition and covenant contained in this Lease.

## ARTICLE XX

## CONSTRUCTION OF TENANT IMPROVEMENTS

      The obligations of Landlord and Tenant, if any, with respect to the Tenant Improvements are set forth in Article 22 of this Lease. It is acknowledged and agreed that all Tenant Improvements under this Lease are and shall be the property of Landlord from and after their installation.

## ARTICLE XXI

## MISCELLANEOUS AND INTERPRETIVE PROVISIONS

      21.1   Brokers.  Tenant represents and warrants to Landlord that Tenant has not had any dealings with any real estate broker, agent or finder in connection with the negotiation of this Lease or the introduction of the parties to this transaction, except for Brokers, and that it knows of no other real estate broker, agent or finder who is or might be entitled to a commission or fee in connection with this Lease.  In the event of any additional claims for brokers' or finders' fees with respect to this Lease, Tenant shall indemnify, hold harmless, protect and defend Landlord from and against such Claims if they shall be based upon any statement or representation or agreement made by Tenant, and Landlord shall indemnify, hold harmless, protect and defend Tenant from and against such Claims if they shall be based upon any statement, representation or agreement made by Landlord.

      21.2   Examination of Lease; Effectiveness.  Submission of this Lease for examination or signature by Tenant does not create a reservation of or option to lease. This Lease shall become effective and binding only upon full execution and delivery of this Lease by both Landlord and Tenant.

      21.3   No Recording.  Tenant shall not record this Lease or any memorandum of this Lease without Landlord's prior written consent, but if Landlord so requests, Tenant agrees to execute, have acknowledged and deliver a memorandum of this Lease in recordable form which Landlord thereafter may file for record.

      21.4   Quitclaim.  Upon any termination of this Lease, Tenant shall, at Landlord's request, execute, have acknowledged and deliver to Landlord an instrument in writing releasing and quitclaiming to Landlord all right, title and interest of Tenant in and to the Premises by reason of this Lease or otherwise.

      21.5   Modifications for Mortgagees.  If in connection with obtaining financing for the Premises or any portion thereof, Landlord's Mortgagees shall request reasonable modifications to this Lease as a condition to such financing, Tenant shall not unreasonably withhold, delay or defer its consent thereto, provided such modifications do not materially adversely affect Tenant's rights hereunder.  Tenant's failure to so consent shall constitute an Event of Default under this Lease.

      21.6   Notice.  Any Notice required or desired to be given under this Lease shall be in writing and shall be addressed to the address of the party to be served. The addresses of Landlord and Tenant are as set forth in Items 1 and 3, respectively, of the Basic Lease Provisions, except that (a) prior to the Commencement Date, the address for Notices to Tenant shall be as set forth below Tenant's signature on this Lease, and (b) from and after the Commencement Date, notwithstanding the addresses for Tenant set forth in Item 3 of the Basic Lease Provisions, all Notices regarding the operation and maintenance of the Premises shall be delivered to Tenant at the Premises. Each such Notice shall be deemed effective and given (i) upon receipt, if personally delivered, (ii) for any Notice given by

overnight courier, the next business day after deposit with the courier, (iii) upon being telephonically confirmed as transmitted, if sent by facsimile, email, telegram, telex or telecopy, (iv) two (2) business days after deposit in the United States mail in the County, certified and postage prepaid, properly addressed to the party to be served, or (v) upon receipt if sent in any other way. Any party hereto may from time to time, by Notice to the other in accordance with this Section 21.6, designate a different address than that set forth above for the purposes of Notice. In the event that Tenant's address for Notices is an address not located in California and/or is a Post Office box, mail-stop or the like, then, notwithstanding anything contained in this Section 21.6 to the contrary, any notice given by Landlord under California Code of Civil Procedure Sections 1161 and/or 1162 (including, without limitation, any Notices given by Landlord under Article XV above that are intended to satisfy the notice requirements under said Sections 1161 and/or 1162) may, at Landlord's option, be served by Landlord at the Premises (and any courtesy copy of such notice sent by Landlord in any other manner shall not affect the legal adequacy of the notice served by Landlord at the Premises).

    21.7    <u>Captions</u>. The captions and headings used in this Lease are for the purpose of convenience only and shall not be construed to limit or extend the meaning of any part of this Lease.

    21.8    <u>Executed Copy</u>. Any fully executed copy of this Lease shall be deemed an original for all purposes.

    21.9    <u>Time</u>. Time is of the essence for the performance of each term, condition and covenant of this Lease.

    21.10    <u>Severability</u>. If any one or more of the provisions contained herein shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Lease, but this Lease shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

    21.11    <u>Survival</u>. All covenants and indemnities set forth herein which contemplate the payment of sums, or the performance by Tenant after the Term or following an Event of Default, including specifically, but not limited to, the covenants and indemnities set forth in Section 6.3, Article VI, Article VII, Section 8.1, Section 9.2, Section 11.1, Section 11.10, Article XV, and Article XIX, and all representations and warranties of Tenant, shall survive the expiration or sooner termination of this Lease.

    21.12    <u>Choice of Law; Construction</u>. This Lease shall be construed and enforced in accordance with the laws of the State of California. The language in all parts of this Lease shall in all cases be construed as a whole according to its fair meaning and not strictly for or against either Landlord or Tenant, it being the intent of the parties that this Lease shall be interpreted as if it was prepared by both parties, and any ambiguities shall not be resolved in favor of Tenant because all or a portion of this Lease was prepared by Landlord.

    21.13    <u>Gender; Singular, Plural</u>. When the context of this Lease requires, the neuter gender includes the masculine, the feminine, a partnership, limited liability company or corporation or joint venture, the singular includes the plural and the plural includes the singular.

    21.14    <u>Non-Agency</u>. It is not the intention of Landlord or Tenant to create hereby a relationship of master-servant or principal-agent, and under no circumstance shall Tenant herein be considered the agent of Landlord, it being the sole purpose and intent of the parties hereto to create a relationship of landlord and tenant.

    21.15    <u>Successors</u>. The terms, covenants, conditions and agreements contained in this Lease shall, subject to the provisions as to assignment, subletting, and bankruptcy contained herein and any other provisions restricting successors or assigns, apply to and bind the heirs, successors, legal representatives and assigns of the parties hereto.

    21.16    <u>Waiver; Remedies Cumulative</u>. The waiver by either party of any term, covenant, agreement or condition herein contained shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant, agreement or condition herein contained, nor shall any custom or practice which may develop between the parties in the administration of this Lease be construed to waive or to lessen the right of Landlord to insist upon the performance by Tenant in strict accordance with all of the provisions of this Lease. The subsequent acceptance of Rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any provisions, covenant, agreement or condition of this Lease, other than the failure of Tenant to pay the particular Rent payment so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent payment. Landlord's acceptance of any check, letter or payment shall in no event be deemed an accord and satisfaction, and any such acceptance by Landlord shall be without prejudice to Landlord's right to recover the

balance of the Rent or pursue any other remedy available to it. The rights and remedies of either party under this Lease shall be cumulative and in addition to any and all other rights and remedies which either party has or may have.

21.17    Unavoidable Delay. Except for the monetary obligations of Tenant under this Lease, neither party shall be chargeable with, liable for, or responsible to the other for anything or in any amount for any Unavoidable Delay and any Unavoidable Delay shall not be deemed a breach of or default in the performance of this Lease, it being specifically agreed that any time limit provision contained in this Lease (other than the scheduled expiration of the Term) shall be extended for the same period of time lost by Unavoidable Delay.

21.18    Entire Agreement. This Lease is the entire agreement between the parties, and supersedes any prior agreements, representations, negotiations or correspondence between the parties except as expressed herein. Except as otherwise provided herein, no subsequent change or addition to this Lease shall be binding unless in writing and signed by the parties hereto.

21.19    Authority. If Tenant is a corporation, limited liability company or a partnership, then Tenant represents and warrants that individual executing this Lease on behalf of the corporation, limited liability company or partnership, as the case may be, is duly authorized to execute and deliver this Lease on behalf of said entity in accordance with its corporate bylaws, operating agreement, statement of partnership or certificate of limited partnership, as the case may be, and that this Lease is binding upon said entity in accordance with its terms. If Tenant is a corporation, Tenant shall, if requested by Landlord, within thirty (30) days after execution of this Lease, deliver to Landlord a certified copy of a resolution of the Board of Directors of the corporation or certificate of the Secretary of the corporation, authorizing, ratifying or confirming the execution of this Lease. If Tenant is a limited liability company, Tenant shall, if requested by Landlord, within thirty (30) days after the execution of this Lease, deliver to Landlord a certified copy of its operating agreement authorizing such execution. If Tenant is a partnership, Tenant shall, if requested by Landlord, within thirty (30) days after the execution of this Lease, deliver to Landlord a certified copy of its partnership agreement authorizing such execution.

21.20    Guaranty. As a condition to the execution of this Lease by Landlord, the obligations, covenants and performance of the Tenant as herein provided shall be guaranteed in writing by the Guarantor listed in item 14 of the Basic Lease Provisions, if any, on a form of guaranty provided by Landlord. The Tenant has represented that the Guarantor is endeavoring to complete a "Guarantor Recapitalization" which shall consist of the completion of each of the following:  (i) a reduction of Guarantor's debt, excluding trade payables, to no more than Seven Million Dollars ($7,000,000);  (ii) each of Guarantor's loans shall have a maturity date at least three (3) full years after the date on which the Guarantor Recapitalization is complete and such maturity date may not be accelerated by the lender for any reason other than default by the Guarantor;  (iii) the projected "Annual Free Cash Flow" divided by the "Annual Debt Service" for each of the two successive one-year periods following the Guarantor Recapitalization shall be no less than 2.0;  and (iv) Tenant shall have provided reasonable evidence to the Landlord that all of the foregoing requirements for completion of the Guarantor Recapitalization have occurred including without limitation, a balance sheet for the Guarantor certified by the Guarantor's CEO or CFO as being accurate and complete, and a certification under penalty of perjury by such officer that the other requirements of a Guarantor Recapitalization have occurred. Tenant agrees to use commercially reasonable efforts to assist Guarantor to effectuate the Guarantor Recapitalization and shall keep Landlord fully and promptly informed of the progress which has been made in completing the Guarantor Recapitalization. As used in this Section 21.20; "Annual Free Cash Flow" shall be equal to earnings before interest, taxes, dividends and amortization, less capital expenditures, as calculated in accordance with Generally Accepted Accounting Principles for any given one-year period; "Annual Debt Service" shall be equal to the sum of all interest, principal and other fees, costs and other payments due from Guarantor to any lender under any and all loans for any given one-year period; and the one-year periods referenced shall be the one-year periods starting on the first day of the month following the date on which items (i) and (ii) of the definition of Guarantor Recapitalization have been completed. Upon completion of the Guarantor Recapitalization, as evidenced by Tenant's submission to Landlord of a full and complete set all of the documents and information described in item (iv) of the definition of Guarantor Recapitalization, Landlord shall have thirty (30) days to review the information and documents provided to Landlord by Tenant and to notify the Tenant that Landlord agrees or reasonably disagrees that the Guarantor Recapitalization has occurred. If Landlord disagrees, Landlord shall provide Tenant with any specific reasons for Landlord's disagreement and Tenant shall have the right to address such specifics and to submit additional information and documents to address Landlord's concerns and then Landlord shall have ten (10) days to review such additional information and documents and to notify Tenant that Landlord agrees or disagrees that the Guarantor Recapitalization has occurred. Such process shall continue until Landlord agrees that a Guarantor Recapitalization has occurred, at which point the Guarantor Recapitalization shall be deemed to be a "Qualified Guarantor Recapitalization."

21.21    Exhibits: References.  All exhibits, amendments, riders and addenda attached to this Lease are hereby incorporated into and made a part of this Lease. In the event of variation or discrepancy, the duplicate original hereof (including exhibits, amendments, riders and addenda, if any, specified above) held by Landlord shall control. All references in this Lease to Articles, Sections, Exhibits, Riders and clauses are made, respectively, to Articles, Sections, Exhibits, Riders and clauses of this Lease, unless otherwise specified.

21.22    Basic Lease Provisions.  The Basic Lease Provisions at the beginning of this Lease are intended to provide general information only.  In the event of any inconsistency between the Basic Lease Provisions and the specific provisions of this Lease, the specific provisions of this Lease shall prevail.

21.23    No Merger.  The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation thereof, or a termination by Landlord, shall not work a merger, and shall, at the option of Landlord, terminate all or any existing subtenancies or may, at the option of Landlord, operate as an assignment to Landlord of any or all such subtenancies.

21.24    Joint and Several Obligations.  If more than one person or entity is Tenant, the obligations imposed on each such person or entity shall be joint and several.

21.25    No Light or Air Easement.  Any diminution or shutting off of light or air by any structure which may be erected on lands adjacent to the Building shall in no way affect this Lease, abate Rent or otherwise impose any liability on Landlord.  This Lease does not confer any right with regard to the subsurface below the ground level of the Building.

21.26    Security Measures.    Tenant hereby acknowledges that Landlord shall have no obligation whatsoever to provide guard service or other security measures for the benefit of the Premises.  Tenant assumes all responsibility for the protection of Tenant, Tenant's Agents and the property of Tenant and of Tenant's Agents from acts of third parties.  Nothing herein contained shall prevent Landlord, at Landlord's sole option, from providing security protection for the Premises, in which event the cost thereof shall be included within the definition of Premises Costs and paid by Tenant in the manner set forth in Section 7.1.

21.27    Transfers by Landlord.  Landlord (and any party comprising Landlord) and its successors in interest shall have the right to transfer their respective interests in this Lease, the Building and the Premises at any time and to any person or entity.  In the event of any such transfer(s), the Landlord originally named herein (and, in the case of any subsequent transfer(s), the applicable transferor(s)) shall be automatically relieved from the date of such transfer, without further act by any person or entity, of all liability under any and all of the covenants and obligations of Landlord contained in or derived from this Lease accruing from and following the date of such transfer, and, upon the request of Landlord, Tenant agrees to attorn to any entity purchasing or otherwise acquiring the Premises.

21.28    Counterparts.  This Lease may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed one and the same instrument.

21.29    No Offer.  The submission of this Lease to Tenant by Landlord shall not be construed as an offer, nor shall either party hereto have any rights under this Lease unless each of Landlord and Tenant executes a copy of this Lease and delivers same to the other party hereto.

### ARTICLE XXII

### ADDITIONAL PROVISIONS

22.1    Additional Requirements Relating to Alterations and Other Work.    The following terms and conditions shall apply to any work or service performed at the Building or on the Premises by Tenant or Tenant's contractors (including, without limitation, Alterations, repairs, maintenance, janitorial and cleaning services), which terms and conditions are in addition to those set forth in the Lease, including, without limitation, the terms and conditions set forth in Article VIII:

(a)    General Requirements.  Such work or services shall not proceed until Landlord has approved in writing:  (i) Tenant's contractor and the form of contract with such contractor (which form shall name Landlord as an express third party beneficiary of the contract and which form shall provide that changes in the contract, including any change orders, shall require the advance approval of the Landlord), (ii) the amount and coverage of public liability, builder's risk and property damage insurance, with Landlord, the

Mortgagees and the Additional Insureds named in Item 16 of the Basic Lease Provisions named as additional insureds, carried by Tenant's contractor, (iii) complete and detailed plans and specifications for such work, and (iv) a schedule for the performance of the work or services. If the work in question consists solely of paint and carpeting, only clause (ii) of the preceding sentence shall apply, and clauses (i), (iii) and (iv) shall not apply to the work in question. Tenant shall use its commercially reasonable efforts to Substantially Complete the Work by the date(s) set forth on the schedule for performance of the work or services.

(b)    Permits; Compliance with Applicable Laws.  All work and services shall be performed in conformity with a valid permit when required, a copy of which shall be furnished to Landlord before commencement of such work or services. In any case, all work and services shall be performed in accordance with all Applicable Laws and Landlord's specifications for quality. Notwithstanding any failure by Landlord to object to any such work or services, Landlord shall have no responsibility for Tenant's failure to comply with Applicable Laws.

(c)    Indemnity.  Tenant agrees to indemnify, defend and hold Landlord and Landlord's Agents harmless from and against all Claims relating to any work or services performed, including, without limitation, Claims for mechanics' and materialmen's' liens for or relating to the Work.

(d)    Union Labor.  Tenant understands that all contractors and subcontractors retained at the Premises by Landlord or Tenant to perform any work or services shall be signatory to a union collective bargaining agreement.

(e)    Development Review.  Tenant shall pay to Landlord, upon demand, a development review fee equal to three percent (3%) of the total cost of any Alterations as compensation to Landlord for review, oversight and related functions performed by Landlord or its agents in connection with such Alterations; provided, however, that such fee shall not apply to the cost of materials or installation of new paint and carpeting in the interior of the Building which is part of the Premises.

(f)    Improvement Allowance.  Landlord shall provide a tenant improvement allowance (the "Tenant Improvement Allowance") which Tenant may obtain to reimburse itself for out-of-pocket costs, paid by the Tenant, during the twelve (12) month period following the Commencement Date or pursuant to the provisions of Section 22.1(k) below, for the cost of designing, permitting, managing and constructing tenant improvements ("Tenant Improvements") in the Building and, if applicable, Landlord's development review fee. The Tenant Improvement Allowance will not be paid at any time following: (i) an Event of Default has occurred and is continuing; or (ii) after Landlord gives notice of a breach which will become an Event of Default if the breach in question is not cured within the periods specified in Section 15.1 for the breach in question. The Tenant Improvements shall be subject to Landlord's prior reasonable review and approval, shall be consistent with the design and quality of comparable office buildings in the general vicinity and shall not include furniture, fixtures, equipment or specialized improvements not common in comparable office buildings in the vicinity. The Tenant Improvement Allowance may also be used to pay such costs paid by Tenant for the monument sign which Tenant plans to construct on the Premises.  The Tenant Improvement Allowance shall be up to Fifteen Dollars ($15.00) per rentable square foot of space in the Building; of this amount, Four Dollars ($4.00) per rentable square foot of space in the Building (the "Four Dollar Allowance") shall be available from the date of this Lease and the balance of the Fifteen Dollars ($15.00), that is, Eleven Dollars ($11.00) per rentable square foot of space in the Building (the "Eleven Dollar Allowance"), shall be available if the Guarantor has a Qualified Guarantor Recapitalization on or before September 30, 2013. If the Guarantor Recapitalization does not become a Qualified Guarantor Recapitalization on or before September 30, 2013, then the Eleven Dollar Allowance shall not be available at all and the Monthly Rent for the balance of the Initial Term of this Lease shall be reduced as shown in the "Alternate Monthly Rent Table if no Qualified Guarantor Recapitalization" which is included in Section 9 of the Basic Lease Provisions. Landlord shall retain any portion of the Tenant Improvement Allowance not paid to Tenant during the period following the date of this Lease and ending twelve (12) months thereafter as to the initial Four Dollar Allowance and starting on the date the Guarantor Recapitalization becomes a Qualified Guarantor Recapitalization and ending twelve (12) months thereafter as to the Eleven Dollar Allowance.  Notwithstanding the preceding sentence, if Tenant qualifies for the Eleven Dollar Allowance and if amounts thereunder have not been paid to Tenant during the twelve (12) month period when the Eleven Dollar Allowance may be paid to Tenant, then the unpaid portion of the Eleven Dollar Allowance, but not in excess of Five Dollars ($5.00) per agreed rentable square foot in the Building, shall be applied to reduce the Rent payable in each full calendar month remaining in the Term of the Lease from and including the first full calendar month of the Term following the twelve (12) month period and the last of which shall be the final full calendar month of the Term (with the reduction in each month to be equal to the amount of the reduction in each other month).

(g)    Application and Payment.    Prior to commencement of any construction on the Premises, Tenant shall have plans and specifications for the work approved by Landlord, shall obtain permits and bids from contractors for the completion of the same and shall deposit with Landlord the amount, if any, by which   the total estimated costs for the design, permits, management and construction of the Tenant Improvements and Signage to which the Tenant Improvement Allowance may be applied exceeds the amount of the undisbursed balance of the Tenant Improvement Allowance. Landlord shall then first use Tenant's funds to reimburse Tenant for amounts described in Section 22.1(f) which are subject to being reimbursed and then, subject to Section 22.1(f) above, the Tenant Improvement Allowance.  Each application for payment shall include copies of paid invoices and unconditional lien waivers for (i) all amounts previously paid by Tenant and (ii) for all amounts previously disbursed by Landlord.  The application shall also include the most recent application for payment from Tenant's contractor and for each of Tenant's other consultants' work on the Tenant Improvements and signage and a summary showing the amount disbursed, the percentage complete, the effect of any change orders, the funds required to complete the work in question and any other information which the Tenant has received from its contractors or consultants for the Tenant Improvements and Signage in question.  If any application shows that completion of the Tenant Improvements or signage on the Premises cannot be completed using the amounts then being held by Landlord for disbursement to Tenant in accordance with this paragraph, then the Tenant shall deposit the shortfall with Landlord within five (5) days after request by Landlord.  Applications shall be processed and paid within thirty (30) days after the application is submitted to Landlord along with the payment of any shortfall.  Except for the cost of materials or installation of new paint and carpeting in the interior of the Building, which is part of the Premises, Landlord shall retain an amount (the "Retention") equal to ten percent (10%) of each requested payment to be disbursed thirty (30) days after a notice of completion is recorded in accordance with Section 22.1(h) below.

(h)    Notices Relating to Construction.    Prior to Commencement of any work on the Premises, Tenant shall prepare a Notice of Non-Responsibility, for Landlord's signature, and, prior to commencement of work, shall record the same in the Official Records of the County where the Premises are located.  Prior to applying for payment of the Retention, Tenant shall record a Notice of Completion and a conformed copy of the recorded Notice of Completion shall be submitted with Tenant's application for the release of the Retention. Each such notice shall be in the form required by statute and in a form and content satisfactory to Landlord.

(i)    As Builts.  Within ten (10) days after the Notice of Completion is recorded, Tenant shall provide Landlord with as built plans for the Tenant Improvements and for the signage described above which Tenant intends to install on the Premises.

(j)    Test Fit.    Upon receipt of an invoice from Tenant's architect, which shall be submitted by Tenant for payment, and upon approval by Tenant, Landlord shall pay the architect, in addition to any amount Landlord is otherwise committed to pay hereunder, the sum of up to Four Thousand Dollars ($4,000.00), but not in excess of the actual charge by the architect, for a "test fit" space plan for the Tenant in the Premises.

(k)    Existing Agreements.    The parties acknowledge that, prior to the Commencement Date, Tenant has entered into agreements for painting and carpeting portions of the Premises, which agreements have been approved by Landlord and consist of the following: (i) a contract between Tenant and George E. Masker, Inc., dated 11/28/2011, for painting the Building in the amount of $30,504.00; and, (ii) a contract between Tenant and Baxley, Inc., dated 11/04/2011 for procurement and installation of carpeting in the Premises, in the amount of $210,125. The form of such agreements has been approved by Landlord, and payment for work thereunder shall be made in accordance with Section 22.1(g) above.  As of the date of this Lease, Landlord has approved Tenant's Tenant Improvement costs listed on Exhibit D in the amount of $123,577.85, in addition to the $4,000 in reimbursement for the "test fit" pursuant to Section 22.1(j) above, for a total of $127,577.85; however, such amounts shall not be paid to Tenant until Tenant has delivered to Landlord the invoices and lien releases described in Section 22.1(g) above.  If the Four Dollar Allowance is exhausted by payments made under the agreements described in the preceding sentence, then the balance due under such agreements shall be paid by Tenant and shall be reimbursed by Landlord from a portion of the Eleven Dollar Allowance when, and if, the Eleven Dollar Allowance becomes available hereunder.

22.2    Restricted Persons.  Tenant warrants, represents and covenants to Landlord that neither Tenant nor any of its affiliates, assignees, sublessees or permitted users of the Premises, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents is , nor will they become, a person or entity with whom United States persons or entities are restricted from doing business under existing or future regulations of the Office of Foreign Assets Control ("OFAC") of

the Department of the Treasury (including, without limitation, those named on OFAC's Specially Designated and Blocked Persons List) or under any existing or future statute, executive order (including, without limitation, Executive Order 13224 entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action, and is not and will not engage in any dealings or transactions or be otherwise associated with such persons or entities. Any breach or violation of this Section 22.2 shall, at Landlord's option, constitute an Event of Default by Tenant under this Lease.

    22.3    ERISA Representations and Agreements.

        (a)    Tenant acknowledges that Landlord ("Pension Fund") is governed by and subject to regulation under the ERISA. In accordance with requirements under ERISA, Tenant hereby represents and warrants to Landlord that neither Tenant nor any ERISA Affiliate (as hereinafter defined) currently has or, within the past year, has had the power to appoint or terminate McMorgan & Company LLC as a manager of Pension Fund assets involved in this transaction, or otherwise negotiate on behalf of the Pension Fund the terms of the investment management agreement with McMorgan & Company LLC, with respect to the Pension fund assets involved in this transaction (the "Appointing Party"). An "ERISA Affiliate" of Tenant means:

        (b)    any other person directly or indirectly controlling, controlled by or under common control with Tenant, or

        (c)    any corporation, partnership, trust or unincorporated enterprise of which Tenant is an officer, director, five-percent or more partner, or employee (but only if employed by the plan sponsor), or

        (d)    any director or employee of Tenant who is a highly compensated employee as defined in Section 4975 (e)(2)(H) of the Internal Revenue Code, or

        (e)    any director or employee of Tenant who has direct or indirect authority, responsibility or control regarding the custody, management or disposition of Pension Fund assets involved in this transaction, or

        (f)    a named fiduciary of Pension Fund, within the meaning of Section 402(a)(2) of ERISA.

The definition of an ERISA Affiliate above is derived from Prohibited Transaction Class Exemption 84-14, March 13, 1984 (49 FR 9494); (amended July 6, 2010 (75 FR 38837)). Tenant hereby represents and warrants to Landlord that Tenant has no interest which constitutes the assets of an "employee benefit plan," as defined in Section 3(3) of ERISA, or a "plan," as defined in Section 4975(e)(1) of the Internal Revenue Code, for purposes of Section 406 of ERISA or Section 4975 of the Internal Revenue Code. The Tenant's representations, warranties and agreements in this Section shall survive the expiration or earlier termination of the Lease, as hereby amended. Tenant agrees that, so long as Landlord owns the Landlord's interest under the Lease, as hereby amended, Tenant shall not assign or sublet the Premises to an Appointing Party. Any attempted assignment or subletting in violation of the foregoing agreements shall be void and constitute a default under the Lease, as hereby amended. The breach of the foregoing representations and warranties or of the foregoing agreements shall be a material default under the Lease, as hereby amended, and Landlord shall have all remedies provided in the Lease, as hereby amended, upon the occurrence of a Default under the Lease, as hereby amended

    22.4    Telecommunications.

        (a)    Tenant and its telecommunications companies, including local exchange telecommunications companies and alternative vendor service companies, shall have no right of access to or within the Building or the Premises for the installation or operation of telecommunications services or systems, including, but not limited to, voice, video, data, and other telecommunications services provided over wire, fiber optic, microwave, wireless, or any other transmission system, for all or part of Tenant's telecommunications within the Building and from the Building or the Premises to any other location without Landlord's prior written consent, which Landlord may withhold in its sole discretion.

        (b)    In the event that Landlord consents in writing to the installation of any cabling and/or wires, in which case Tenant shall be responsible for ensuring that any such cabling and/or wiring is properly labeled. Tenant acknowledges and agrees that the following terms and conditions shall apply to the same:

(i) · No later than the tenth (10th) day after the expiration or sooner termination of the Lease, Landlord may elect by written notice to Tenant (the "Election Right") to:

(1) Retain any or all wiring, cables, risers, and similar installations appurtenant thereto installed by Tenant in the risers of the Building (the "Wiring");

(2) Remove any or all such Wiring and restore the Premises and risers to their condition existing prior to the installation of the Wiring (the "Wire Restoration Work"). Landlord shall perform such Wire Restoration Work at Tenant's sole cost and expense; or

(3) Require Tenant to perform the Wire Restoration Work at Tenant's sole cost and expense.

(c)    In the event Landlord elects to retain the Wiring, Tenant covenants that:

(i) Tenant shall convey good title to such Wiring, Tenant shall have good right to surrender such Wiring, and such Wiring shall be free of all liens and encumbrances; and

(ii) All wiring shall be left in good condition, working order, properly labeled at each end and in each telecommunications/electrical closet and junction box, and in safe condition.

(d)    Notwithstanding anything to the contrary in Section 4.6, Landlord may retain Tenant's Security Deposit, if any, after the expiration or sooner termination of this Lease until the earliest of the following events:

(i) Landlord elects to perform the Wire Restoration Work, the Wire Restoration Work is complete, and Tenant has fully reimbursed Landlord for all costs related thereto; or

(ii) Landlord elects to require Tenant to perform the Wire Restoration Work, the Wire Restoration Work is complete, and Tenant has paid for all costs related thereto.

(e)    In the event Tenant fails or refuses to pay all costs of the Wire Restoration Work within thirty (30) days after Tenant's receipt of Landlord's notice requesting Tenant's reimbursement for or payment of such costs, Landlord may apply all or any portion of Tenant's Security Deposit, if any, toward the payment of such unpaid costs relative to the Wire Restoration Work.

(f)    The retention or application of the Security Deposit, if any, as provided in this Section 21.30 does not constitute a limitation on or waiver of Landlord's right to seek further remedy under this Lease, at law, or in equity.

(g)    The provisions of this Section 21.30 shall survive the expiration or sooner termination of this Lease.

22.5    Letter of Credit.

(a)    Delivery of Letter of Credit; Key Provisions.    Tenant shall deliver to Landlord, concurrently with Tenant's execution of this Lease, an unconditional, clean, irrevocable letter of credit (the "L-C") in the amount set forth in Section 22.5(c) below (the "L-C Amount"), which L-C shall be issued by a money-center, solvent and nationally recognized bank (a bank which accepts deposits, maintains accounts, has a local San Francisco office which will negotiate a letter of credit, and whose deposits are insured by the FDIC) reasonably acceptable to Landlord (such approved, issuing bank being referred to herein as the "Bank"), which Bank must have a short term Fitch Rating which is not less than "F1", and a long term Fitch Rating which is not less than "A"(or in the event such Fitch Ratings are no longer available, a comparable rating from Standard and Poor's Professional Rating Service or Moody's Professional Rating Service) (collectively, the "Bank's Credit Rating Threshold"), and which L-C shall be in the form of Exhibit C, attached hereto. Tenant shall pay all expenses, points and/or fees incurred by Tenant in obtaining the L-C. The L-C shall (i) be "callable" at sight, irrevocable and unconditional, (ii) be maintained in effect, whether through renewal or extension, for the period commencing on the date of this Lease and continuing until the date (the

"L-C Expiration Date") that is no less than sixty (60) days after the expiration of the Term, as the same may be extended, and Tenant shall deliver a new L-C or certificate of renewal or extension to Landlord at least thirty (30) days prior to the expiration of the L-C then held by Landlord, without any action whatsoever on the part of Landlord, (iii) be fully assignable by Landlord, its successors and assigns, (iv) permit partial draws and multiple presentations and drawings, and (v) be otherwise subject to the Uniform Customs and Practices for Documentary Credits (2007-Rev), International Chamber of Commerce Publication #600. Landlord, or its then managing agent, shall have the right to draw down an amount up to the face amount of the L-C if any of the following shall have occurred or be applicable: (A) such amount is past due to Landlord under the terms and conditions of the Lease, as amended, or (B) Tenant has filed a voluntary petition under the U. S. Bankruptcy Code or any state bankruptcy code (collectively, "**Bankruptcy Code**"), or (C) an involuntary petition has been filed against Tenant under the Bankruptcy Code, or (D) the Lease, as amended, has been rejected, or is deemed rejected, by Tenant under Section 365 of the U.S. Bankruptcy Code, or (E) the Bank has notified Landlord that the L-C will not be renewed or extended through the L-C Expiration Date, or (F) Tenant is placed into receivership or conservatorship, or becomes subject to similar proceedings under federal or state law, or (G) Tenant executes an assignment for the benefit of creditors, or (H) if (1) any of the Bank's Fitch Ratings (or other comparable ratings to the extent the Fitch Ratings are no longer available) have been reduced below the Bank's Credit Rating Threshold, or (2) there is otherwise a material adverse change in the financial condition of the Bank, and Tenant has failed to provide Landlord with a replacement letter of credit, conforming in all respects to the requirements of this Section 22.5, in the amount of the applicable L-C Amount, within ten (10) days following Landlord's demand in the event of the ratings reduction or the material adverse change (each of the foregoing being an "**L-C Draw Event**"). Tenant shall be responsible for the payment of any and all costs incurred by Landlord in connection with the review of any replacement L-C (including without limitation Landlord's reasonable attorneys' fees), if replacement is required to avoid an L-C Draw Event or is otherwise requested by Tenant. In the event of an assignment by Tenant of its interest in the Lease, as amended (and irrespective of whether Landlord's consent is required for such assignment), the acceptance of any replacement or substitute letter of credit by Landlord from the assignee shall be subject to Landlord's prior written approval, in Landlord's reasonable discretion, and the attorney's fees incurred by Landlord in connection with such determination shall be payable by Tenant to Landlord within ten (10) days of billing.

(b)     Application of Proceeds. Landlord is entering into this Lease in material reliance upon the ability of Landlord to draw upon the L-C upon the occurrence of any L-C Draw Event. Upon the occurrence of an L-C Draw Event, Landlord may, but without obligation to do so, and without notice to Tenant, draw upon the L-C, in whole or in part, to cure any such L-C Draw Event and/or to compensate Landlord for any and all damages of any kind or nature sustained or which Landlord reasonably estimates that it will sustain resulting from the occurrence of the L-C Draw Event and/or to compensate Landlord for any and all damages arising out of, or incurred in connection with, the termination of the Lease. The use, application or retention of the L-C, or any portion thereof, by Landlord shall not prevent Landlord from exercising any other right or remedy provided by the Lease or by any applicable law, it being intended that Landlord shall not first be required to proceed against the L-C, and such L-C shall not operate as a limitation on any recovery to which Landlord may otherwise be entitled. Tenant agrees not to interfere with payment to Landlord of the proceeds of the L-C, either prior to or following a "draw" by Landlord of any portion of the L-C, regardless of whether any dispute exists between Tenant and Landlord as to Landlord's right to draw upon the L-C. Tenant agrees and acknowledges that (i) the L-C constitutes a separate and independent contract between Landlord and the Bank, (ii) Tenant is not a third party beneficiary of such contract, (iii) Tenant has no property interest whatsoever in the L-C or the proceeds thereof, and (iv) in the event Tenant becomes a debtor under any chapter of the Bankruptcy Code, Tenant is placed into receivership or conservatorship, and/or there is an event of a receivership, conservatorship or a bankruptcy filing by, or on behalf of, Tenant, neither Tenant, any trustee, nor Tenant's bankruptcy estate shall have any right to restrict or limit Landlord's claim and/or rights in and under the L-C and/or the proceeds thereof by application of Section 502(b)(6) of the U. S. Bankruptcy Code or otherwise.

(c)     L-C Amount; Maintenance of L-C by Tenant.

(i)     The L-C Amount shall be Fifty Thousand and 00/100 Dollars ($50,000.00).

(ii)     If, as a result of any draw by Landlord of all or any portion of the amounts available under the L-C, the amount of the L-C shall be less than the L-C Amount, Tenant shall, within five (5) days thereafter, provide Landlord with additional letter(s) of credit in an amount equal to the deficiency and any such additional letter(s) of credit shall comply with all of the provisions of this Section 22.5. If the L-C expires earlier than the L-C Expiration Date, Landlord will accept a renewal thereof (such renewal letter of credit to be

In effect and delivered to Landlord not later than thirty (30) days prior to the expiration of the L-C), which shall include all of the terms of the expiring L-C. The proceeds of the L-C may be applied by Landlord against any Rent that is not paid when due, to Rent accruing in the future if Landlord is exercising its rights under Section 1951.4 of the California Civil Code, and/or to pay for all losses and damages that Landlord has suffered or that Landlord reasonably estimates that it will suffer as a result of any breach or default by Tenant under the Lease. If Landlord elects to exercise its rights under the foregoing sentence, (i) any unused proceeds shall constitute the property of Landlord and need not be segregated from Landlord's other assets, and (ii) Landlord agrees to pay to Tenant within thirty (30) days after the later of Lease termination and the L-C Expiration Date the amount of any proceeds of the L-C received by Landlord and not applied against any Rent and/or damages as provided in the preceding sentence. Landlord shall not be obligated to make such payment in the amount of the unused L-C proceeds until either all preference issues relating to payments under the Lease have been resolved.

LANDLORD'S INITIALS                    TENANT'S INITIALS

(d)    Transfer and Encumbrance.   The L-C shall also provide that Landlord may, from time to time, without notice to Tenant and without first obtaining Tenant's consent, transfer its interest under the L-C to another person or entity, regardless of whether or not such transfer is in connection with the assignment by Landlord of its rights and interests under the Lease. In the event of a transfer of Landlord's interest under the L-C, Landlord shall be released, automatically, from all liability in connection with the L-C. In connection with any such transfer of the L-C by Landlord, Tenant shall, at Tenant's sole cost and expense, execute and submit to the Bank such applications, documents and instruments as may be necessary to effectuate such transfer and, Landlord shall be responsible for paying the Bank's transfer and processing fees in connection therewith to a maximum of $200.00; provided that, Tenant shall have the right (in its sole discretion), but not the obligation, to pay such fees on behalf of Landlord, in which case Landlord shall reimburse Tenant within ten (10) days after Tenant's demand the amount of the fees in question, but not in excess of $200.00.

(e)    L-C Not a Security Deposit.   Landlord and Tenant agree that neither the L-C nor any proceeds drawn thereunder shall be a "security deposit" under any law applicable to security deposits including, but not limited to, Section 1950.7 of the California Civil Code (the "**Security Deposit Laws**"). Landlord and Tenant waive any and all rights, duties and obligations that they now have, or in the future may have, relating to or arising from the Security Deposit Laws. The foregoing waiver by Tenant includes, without limitation, a waiver of the right to claim that the Security Deposit Laws apply to the proceeds drawn under the L-C or prevent Landlord from applying such proceeds to compensate Landlord for any damages Landlord suffers as a result of any breach or default under or termination of the Lease.

(f)    Waiver of Certain Relief.   Tenant unconditionally and irrevocably waives (and as an independent covenant hereunder, covenants not to assert) any right to claim or obtain any of the following relief in connection with the L-C:

(i)    Temporary restraining order, temporary injunction, permanent injunction, or other order that would prevent, restrain or restrict the presentment of documents and sight drafts under any L-C or the Bank's honoring or payment of sight draft(s); or

(ii)    Any attachment, garnishment, or levy in any manner upon either the proceeds of any L-C or the obligations of the Bank (either before or after the presentment to the Bank of sight drafts drawn under such L-C) based on any theory.

(g)    Remedy for Improper Drafts.   Tenant's sole remedy in connection with the improper presentment or payment of sight drafts drawn under any L-C shall be the right to obtain from Landlord a refund of the amount paid in connection with any sight draft(s) that was(were) improperly presented or the proceeds of which were misapplied, provided that, at the time of such refund, Tenant applies such refund to increases in the amount of such L-C to the amount (if any) then required under the applicable provisions of the Lease, as amended. Tenant acknowledges that the presentment of sight drafts drawn under any L-C, or the Bank's payment of sight drafts drawn

under such L.-C, could not under any circumstances cause Tenant injury that could not be remedied by an award of money damages, and that the recovery of money damages would be an adequate remedy therefor.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the date of this Lease.

LANDLORD:

PTF FOR OPERATING ENGINEERS, LLC,
a Delaware limited liability company

By:      McMorgan & Company LLC,
         a Delaware limited liability company,
Its:     Manager

         By: _____
         Name:    Malcolm Talcott
         Its:     Vice President

TENANT:

ASSOCIATED THIRD PARTY ADMINISTRATORS, a
California corporation

By: _____

Name: _Richard STTERWALT_

Its: _President & CEO_


By: _____

Name: _Diane Gist_

Its: _SR. Vice President_


TENANT'S ADDRESS FOR NOTICES PRIOR TO
COMMENCEMENT DATE:

_1640 South Loop Rd._
_Alameda, CA 94502_
Attn: _Richard Sterrwalt_

## EXHIBIT A

### DESCRIPTION OF PREMISES

This Exhibit is attached to and made a part of that certain Standard Form Office Lease dated as of March 21, 2012, by and between PTF FOR OPERATING ENGINEERS, LLC, as Landlord, and ASSOCIATED THIRD PARTY ADMINISTRATORS, as Tenant for Premises known as 1640 South Loop Road, Alameda, California.

Parcel 3, Parcel Map 5274, Filed February 29, 1988, Parcel Map Book 176, page 4, Alameda County Records.

APN 74-1339-30

<u>EXHIBIT B</u>

RULES AND REGULATIONS

This Exhibit is attached to and made a part of that certain Standard Form Office Lease dated as of March 21, 2011, by and between PTF FOR OPERATING ENGINEERS, LLC, as Landlord, and ASSOCIATED THIRD PARTY ADMINISTRATORS, as Tenant for Premises known as 1640 South Loop Road, Alameda, California

      This Exhibit sets forth the rules and regulations governing Tenant's use of the Premises leased to Tenant pursuant to the terms, covenants and conditions of the Lease to which this Exhibit is attached. Unless otherwise defined, capitalized terms used herein shall have the same meanings as set forth in the Lease. In the event of any conflict or inconsistency between this Exhibit and the Lease, the Lease shall control.

     1.    Tenant shall not place anything or allow anything to be placed near the glass of any window, door, partition or wall which may appear unsightly from outside the Premises.

     2.    The walls, walkways, sidewalks, entrance passages, courts and vestibules shall not be obstructed or used for any purpose other than ingress and egress of pedestrian travel to and from the Premises, and shall not be used for loitering or gathering, or to display, store or place any merchandise, equipment or devices, or for any other purpose. Landlord may remove any such obstruction without notice or obligation to Tenant. The walkways, entrance passageways, courts, vestibules and roof are not for the use of the general public and Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence in the judgment of the Landlord shall be prejudicial to the safety, character, reputation and interests of the Building, provided that nothing herein contained shall be construed to prevent such access to the Building to persons with whom Tenant normally deals in the ordinary course of Tenant's business unless such persons are engaged in illegal activities. Neither Tenant nor any employee or invitee of Tenant, other than HVAC contractors approved by Landlord which service Tenant's HVAC equipment which provide service to Tenant's Server Room, shall be permitted upon the roof of the Building.

     3.    No awnings or other projection shall be attached to the outside walls of the Building. No security bars or gates, curtains, blinds, shades or screens shall be attached to or hung in, or used in connection with, any window or door of the Premises without the prior written consent of Landlord. Neither the interior nor exterior of any windows shall be coated or otherwise sunscreened without the express written consent of Landlord.

     4.    Tenant shall not in any way deface any part of the Premises. Tenant shall not remove or lay linoleum, tile, carpet or other similar floor covering so that the same shall be affixed to the floor of the Building in any manner except as approved by Landlord in writing. The expense of repairing any damage resulting from a violation of this rule or removal of any floor covering shall be borne by Tenant.

     5.    The toilet rooms, urinals, wash bowls and other plumbing apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever shall be thrown therein. The expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by Tenant.

     6.    Landlord shall direct electricians as to the manner and location of any future telephone wiring. No boring or cutting for wires will be allowed without the prior written consent of Landlord. The locations of the telephones, call boxes and other office equipment affixed to the Premises shall be subject to the prior written approval of Landlord.

     7.    The Premises shall not be used for manufacturing, retail sales, or the storage of merchandise. No exterior storage shall be allowed at any time without the prior written approval of Landlord. The Premises shall not be used for cooking, a beauty parlor, manicuring, any medical use or washing of clothes without the prior written consent of Landlord, or for lodging or sleeping or for any immoral or illegal purposes.

     8.    Tenant shall not make, or permit to be made, any unseemly or disturbing noises or disturb or interfere with occupants of neighboring buildings or premises or those having business with them, whether by the use of any musical instrument, radio, phonograph, machinery, or otherwise. Tenant shall not use keep or permit to be used, or kept, any foul or obnoxious gas or substance in the Premises or permit or suffer the Premises to be used or occupied in any manner offensive or objectionable to Landlord or occupants of neighboring buildings or premises by reason of any odors, fumes or gases.

831227.10/SF
370251-00000/4-5-12/lgm/lgm

EXHIBIT B
-2-

9.      Parking any type of recreational vehicles is specifically prohibited.  No vehicle of any type shall be stored in the parking areas at any time.  In the event that a vehicle is disabled, it shall be removed within 48 hours.  There shall be no "For Sale" or other advertising signs on or about any parked vehicle.  All vehicles shall be parked in the designated parking areas in conformation with all signs and other markings.

10.      Neither Tenant nor any of Tenant's Agents shall at any time bring or keep upon the Premises any toxic, hazardous, inflammable, combustible or explosive fluid, chemical or substance without the prior written consent of Landlord.  Smoking or carrying cigars or cigarettes on the Premises may be regulated from time to time as determined by Landlord, and Tenant and Tenant's Agents shall strictly comply with any such regulations.

11.      Except as required by law, no animals shall be permitted at any time within the Premises.

12.      Tenant shall not use the name of the Building in connection with or in promoting or advertising the business of Tenant, except as Tenant's address, without the prior written consent of Landlord.  Landlord shall have the right to prohibit any advertising by Tenant which, in Landlord's reasonable opinion, tends to impair the reputation of the Premises or its desirability for its intended uses, and, upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising.

13.      Canvassing, soliciting, peddling, parading, picketing, demonstrating or otherwise engaging in any conduct that unreasonably impairs the value or use of the Premises are prohibited and Tenant shall cooperate to prevent the same.

14.      All equipment of any electrical or mechanical nature shall be placed by Tenant on the Premises, in settings approved by Landlord in writing, in such a way as to best minimize, absorb and prevent any vibration, noise or annoyance.  No cooking shall be done or permitted upon the Premises except pursuant to normal use of a microwave oven, toaster oven and coffee maker for the sole benefit of Tenant and Tenant's Agents.

15.      No safes, computers or other objects larger or heavier than the design load of the Building's floors shall be brought into or installed in the Premises.  Landlord shall have the right to prescribe and approve of the weight and position of safes, computers or other large or heavy objects which shall, if deemed necessary by Landlord, be placed on some type of applicable platform prescribed by Landlord to distribute the weight.  The moving of safes, computers or other large or heavy objects shall occur only between those hours as may be designated by, and only upon previous written notice to, Landlord, and the persons employed to move those objects in or out of the Building must be reasonably acceptable to Landlord.

16.      No air conditioning unit or other similar apparatus shall be installed or used by Tenant without the prior written consent of Landlord.  Tenant shall not install equipment, such as but not limited to electronic tabulating or computer equipment, requiring electrical or air conditioning service in excess of that to be provided by Landlord under the Lease.

17.      No aerial antenna or other devices shall be erected on the roof or exterior walls of the Building, or on the grounds, without in each instance the prior written consent of Landlord (which consent may be withheld by Landlord in its sole and absolute discretion).  Any aerial antenna or other device so installed by or on behalf of Tenant without such written consent shall be subject to removal by Landlord at any time without prior notice at the expense of Tenant, and Tenant shall upon Landlord's demand pay a removal fee to Landlord of not less than $500.00.

18.      Tenant shall not place any movable objects, including antennas, outdoor furniture, etc., in the parking areas, landscaped area or other areas outside of said Premises, or on the roof of said Premises.

19.      Tenant shall maintain the Premises as provided in the Lease, and except with the written consent of Landlord, no person or persons other than those approved by Landlord will be permitted to enter the Building for that purpose.  Tenant shall not cause unnecessary labor by reason of Tenant's carelessness and indifference in the preservation of good order and cleanliness.  All cardboard boxes must be "broken down", and all Styrofoam chips must be bagged or otherwise contained so as not to constitute a nuisance.

20.      Tenant shall see that the windows, transoms and doors of the Premises are closed and securely locked before leaving the Building and shall observe strict care not to leave windows open, if applicable, when it rains.  Tenant shall exercise extraordinary care and caution that all water faucets or water apparatus are entirely shut off before Tenant or Tenant's employees leave the Building, and that all electricity, gas or air shall likewise be

EXHIBIT B
-3-

carefully shut off, so as to prevent waste or damage, and for any default or carelessness Tenant shall make good all injuries sustained by other tenants or occupants of the Building or Landlord.

21.    All keys for the Premises shall be provided to Tenant by Landlord and Tenant shall return to Landlord any of such keys so provided upon the termination of the Lease. Tenant shall not change locks or install other locks on doors of the Premises, without the prior written consent of Landlord. In the event of loss of any keys furnished by Landlord for Tenant, Tenant shall pay to Landlord the costs thereof. Upon termination of its tenancy, Tenant shall deliver to Landlord all keys and access cards to the Premises, the Building and Premises.

22.    No person shall enter or remain on or within the Premises while intoxicated or under the influence of liquor or drugs. Landlord shall have the right to exclude or expel from the Premises any person who, in the absolute discretion of Landlord, is under the influence of liquor or drugs or who shall in any manner do any act in violation of the Rules and Regulations of the Premises.

23.    Tenant shall give Landlord prompt notice of any defects in the water, lawn sprinkler, sewage, gas pipes, electrical lights and fixtures, heating apparatus, or any other service equipment or any dangerous or hazardous condition existing on the property.

24.    All electrical equipment used by Tenant shall be U.L. approved. Nothing shall be done or permitted in the Premises, and nothing shall be brought into or kept in the Premises which would impair or interfere with any of the Building services or the proper and economic heating, cooling, cleaning or other servicing of the Building or the Premises.

25.    Tenant shall furnish and utilize masonite or plastic floor mats so as to minimize carpet damage resulting from the use of rollers on chairs.

Tenant agrees to comply with all such Rules and Regulations. Should Tenant not abide by these Rules and Regulations, Landlord or any "Operator," "Association" or "Declarant" under any CC&Rs may serve a three (3) day notice to correct the deficiencies. If Tenant has not corrected the deficiencies by the end of the notice period, Tenant will be in default of the Lease, and, in addition to all other rights and remedies of Landlord, Landlord and/or its designee shall have the right, without further notice, to cure the violation at Tenant's expense.

Landlord reserves the right to amend or supplement the foregoing Rules and Regulations and to adopt and promulgate additional rules and regulations applicable to the Premises, and Tenant shall abide by (and cause Tenant's Agents to abide by) any such amendments, supplements and additional rules and regulations. Notice of such rules and regulations and amendments and supplements thereto, if any, shall be given to the Tenant.

Neither Landlord nor Landlord's Agents or any other person or entity shall be responsible to Tenant or to any other person for the ignorance or violation of these Rules and Regulations. Tenant shall be deemed to have read these Rules and Regulations and to have agreed to abide by them as a condition precedent, waivable only by Landlord, to Tenant's occupancy of the Premises.

Landlord may waive any one or more of these Rules and Regulations for the benefit of any particular tenant or tenants, but no such waiver by Landlord shall be construed as a waiver of such Rules and Regulations in favor of any other tenant or tenants, nor prevent Landlord from thereafter enforcing any such Rules and Regulations against any or all tenants of the Building and/or the Premises.

Rules and Regulations shall also include such rules and regulations promulgated from time to time pursuant to the CC&Rs, as such rules and regulations may be amended or supplemented from time to time.

EXHIBIT B
-5-

**EXHIBIT C**

**LETTER OF CREDIT FORM**

**(Letterhead of a money center bank
acceptable to the Landlord)**

FAX NO. [(___) ___-____]                 [Insert Bank Name And Address]
SWIFT: [Insert No., if any]

DATE OF ISSUE: _____

BENEFICIARY:                             APPLICANT:
[Insert Beneficiary Name And Address]    [Insert Applicant Name And Address]

LETTER OF CREDIT NO. _____

EXPIRATION DATE:                         AMOUNT AVAILABLE:
_____ AT OUR COUNTERS           USD[Insert Dollar Amount]
                                         (U.S. DOLLARS [Insert Dollar Amount])

LADIES AND GENTLEMEN:

WE HEREBY ESTABLISH OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____ IN YOUR FAVOR FOR THE ACCOUNT OF [Insert Tenant's Name], A [Insert Entity Type], UP TO THE AGGREGATE AMOUNT OF USD[Insert Dollar Amount] ([Insert Dollar Amount] U.S. DOLLARS) EFFECTIVE IMMEDIATELY AND EXPIRING ON ___(Expiration Date)___ AVAILABLE BY PAYMENT UPON PRESENTATION OF YOUR DRAFT AT SIGHT DRAWN ON [Insert Bank Name] WHEN ACCOMPANIED BY THE FOLLOWING DOCUMENT(S):

1.      THE ORIGINAL OF THIS IRREVOCABLE STANDBY LETTER OF CREDIT AND AMENDMENT(S), IF ANY.

2.      BENEFICIARY'S SIGNED STATEMENT PURPORTEDLY SIGNED BY AN AUTHORIZED REPRESENTATIVE OF [Insert Landlord's Name], A [Insert Entity Type] ("LANDLORD") STATING ANY ONE OF THE FOLLOWING:

"THE UNDERSIGNED HEREBY CERTIFIES THAT THE LANDLORD, EITHER (A) UNDER THE LEASE (DEFINED BELOW), OR (B) AS A RESULT OF THE TERMINATION OF SUCH LEASE, HAS THE RIGHT TO DRAW THE AMOUNT OF USD _____ IN ACCORDANCE WITH THE TERMS OF THAT CERTAIN OFFICE LEASE DATED [Insert Lease Date], AS AMENDED (COLLECTIVELY, THE "LEASE"), OR SUCH AMOUNT CONSTITUTES DAMAGES OWING BY THE TENANT TO BENEFICIARY RESULTING FROM THE BREACH OF SUCH LEASE BY THE TENANT THEREUNDER, OR THE TERMINATION OF SUCH LEASE, AND SUCH AMOUNT REMAINS UNPAID AT THE TIME OF THIS DRAWING."

OR

"THE UNDERSIGNED HEREBY CERTIFIES THAT WE HAVE RECEIVED A WRITTEN NOTICE OF [Insert Bank Name]'S ELECTION NOT TO EXTEND ITS STANDBY LETTER OF CREDIT NO. _____ AND HAVE NOT RECEIVED A REPLACEMENT LETTER OF CREDIT WITHIN AT LEAST THIRTY (30) DAYS PRIOR TO THE PRESENT EXPIRATION DATE."

OR

"THE UNDERSIGNED HEREBY CERTIFIES THAT BENEFICIARY IS ENTITLED TO DRAW THE FULL AMOUNT OF LETTER OF CREDIT NO. _____ AS THE RESULT OF THE FILING

OF A VOLUNTARY PETITION UNDER THE U.S. BANKRUPTCY CODE OR A STATE BANKRUPTCY CODE BY THE TENANT UNDER THAT CERTAIN OFFICE LEASE DATED [Insert Lease Date], AS AMENDED (COLLECTIVELY, THE "LEASE"), WHICH FILING HAS NOT BEEN DISMISSED AT THE TIME OF THIS DRAWING."

OR

"THE UNDERSIGNED HEREBY CERTIFIES THAT BENEFICIARY IS ENTITLED TO DRAW THE FULL AMOUNT OF LETTER OF CREDIT NO. _____ AS THE RESULT OF AN INVOLUNTARY PETITION HAVING BEEN FILED UNDER THE U.S. BANKRUPTCY CODE OR A STATE BANKRUPTCY CODE AGAINST THE TENANT UNDER THAT CERTAIN OFFICE LEASE DATED [Insert Lease Date], AS AMENDED (COLLECTIVELY, THE "LEASE"), WHICH FILING HAS NOT BEEN DISMISSED AT THE TIME OF THIS DRAWING."

OR

"THE UNDERSIGNED HEREBY CERTIFIES THAT BENEFICIARY IS ENTITLED TO DRAW THE FULL AMOUNT OF LETTER OF CREDIT NO. _____ AS THE RESULT OF THE REJECTION, OR DEEMED REJECTION, OF THAT CERTAIN OFFICE LEASE DATED [Insert Lease Date], AS AMENDED, BY THE TENANT THEREUNDER, UNDER SECTION 365 OF THE U.S. BANKRUPTCY CODE."

OR

"THE UNDERSIGNED HEREBY CERTIFIES THAT BENEFICIARY IS ENTITLED TO DRAW THE FULL AMOUNT OF LETTER OF CREDIT NO. _____ AS THE RESULT OF THE TENANT UNDER THAT CERTAIN OFFICE LEASE DATED [Insert Lease Date], AS AMENDED, BEING PLACED INTO RECEIVERSHIP OR CONSERVATORSHIP OR SIMILAR PROCEEDING UNDER STATE OR FEDERAL LAW."

OR

"THE UNDERSIGNED HEREBY CERTIFIES THAT BENEFICIARY IS ENTITLED TO DRAW THE FULL AMOUNT OF LETTER OF CREDIT NO. _____ AS THE RESULT OF THE TENANT UNDER THAT CERTAIN OFFICE LEASE DATED [Insert Lease Date], AS AMENDED, HAVING EXECUTED AN ASSIGNMENT FOR THE BENEFIT OF CREDITORS."

OR

"THE UNDERSIGNED HEREBY CERTIFIES THAT BENEFICIARY IS ENTITLED TO DRAW THE FULL AMOUNT OF LETTER OF CREDIT NO. _____ BECAUSE THE TENANT UNDER THAT CERTAIN OFFICE LEASE DATE [Insert Lease Date] HAS NOT PROVIDED THE BENEFICIARY WITH A REPLACEMENT LETTER OF CREDIT WITHIN TEN DAYS FOLLOWING THE OCCURRENCE OF EITHER OF THE FOLLOWING: (I) THE BANK'S FITCH RATINGS (OR OTHER COMPARABLE RATINGS IF THE FITCH RATINGS ARE NO LONGER AVAILABLE), HAVE BEEN REDUCED BELOW THE FITCH SHORT TERM RATING OF 'F1' AND LONG TERM RATING OF 'A' (OR SUCH COMPARABLE RATINGS IF THE FITCH RATINGS ARE NO LONGER AVAILABLE) OR (II) A MATERIAL ADVERSE CHANGE IN THE FINANCIAL CONDITION OF THE BANK."

SPECIAL CONDITIONS:

PARTIAL DRAWINGS AND MULTIPLE PRESENTATIONS MAY BE MADE UNDER THIS STANDBY LETTER OF CREDIT, PROVIDED, HOWEVER, THAT EACH SUCH DEMAND THAT IS PAID BY US SHALL REDUCE THE AMOUNT AVAILABLE UNDER THIS STANDBY LETTER OF CREDIT.

ALL INFORMATION REQUIRED WHETHER INDICATED BY BLANKS, BRACKETS OR OTHERWISE, MUST BE COMPLETED AT THE TIME OF DRAWING.  [Please Provide The Required Forms For Review, And Attach As Schedules To The Letter Of Credit.]

831227.10/SF
370251-00009/4-5-12/lgm/lgm

EXHIBIT C
-2-

ALL SIGNATURES MUST BE MANUALLY EXECUTED IN ORIGINALS.

ALL BANKING CHARGES ARE FOR THE APPLICANT'S ACCOUNT.

IT IS A CONDITION OF THIS STANDBY LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY EXTENDED WITHOUT AMENDMENT FOR A PERIOD OF ONE YEAR FROM THE PRESENT OR ANY FUTURE EXPIRATION DATE, UNLESS AT LEAST THIRTY (30) DAYS PRIOR TO THE EXPIRATION DATE WE SEND YOU NOTICE BY NATIONALLY RECOGNIZED OVERNIGHT COURIER SERVICE THAT WE ELECT NOT TO EXTEND THIS LETTER OF CREDIT FOR ANY SUCH ADDITIONAL PERIOD. SAID NOTICE WILL BE SENT TO THE ADDRESS INDICATED ABOVE, UNLESS A CHANGE OF ADDRESS IS OTHERWISE NOTIFIED BY YOU TO US IN WRITING BY RECEIPTED MAIL OR COURIER. ANY NOTICE TO US WILL BE DEEMED EFFECTIVE ONLY UPON ACTUAL RECEIPT BY US AT OUR DESIGNATED OFFICE. IN NO EVENT, AND WITHOUT FURTHER NOTICE FROM OURSELVES, SHALL THE EXPIRATION DATE BE EXTENDED BEYOND A FINAL EXPIRATION DATE OF SIXTY (60) DAYS FROM THE EXPIRATION DATE OF THE LEASE, AS AMENDED.

THIS LETTER OF CREDIT MAY BE TRANSFERRED SUCCESSIVELY IN WHOLE OR IN PART ONLY UP TO THE THEN AVAILABLE AMOUNT IN FAVOR OF A NOMINATED TRANSFEREE ("TRANSFEREE"), ASSUMING SUCH TRANSFER TO SUCH TRANSFEREE IS IN COMPLIANCE WITH ALL APPLICABLE U.S. LAWS AND REGULATIONS. AT THE TIME OF TRANSFER, THE ORIGINAL LETTER OF CREDIT AND ORIGINAL AMENDMENT(S) IF ANY, MUST BE SURRENDERED TO US TOGETHER WITH OUR TRANSFER FORM (AVAILABLE UPON REQUEST) AND PAYMENT OF OUR CUSTOMARY TRANSFER FEES, WHICH FEES SHALL BE PAYABLE BY BENEFICIARY, BUT NOT IN EXCESS OF $200.00, WITH THE BALANCE, IF ANY, TO BE PAID BY APPLICANT (PROVIDED THAT APPLICANT MAY, BUT SHALL NOT BE OBLIGATED TO, PAY SUCH FEES TO US ON BEHALF OF BENEFICIARY, AND SEEK REIMBURSEMENT THEREOF FROM BENEFICIARY, BUT NO SUCH REIMBURSEMENT SHALL EXCEED $200.00). IN CASE OF ANY TRANSFER UNDER THIS LETTER OF CREDIT, THE DRAFT AND ANY REQUIRED STATEMENT MUST BE EXECUTED BY THE TRANSFEREE AND WHERE THE BENEFICIARY'S NAME APPEARS WITHIN THIS STANDBY LETTER OF CREDIT, THE TRANSFEREE'S NAME IS AUTOMATICALLY SUBSTITUTED THEREFOR.

ALL DRAFTS REQUIRED UNDER THIS STANDBY LETTER OF CREDIT MUST BE MARKED: "DRAWN UNDER [Insert Bank Name] STANDBY LETTER OF CREDIT NO. _____."

WE HEREBY AGREE WITH YOU THAT IF DRAFTS ARE PRESENTED TO [Insert Bank Name] UNDER THIS LETTER OF CREDIT AT OR PRIOR TO [Insert Time – (e.g., 11:00 AM)], ON A BUSINESS DAY, AND PROVIDED THAT SUCH DRAFTS PRESENTED CONFORM TO THE TERMS AND CONDITIONS OF THIS LETTER OF CREDIT, PAYMENT SHALL BE INITIATED BY US IN IMMEDIATELY AVAILABLE FUNDS BY OUR CLOSE OF BUSINESS ON THE SUCCEEDING BUSINESS DAY. IF DRAFTS ARE PRESENTED TO [Insert Bank Name] UNDER THIS LETTER OF CREDIT AFTER [Insert Time – (e.g., 11:00 AM)], ON A BUSINESS DAY, AND PROVIDED THAT SUCH DRAFTS CONFORM WITH THE TERMS AND CONDITIONS OF THIS LETTER OF CREDIT, PAYMENT SHALL BE INITIATED BY US IN IMMEDIATELY AVAILABLE FUNDS BY OUR CLOSE OF BUSINESS ON THE SECOND SUCCEEDING BUSINESS DAY. AS USED IN THIS LETTER OF CREDIT, "BUSINESS DAY" SHALL MEAN ANY DAY OTHER THAN A SATURDAY, SUNDAY OR A DAY ON WHICH BANKING INSTITUTIONS IN THE STATE OF CALIFORNIA ARE AUTHORIZED OR REQUIRED BY LAW TO CLOSE. IF THE EXPIRATION DATE FOR THIS LETTER OF CREDIT SHALL EVER FALL ON A DAY WHICH IS NOT A BUSINESS DAY THEN SUCH EXPIRATION DATE SHALL AUTOMATICALLY BE EXTENDED TO THE DATE WHICH IS THE NEXT BUSINESS DAY.

PRESENTATION OF A DRAWING UNDER THIS LETTER OF CREDIT MAY BE MADE ON OR PRIOR TO THE THEN CURRENT EXPIRATION DATE HEREOF BY HAND DELIVERY, COURIER SERVICE, OVERNIGHT MAIL, OR FACSIMILE. PRESENTATION BY FACSIMILE TRANSMISSION SHALL BE BY TRANSMISSION OF THE ABOVE REQUIRED SIGHT DRAFT DRAWN ON US TOGETHER WITH THIS LETTER OF CREDIT TO OUR FACSIMILE NUMBER, [Insert Fax Number – (___) ___-____], ATTENTION: [Insert Appropriate Recipient], WITH TELEPHONIC CONFIRMATION OF OUR RECEIPT OF SUCH FACSIMILE TRANSMISSION AT OUR TELEPHONE NUMBER [Insert Telephone Number – (___) ___-____] OR TO SUCH OTHER FACSIMILE OR TELEPHONE NUMBERS, AS TO WHICH YOU HAVE RECEIVED WRITTEN NOTICE FROM US AS BEING THE APPLICABLE SUCH NUMBER. WE AGREE TO NOTIFY YOU IN WRITING, BY NATIONALLY RECOGNIZED OVERNIGHT COURIER SERVICE, OF ANY CHANGE IN SUCH DIRECTION. ANY FACSIMILE PRESENTATION PURSUANT TO THIS PARAGRAPH SHALL ALSO STATE THEREON THAT THE ORIGINAL OF SUCH SIGHT DRAFT AND LETTER OF CREDIT ARE BEING REMITTED, FOR DELIVERY ON THE NEXT BUSINESS DAY, TO [Insert Bank Name] AT THE APPLICABLE ADDRESS FOR PRESENTMENT PURSUANT TO THE PARAGRAPH FOLLOWING THIS ONE.

WE HEREBY ENGAGE WITH YOU THAT ALL DOCUMENT(S) DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS OF THIS STANDBY LETTER OF CREDIT WILL BE DULY HONORED IF DRAWN AND PRESENTED FOR PAYMENT AT OUR OFFICE LOCATED AT [Insert Bank Name], [Insert Bank Address], ATTN: [Insert Appropriate Recipient], ON OR BEFORE THE EXPIRATION DATE OF THIS CREDIT, ____(Expiration Date)____.

IF THE ORIGINAL OF THIS STANDBY LETTER OF CREDIT IS LOST, STOLEN, MUTILATED, OR OTHERWISE DESTROYED, WE HEREBY AGREE TO ISSUE A DUPLICATE ORIGINAL HEREOF UPON RECEIPT OF A WRITTEN REQUEST FROM YOU AND A CERTIFICATION BY YOU (PURPORTEDLY SIGNED BY YOUR AUTHORIZED REPRESENTATIVE) OF THE LOSS, THEFT, MUTILATION, OR OTHER DESTRUCTION OF THE ORIGINAL HEREOF.

EXCEPT SO FAR AS OTHERWISE EXPRESSLY STATED HEREIN, THIS STANDBY LETTER OF CREDIT IS SUBJECT TO THE "UNIFORM CUSTOMS AND PRACTICES FOR DOCUMENTARY CREDITS, 2007 REVISION, INTERNATIONAL CHAMBER OF COMMERCE (PUBLICATION NO. 600) ("UNIFORM CUSTOMS"). AS TO MATTERS NOT GOVERNED BY THE UNIFORM CUSTOMS, THIS STANDBY LETTER OF CREDIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WIT THE LAWS OF THE STATE OF CALIFORNIA.

Very truly yours,

(Name of Issuing Bank)

By: _____

## EXHIBIT D

### APPROVED TENANT IMPROVEMENT COSTS AS OF MARCH 30, 2012

| Vendor | Invoice | Invoice Date | Description | |
|---|---|---|---|---|
| George Masker Inc. | 22620 | 1/19/2012 | Paint for Alameda | 33,563.50 |
| | | | Subtotal | 33,563.50 |
| | | | | |
| DX Baxley | 16077 | 1/16/2012 | Carpet for Alameda | 52,531.25 |
| | | | Subtotal | 52,531.25 |
| | | | | |
| Dawson Electric | 72111 | 1/31/2012 | Electric for Alameda | 1,829.06 |
| Dawson Electric | 72095 | 1/31/2013 | Work required to reconfigure Alameda | 4,980.82 |
| | | | Subtotal | 6,809.88 |
| | | | | |
| Service West | 162305-N001 | 1/29/2012 | Work required to consolidate from Concord to Alameda | 4,000.00 |
| Service West | 160126 | 11/10/2011 | Work required to reconfigure to Alameda | 15,355.00 |
| | | | Subtotal | 19,355.00 |
| | | | | |
| Relocation Connections | 327847 | 11/16/2011 | Portion of invoice total Space planning and project mgmt to reconfigure Alameda | 2,409.22 |
| Relocation Connections | 327879 | 12/1/2011 | Project mgmt Alameda | 745.00 |
| Relocation Connections | 327885 | 12/16/2011 | Portion of invoice total Project mgmt for carpet/paint Alameda | 2,463.75 |
| Relocation Connections | 327915 | 1/1/2012 | Portion of invoice total Project mgmt for carpet/paint Alameda | 3,024.25 |
| Relocation Connections | 327935 | 1/16/2012 | Portion of invoice total Project mgmt for carpet/paint Alameda | 1,698.50 |
| Relocation Connections | 327969 | 2/1/2012 | Portion of invoice total Project mgmt for carpet/paint Alameda | 1,118.25 |
| Relocation Connections | 327991 | 2/16/2012 | Portion of invoice total Project mgmt for carpet/paint Alameda | 71.25 |
| | | | Subtotal | 11,616.22 |
| | | | | |
| Relocation Connections | 327847 | 11/16/2011 | Portion of invoice total, Space planning and project mgmt to reconfigure Alameda. Applicable to Test Fit Allowance* | 4,000.00 |
| | | | Subtotal | 4,000.00 |
| | | | | |
| | | | Subtotal Applicable to Tenant Improvement Allowance | $123,877.85 |
| | | | Subtotal Applicable to Test Fit Allowance | $ 4,000.00 |
| | | | Total | $127,877.85 |

# EXHIBIT 2

0.0/
- /0-0-00/ /cdl

# FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "**Amendment**") is made and entered into as of October 31st, 2013, by and between PTF for Operating Engineers, LLC, a Delaware limited liability company ("**Landlord**"), and Associated Third Party Administrators, a California corporation ("**Tenant**").

## R E C I T A L S :

A.    Landlord and Tenant have heretofore entered into a Standard Form Office Lease (Base Year) dated as of March 21, 2012 (the "**Lease**").

B.    Under the Lease, Tenant is leasing approximately 49,067 rentable square feet in the building located at 1640 South Loop Road, Alameda, California (as more particularly described in the Lease, the "**Premises**").

C.    The Lease provides for a Fifteen Dollar ($15.00) tenant improvement allowance which was split into a Four Dollar Allowance, available to the Tenant during the first twelve months following the date of the Lease, and an Eleven Dollar Allowance, available if there is a Qualified Guarantor Recapitalization, for a period of twelve (12) months following the Qualified Guarantor Recapitalization.

D.    Landlord and Tenant now desire to amend the Lease to change the Eleven Dollar Allowance into an Eight Dollar Allowance and a Three Dollar Allowance and to make certain other changes set forth below.

## A G R E E M E N T :

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.    **Defined Terms**.  All terms defined in the Lease when used herein shall have the meanings ascribed to such terms in the Lease unless expressly superseded by the terms of this Amendment.

2.    **Improvement Allowance**.    The Eleven Dollar Allowance, as defined in Section 22.1(f) of the Lease, is hereby modified to be split into an allowance of (i) Three Dollars ($3.00) per agreed rentable square foot of the Premises (the "**Three Dollar Allowance**"), and (ii) Eight Dollars ($8.00) per agreed rentable square foot of the Premises (the "**Eight Dollar Allowance**").

(a)    The Three Dollar Allowance shall be available to Tenant following the mutual execution of this Amendment and shall be disbursed to Tenant in the same manner that the Four Dollar Allowance, as defined in Section 22.1(f) of the Lease, was disbursed to Tenant. Landlord shall retain any part of the Three Dollar Allowance not paid to Tenant during the period following the date of this Amendment and ending six (6) months thereafter.

(b)    The Eight Dollar Allowance shall be available to Tenant if Guarantor has a Qualified Guarantor Recapitalization on or before December 31, 2013. If the Guarantor Recapitalization does not become a Qualified Guarantor Recapitalization on or before December 31, 2013, then the Eight Dollar Allowance shall not be available at all and the Monthly Rent for the balance of the initial Term of the Lease shall be reduced as shown in the "Alternate Monthly Rent Table if no Qualified Guarantor Recapitalization" which is included in Section 9 of the Basic Lease Provisions of the Lease, as modified by this Amendment. Landlord shall retain any portion of the Eight Dollar Allowance not paid to Tenant during the period starting on the date the Guarantor Recapitalization becomes a Qualified Guarantor Recapitalization and ending twelve (12) months thereafter. Notwithstanding the preceding sentence, if Tenant qualifies for the Eight Dollar Allowance and if amounts thereunder have not been paid to Tenant during the twelve (12) month period when the Eight Dollar Allowance may be paid to Tenant, then the unpaid portion of the Eight Dollar Allowance, but not in excess of Five Dollars ($5.00) per agreed rentable square foot in the Building, shall be applied to reduce the Rent payable in each full calendar month remaining in the Term of the Lease from and including the first full calendar month of the Term following the twelve (12) month period and the last of which shall be the final full calendar month of the Term (with the reduction in each month to be equal to the amount of the reduction in each other month).

3.    <u>Guarantor Recapitalization</u>. The second sentence of Section 21.20 sets forth several requirements which, if completed, comprise a "Guarantor Recapitalization." The second of these requirements is set forth in clause (ii) of such second sentence which clause is hereby modified to read as follows: "(ii) each of Guarantor's loans shall have a maturity date that may not be accelerated by the lender for any reason other than default by the Guarantor;". The parties agree that the requirements of a Guarantor Recapitalization have not yet occurred due to the fact not all of the requirements of a Guarantor Recapitalization have occurred including, without limitation, that the Guarantor's debt, excluding trade payables, has not been reduced to less than Seven Million Dollars ($7,000,000).

4.    <u>Alternate Monthly Rent Table if no Qualified Guarantor Recapitalization</u>. The table in Section 9 of the Lease, which is headed with the caption "**Alternate Monthly Rent Table if no Qualified Guarantor Recapitalization**," is hereby amended, in its entirety, to read as follows:

<u>Alternate Monthly Rent Table if no Qualified Guarantor Recapitalization</u>

Notwithstanding the above table, from and after February 1, 2014, the Monthly Rent shall be the following if there is no Qualified Guarantor Recapitalization by December 31, 2013:

| Period of the Term | Monthly Rent for Each Month During the Period |
|---|---|
| Feb. 1, 2014 – Nov. 30, 2014 | $93,723.09 |
| Dec. 1, 2014 - Nov. 30, 2015 | $96,694.78 |
| Dec. 1, 2015 - Nov. 30, 2016 | $99,755.63 |
| Dec. 1, 2016 - Nov. 30, 2017 | $102,908.30 |

5.    **Ratification and Confirmation**.    Except as set forth in this Amendment, all of the terms and provisions of the Lease are hereby ratified and confirmed and shall remain unmodified and in full force and effect and each of Tenant's representations in the Lease are hereby remade and shall be true and correct as of the date when originally made and as of the date of this Amendment.    Each party represents to the other party that the party making the representation does not know of any breach or default by the other party under the Lease nor is the party making the representation aware of any event or circumstance which would be a breach, default or Event of Default under the Lease, by the other party, with the giving of notice or the passage of time or both.    In the event of any conflict between the terms and conditions of the Lease and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall prevail.

6.    **Counterparts**.    This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which counterparts, when taken together, shall be deemed to constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

LANDLORD:                                      TENANT:

PTF FOR OPERATING ENGINEERS, LLC,             ASSOCIATED THIRD PARTY
a Delaware limited liability company           ADMINISTRATORS,
                                               a California corporation

By: MCMORGAN & COMPANY LLC,                    By: _Ken Berry_____
    a Delaware limited liability company           Name: KEN BERRY
Its: Manager                                       Title: PRESIDENT

By_____                By: _____
    Name: Malcolm Talcott                          Name:_____
    Title:  Vice President                         Title:_____

    MARK R TAYLOR
    PARTNER

# EXHIBIT 3

0.0/
 - /0-0-00/ /cdl

| | |
|---|---|
| **From:** | Aaron E. de Leest <adeleest@dgdk.com> |
| **Sent:** | Thursday, February 2, 2017 4:57 PM |
| **To:** | Kathleen.Andrade@colliers.com |
| **Cc:** | Gold, Ivan; Richard K. Diamond |
| **Subject:** | ATPA |

Kathleen

It was a pleasure meeting you today. Just as an FYI, the trustee's accountants will be at the Alameda property tomorrow as well.

Sent from my iPhone

Danning, Gill, Diamond & Kollitz, LLP
1900 Avenue of the Stars, 11th Floor
Los Angeles CA 90067
(310) 277-0077 | (310) 277-5735 fax
adeleest@dgdk.com | www.dgdk.com

CONFIDENTIALITY
This e-mail message and any attachments thereto is
intended only for use by the addressee(s) named herein and may contain legally
privileged and/or confidential information. If you are not the intended
recipient of this e-mail message, you are hereby notified that any
dissemination, distribution or copying of this e-mail message, and any
attachments thereto is strictly prohibited. If you have received this e-mail
message in error, please immediately notify me by telephone and permanently
delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform
Electronic Transactions Act or the applicability of any other law of similar
substance and effect, absent an express statement to the contrary hereinabove,
this e-mail message, its contents, and any attachments hereto are not intended
to represent an offer or acceptance to enter into a contract and are not
otherwise intended to bind the sender, Danning, Gill, Diamond & Kollitz,
LLP, any of its clients, or any other person or entity.

IRS Circular 230 Disclosure:
In order to comply with requirements imposed
by the Internal Revenue Service, we inform you that any U.S. tax advice
contained in this communication (including any attachments) is not intended to
be used, and cannot be used, for the purpose of (i) avoiding penalties under the
Internal Revenue Code or (ii) promoting, marketing, or recommending to another
party any transaction or matter addressed herein.

# EXHIBIT 4

0.0/
 - /0-0-00/ /cdl

| | |
|---|---|
| **From:** | Aaron E. de Leest <adeleest@dgdk.com> |
| **Sent:** | Friday, February 3, 2017 11:32 AM |
| **To:** | Andrade, Kathleen (REMS-WNC) |
| **Cc:** | Gold, Ivan; Richard K. Diamond |
| **Subject:** | Re: ATPA |

Kathleen

I don't have a problem with you going by today to take pictures. You can reach the trustee's Representatives who should still be on site today at the numbers below

   David   - <u>281-217-1310</u>
Dorian  - <u>650-201-2760</u>

Sent from my iPhone

On Feb 2, 2017, at 5:13 PM, Andrade, Kathleen (REMS-WNC) <<u>Kathleen.Andrade@colliers.com</u>> wrote:

> Aaron,
>
> Do you mind if I return to the property tomorrow, while the accountants are on-site, and take a few pictures of the interior condition of the building? Please advise if this is possible and, if so, what time.
>
> Thanks!
>
> Kathleen Andrade
> Property Manager
> (925) 279-4600
> <u>Kathleen.Andrade@colliers.com</u>

**Aaron E. de Leest**
**Danning, Gill, Diamond & Kollitz, LLP**
1900 Avenue of the Stars, 11th Floor
Los Angeles CA 90067-4402
(310) 277-0077 | (310) 277-5735 fax
<u>adeleest@dgdk.com</u> | <u>www.dgdk.com</u>



DANNING, GILL, DIAMOND & KOLLITZ, LLP

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Danning, Gill, Diamond & Kollitz, LLP, any of its clients, or any other person or entity.

-----Original Message-----
From: Aaron E. de Leest [mailto:adeleest@dgdk.com]
Sent: Thursday, February 02, 2017 4:57 PM
To: Andrade, Kathleen (REMS-WNC) <Kathleen.Andrade@colliers.com>
Cc: Gold Ivan <igold@allenmatkins.com>; Richard K. Diamond <RDiamond@dgdk.com>
Subject: ATPA

Kathleen

It was a pleasure meeting you today.  Just as an FYI, the trustee's accountants will be at the Alameda property tomorrow as well.

Sent from my iPhone


Danning, Gill, Diamond & Kollitz, LLP
1900 Avenue of the Stars, 11th Floor
Los Angeles CA 90067
(310) 277-0077 | (310) 277-5735 fax
adeleest@dgdk.com | www.dgdk.com


CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Danning, Gill, Diamond & Kollitz, LLP, any of its clients, or any other person or entity.

IRS Circular 230 Disclosure:
In order to comply with requirements imposed by the Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any

transaction or matter addressed herein.

# EXHIBIT 5

0.0/
  - /0-0-00/ /cdl

w/
Key

ALARM CODE — 9, 1, 2, 3, 4, 5   ENTER

ACCESSING PROGRAM FOR KEYLESS ENTRY

ATPA    PASSWORD — TERMINAL

CLICK ON BOSCH READYKEY X

LOGIN NAME — INSTALLER

PASSWORD — INSTALLER

E-MAIL ADDRESS:
SPANTA@DGDK.COM



# D|G|D|K

### DANNING, GILL, DIAMOND & KOLLITZ, LLP

1900 AVENUE OF THE STARS
11TH FLOOR
LOS ANGELES, CALIFORNIA 90067-4402

(310) 277-0077 – TEL
(310) 277-5735 – FAX

February 27, 2017

TO:     Kathleen Andrade
        Property Manager
        Colliers International
        1850 Mount Diablo Boulevard, Suite 200
        Walnut Creek, CA 94596

*w/ key fob*

FROM:   Shelly Panta
        Paralegal

RE:     ATPA Alameda Location

---

Enclosed please find:  FOB for Alameda location

☐   For your information
☐   Please sign
☐   Please read
☐   Please comment
☐   Please return to me
☐   Please file and return a conformed copy
☐   Please telephone me
☐   Please acknowledge receipt
☐   For your files
☐   Please handle
☐   Please read and advise me how to reply
☐   In accordance with your request

SP:sp

# EXHIBIT 6

| | |
|---|---|
| **From:** | Andrade, Kathleen (REMS-WNC) <Kathleen.Andrade@colliers.com> |
| **Sent:** | Friday, March 10, 2017 9:08 AM |
| **To:** | Nicholas R. Troszak |
| **Cc:** | Tom Jeremiassen; Rowen Dizon; Aaron E. de Leest; Gold, Ivan |
| **Subject:** | RE: APTA - Associated Third Party Administrators - Office Visit |

Nicholas,

Thank you for the clarification on the time. With regards to the alarm system, I am unable to provide you with a direct answer as to it being active/non-active as this account was the responsibility of ATPA. I can state that when I entered the alarm code provided by the Trustee last Friday the alarm pad did not do anything...nor did any alarms sound.

Regards,
   Kathleen

**Kathleen Andrade**
Property Manager
CA License No. 02016903
**Direct +1 925 279 4600**
Main +1 925 279 0120 | Fax +1 925 279 1225
kathleen.andrade@colliers.com | Add as Contact

Property Assistant, Johanne Vailleau
+1 925 279 5598, johanne.vailleau@colliers.com
*For properties: 2610 Crow Canyon Road, San Ramon; Kiewit Infrastructure, Fairfield*

Property Assistant, Nicole Sise
+1 209 475 5133, nicole.sise@colliers.com
*For properties: Lathrop Business Park, Lathrop; Patterson Pass 8 and Patterson Pass 10, Tracy*

**Colliers International**
1850 Mount Diablo Boulevard, Suite 200 | Walnut Creek, CA 94596 | United States
**www.colliers.com**





WE'RE NUMBER ONE ® — Colliers named #1 in Commercial Property Executive's 2016 Top Property Managers rankings!

**From:** Nicholas R. Troszak [mailto:NTroszak@thinkbrg.com]
**Sent:** Thursday, March 09, 2017 6:00 PM
**To:** Andrade, Kathleen (REMS-WNC) <Kathleen.Andrade@colliers.com>
**Cc:** Tom Jeremiassen <TJeremiassen@thinkbrg.com>; Rowen Dizon <RDizon@thinkbrg.com>; Aaron E. de Leest <adeleest@dgdk.com>; Ivan Gold <igold@allenmatkins.com>
**Subject:** RE: APTA - Associated Third Party Administrators - Office Visit

1

Kathleen,

Rowen will have a key to the building and will be there prior to 10 AM working and more than likely be at the office after 2 PM. Once Rowen reviews the unlocked offices, he will need access to the offices that only open with the key fob. My understanding is that you possess the key fob for these locked offices. Rowen will need to access these offices to review their contents and possibly package up accounting records/documents.

Also, our understanding is that the office has an alarm system, but it currently is not active. Can you please confirm the alarm is not active? If it is active, can you please provide the security access code? Rowen can then disarm/arm the alarm upon arrival and departure.

Please let us know your thoughts on the above. I have not been to the office, so all the assistance you can provide would be great.

Thanks again


**Nicholas R. Troszak** | Associate Director

**Berkeley Research Group, LLC**
2049 Century Park East, Suite 2525 | Los Angeles, CA 90067
D 310.499.4741 | O 510.285.3300 | M 517.290.6000 | F 424.371.2031
NTroszak@thinkbrg.com | thinkbrg.com


**From:** Andrade, Kathleen (REMS-WNC) [mailto:Kathleen.Andrade@colliers.com]
**Sent:** Thursday, March 9, 2017 4:16 PM
**To:** Nicholas R. Troszak <NTroszak@thinkbrg.com>
**Cc:** Tom Jeremiassen <TJeremiassen@thinkbrg.com>; Rowen Dizon <RDizon@thinkbrg.com>; Aaron E. de Leest <adeleest@dgdk.com>; Ivan Gold <igold@allenmatkins.com>
**Subject:** RE: APTA - Associated Third Party Administrators - Office Visit


Nicholas,

As I mentioned, I will be on-site March 16th from 10a-2p to accommodate an alternate vendor access. Do you anticipate Rowen needing access to the building beyond 2pm? Reason I ask, is because you had mentioned that Rowen has a key to building and I wanted to know if he would be using it to access the building after 2pm.

Thank you.

**Kathleen Andrade**
Property Manager

CA License No. 02016903
**Direct +1 925 279 4600**
Main +1 925 279 0120 | Fax +1 925 279 1225
kathleen.andrade@colliers.com | Add as Contact

Property Assistant, Johanne Vailleau
+1 925 279 5598, johanne.vailleau@colliers.com

2

*For properties: 2610 Crow Canyon Road, San Ramon; Kiewit Infrastructure, Fairfield*

Property Assistant, Nicole Sise
+1 209 475 5133, nicole.sise@colliers.com
*For properties: Lathrop Business Park, Lathrop; Patterson Pass 8 and Patterson Pass 10, Tracy*

**Colliers International**
1850 Mount Diablo Boulevard, Suite 200 | Walnut Creek, CA 94596 | United States
www.colliers.com





WE'RE NUMBER ONE ®    Colliers named #1 in Commercial Property Executive's 2016 Top Property Managers rankings!

**From:** Nicholas R. Troszak [mailto:NTroszak@thinkbrg.com]
**Sent:** Thursday, March 09, 2017 3:57 PM
**To:** Andrade, Kathleen (REMS-WNC) <Kathleen.Andrade@colliers.com>
**Cc:** Tom Jeremiassen <TJeremiassen@thinkbrg.com>; Rowen Dizon <RDizon@thinkbrg.com>; Aaron E. de Leest <adeleest@dgdk.com>
**Subject:** APTA - Associated Third Party Administrators - Office Visit

Hello Kathleen,

It was a pleasure speaking with you today.

Rowen Dizon from Berkeley Research Group, LLC ("BRG") will be visiting the APTA Alameda office located at 1640 South Loop Road, Alameda, CA. on March 16, 2017. Rowen will be arriving at the office early morning on March 16, 2017 and will more than likely be at the offices until late afternoon. Rowen will be locating, reviewing and packing up accounting records (For example account receivable and account payable records, bank statements, canceled checks, etc.) for shipment to Los Angeles. If you could please meet Rowen at the office prior to noon to open the locked doors, that would be great.

Rowen's cell phone number is 626-463-8755 and he is also cc'd on this email.

Thanks again and please let us know if you have any questions.

**Nicholas R. Troszak** | Associate Director

**Berkeley Research Group, LLC**

2049 Century Park East, Suite 2525 | Los Angeles, CA 90067

D 310.499.4741 | O 510.285.3300 | M 517.290.6000 | F 424.371.2031

NTroszak@thinkbrg.com | thinkbrg.com



BERKELEY RESEARCH GROUP, LLC (TOGETHER WITH ITS AFFILIATES, "BRG") - NOTICE
THIS EMAIL TRANSMISSION AND ANY ATTACHMENTS HERETO CONTAIN INFORMATION FROM BRG WHICH MAY BE CONFIDENTIAL AND PRIVILEGED. THE
INFORMATION IS INTENDED FOR THE SOLE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED. IF YOU ARE NOT THE INTENDED RECIPIENT, YOUR USE,
DISSEMINATION, FORWARDING, PRINTING OR COPYING OF THIS INFORMATION IS PROHIBITED.

TAX ADVICE DISCLOSURE
ANY TAX ADVICE CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR
THE PURPOSE OF (I) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE OR (II) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY
TRANSACTION OR MATTER ADDRESSED HEREIN.

BRG IS (I) NOT A LAW FIRM AND DOES NOT PROVIDE LEGAL ADVICE AND (II) NOT A CPA FIRM AND DOES NOT PROVIDE AUDIT, ATTEST OR PUBLIC ACCOUNTING
SERVICES.